UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANA GIBSON,

                              Plaintiff,
                                                        9:13-CV-00503
v.
                                                        (GLS/TWD)

C. ROSATI; D. MAGUIRE; P. McNALLY; R. LOWRY;
P. LAROSE; S. DELONG; S. SHATTUCK;
J. JOHNSTON; JOHN KITCHNER; THERESA A.
KNAPP-DAVID; J. SCROGGY; WILLIE J. TABB,
JR.; VERNON FONDA; DELUCCIA; BIRRELL; C.
BURNELLE; VANESSA BROWN; ALBERT PRACK;
DONALD UHLER,
                              Defendants.
_____

APPEARANCES:                                            OF COUNSEL:

DANA GIBSON
05-A-3824
Plaintiff *pro se*
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902


HON. ERIC T. SCHNEIDERMAN                    JOSHUA E. McMAHON, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge


## REPORT-RECOMMENDATION AND ORDER

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Senior

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff

Dana Gibson alleges that she was subject to mistreatment by nineteen employees of the New

York State Department of Corrections and Community Supervision ("DOCCS") between 2011

and 2013. (*See generally* Dkt. No. 119.) Currently pending before the Court is Defendants'

motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, dismissing

all claims against Defendant Vanessa Brown ("Brown"). (Dkt. No. 139.) Plaintiff has opposed

the motion. (Dkt. Nos. 144 and 145.) For the reasons discussed below, the Court recommends

that Defendants' motion be granted and that Defendant Brown be dismissed from this action.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Plaintiff asserts numerous claims arising out of her confinement at Great Meadow

Correctional Facility ("Great Meadow"). (*See generally* Dkt. No. 119.) Plaintiff alleges that

despite notifying DOCCS that she was receiving threats of harm in retaliation for prior

successful civil actions against several Defendants, Plaintiff was transferred to Great Meadow in

October, 2011. *Id*. at ¶ 15. She further claims that her transfer to Great Meadow placed her at

risk of serious harm and that Defendants failed to take appropriate action to protect her from this

known risk. *Id*. at ¶¶ 14-17. Plaintiff alleges that on two separate occasions in February, 2013,

she was subjected to excessive force by several Defendants. *Id*. at ¶¶ 9-13. Plaintiff also claims

that she was denied due process at the disciplinary hearings conducted by Defendant Birrell in

March, 2013. *Id*. at ¶ 23. Plaintiff alleges that Defendant Brown, a social worker employed by

New York State Office of Mental Health ("OMH"), disclosed confidential facts regarding her

mental health in violation of her right to privacy. *Id*. at ¶¶ 21-22. Finally, Plaintiff claims that in

April, 2013, two restraint orders were issued against her in violation of her rights. *Id*. at ¶¶ 18-

20.

Plaintiff filed her original Complaint on May 2, 2013. (Dkt. No. 1.) The Complaint was subsequently amended. (Dkt. Nos. 6 and 7.) In the Second Amended Complaint, Plaintiff named eighteen employees of DOCCS as Defendants. (Dkt. No. 7 at ¶¶ 8-9.) Plaintiff also named an unidentified Jane Doe as a Defendant, alleging that she disclosed confidential information regarding Plaintiff's mental health status in violation of her privacy rights under the First and Fourteenth Amendments. *Id.* at ¶¶ 31-32.

On November 11, 2013, Defendants filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to exhaust administrative remedies, and to sever all unrelated claims pursuant to Federal Rule of Civil Procedure 21. (Dkt. No. 47.) Plaintiff opposed the motion. (Dkt. No. 52.) This Court denied Defendants' motion to dismiss for failure to state a claim, denied Defendants' motion to sever, and directed Defendants to answer the Second Amended Complaint. (Dkt. Nos. 70, 74.)

On September 2, 2014, Defendants answered the Second Amended Complaint. (Dkt. No. 77.) Discovery ensued and Vanessa Brown was identified as the social worker from OMH who testified at Plaintiff's March 22, 2013, disciplinary hearings.

Thereafter, Plaintiff filed a motion for leave to file a third amended complaint substituting Vanessa Brown for Defendant Jane Doe. (Dkt. No. 108.) By Decision and Order dated August 4, 2015, this Court granted Plaintiff's motion. (Dkt. No. 118.) Plaintiff filed the Third Amended Complaint, which is the operative complaint in this action, on August 10, 2015. (Dkt. No. 119.) Plaintiff's Third Amended Complaint organizes the above events into six causes of action:

(1)     Eighth Amendment violation based on the events of February 10, 2013;
(2)     Eighth Amendment violation based on the events of February 20, 2013;
(3)     Eighth Amendment violation based on the events in 2011;

<ol start="4">
<li>Eighth Amendment and Due Process violations based on the 2013 restraint orders;</li>
<li>First Amendment and Due Process violations based on the medical disclosures; and</li>
<li>Due Process violations based on the events at the two disciplinary hearings.</li>
</ol>

*Id*. On October 8, 2016, Defendant Brown filed her answer. (Dkt. No. 127.)

Defendants have now moved for partial summary judgment dismissing all claims against Defendant Brown. (Dkt. No. 139.[1]) Plaintiff has opposed Defendants' motion and also filed a supplemental response in opposition. (Dkt. Nos. 144 and 145.) Defendants filed a reply and supplemental exhibits in support of their motion. (Dkt. Nos. 146 and 148.)

---

[1] Defendants' motion for partial summary judgment contains several Exhibits. (*See* Dkt. Nos. 139-2, 146-1, and 148-1.) Of those, Exhibits 2 and 5 have been marked by Defendants for *in camera* submission to the Court and were not uploaded on the docket through the Court's CM/ECF. (Dkt. No. 139-2 at ¶¶ 2, 5.) Exhibit 2 is the transcript of the confidential portion of Defendant Brown's testimony at Plaintiff's March 22, 2013, disciplinary hearings. (Dkt. No. 139-3 at ¶ 15.) Exhibit 5 contains two "confidential Private Settlement Agreements" in *Anderson v. Goord* (87-CV-141), duly executed on or about October 7, 2003, and *Disability Advocates v. OMH* (02-c-v-4002), dated on or about April 27, 2007. (Dkt. No. 139-2 at ¶ 4.)

Defendants ask this Court to review and consider Defendant Brown's confidential testimony and the two confidential settlement agreements, but also ask that this information be kept from Plaintiff's purview. (Dkt. No. 140 at 7, 9; Dkt. No. 139-1 at ¶¶ 6, 8, 11, 17, 19, 20, 21, 23, 24.) The Court notes that no formal request for this unconventional filing has been submitted, and instead, in the February 16, 2016, cover letter accompanying the *in camera* submissions, Defendants request that the Exhibits be placed under Seal because they "contain highly-confidential information." The Court declines to consider evidence submitted by one party *in camera* in ruling on a summary judgment motion. *See Hansberry v. Father Flanagan's Boys' Home*, No. CV-03-3006(CPS), 2004 WL 3152393, at *4 n.9 (E.D.N.Y. Nov. 28, 2004).

However, Defendants' February 16, 2016, letter also indicates that Plaintiff "may have previously received in error a copy of his OMH testimony." Indeed, Plaintiff submitted copies of Defendant Brown's testimony in opposition to Defendants' motion. (Dkt. No. 144-2.) Because Plaintiff submitted a copy of Defendant Brown's confidential testimony in opposition to Defendants' motion, the Court will consider the testimony.

Plaintiff also states that she "had the opportunity to view the agreement" in *Anderson v. Goord*. (Dkt. No. 145.) Plaintiff's supplemental opposition does not indicate whether or not she also viewed the agreement in *Disability Advocates v. OMH*. *See id*. In any event, the Court did not consider Exhibit 5. *See Hansberry*, 2004 WL 3152393, at *4 n.9.

## II.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted).  The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."

426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999[2]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.    ANALYSIS

### A.    Section 1983

To state a claim under § 1983, a plaintiff must allege that the challenged conduct (1) was "committed by a person acting under color of state law," and (2) "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States."

---

[2] The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

*Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) *cert. denied*, 562 U.S. 948 131 (2010) (quoting

*Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir.1994)). Section 1983 "is not itself a source of

substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts

of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443

U.S. 137, 145, n.3 (1979). "The purpose of § 1983 is to deter state actors from using the badge

of their authority to deprive individuals of their federally guaranteed rights and to provide relief

to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

      **B.     Constitutional Right to Privacy**

      The United States Constitution recognizes a right to privacy which protects "the

individual interest in avoiding disclosure of personal matters." *Matson v. Bd. of Educ. of City*

*Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (citing *Doe v. City of New York*, 15 F.3d

264, 267 (2d Cir. 1994) (quoting *Whalen v. Roe*, 429 U.S. 589, 599 (1977))). Specifically, the

Due Process Clause of the Fourteenth Amendment protects a "right to privacy [that] can be

characterized as a right to 'confidentiality,'" which "includes the right to protection regarding

information about the state of one's health." *Doe*, 15 F.3d at 267. "This constitutional right to

privacy extends in a *limited* way to prisoners as well." *Matson*, 631 F.3d at 64 (emphasis added)

(citing *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) ("[I]nmates retain those

constitutional rights that are not inconsistent with their status as prisoners or with the legitimate

penological objectives of the corrections system.") (internal quotation marks and alterations

omitted)); *Byng v. Campbell*, No. 9:07-cv-471 (GLS/DRH), 2010 WL 681374, at *16 (Feb. 24,

2010) (noting a plaintiff's privacy right in his medical records is neither fundamental nor

absolute).

In the prison context, "[t]his narrow constitutional right applies in the case of an unusual medical condition which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when the word of the condition is likely to spread through 'humor or gossip[.]'" *Williams v. Perlman*, No. 9:06-CV-00936 (GLS/DEP), 2009 WL 1652193, at *11 (N.D.N.Y. Feb. 5, 2009) (quoting *Powell*, 175 F.3d at 112); *see also Khalfani v. Secretary, Dep't of Veterans Affairs*, No. 94–CV–5270 (JG), 1999 WL 138247, at *6 (E.D.N.Y. Mar. 10, 1999) (distinguishing between "deeply personal" medical records, which are protected by the right to privacy, and "mundane" medical information, which is not). Whether an inmate is entitled to constitutional protection against the disclosure of a particular medical condition is determined on a case-by-case basis. *Matson*, 631 F.3d at 66.

In this circuit, courts have accorded constitutional privacy protection "only to a handful of medical conditions," including human immunodeficiency virus ("HIV"), transsexualism, and sickle cell anemia. *Cummings v. Clinton County Legislature*, No. 9:14-CV-281 (DNH/ATB), 2014 WL 4265844, at *3 (N.D.N.Y. Aug. 27, 2014) (collecting cases). Courts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis, sleep apnea, Hepatitis A, participation in mandated alcohol and drug rehabilitation, and exhibitionism. *Id.* at *3 (collecting cases); *see also Barrow v. Buren*, No. 9:12-cv-01268 (MAD/CFH), 2015 WL 417084, at *19-20 (N.D.N.Y. Jan. 30, 2015) (exhibitionism). Significantly, at least one court has refused to recognize a right to privacy based upon the purported disclosure of an inmate's psychiatric condition and treatment by a counselor to other corrections workers and inmates. *See Williams*, 2009 WL 1652193 (dismissing plaintiff's Fourteenth Amendment right to privacy claim where the inmate failed to alleged the "existence

of any condition of such magnitude or nature as to place it on par with HIV positive status or transsexualism which was disclosed indiscriminately to non-medical personnel").

In this case, Plaintiff alleges a violation of her right to privacy when Defendant Brown "disclosed facts of Plaintiff's psychiatric health, state, status, disorder, care, and treatment denoted in Plaintiff's confidential OMH Psychiatric Clinical Records" to Defendant Birrell, without Plaintiff's consent, during the March 22, 2013, disciplinary hearings. (Dkt. No. 119 at 6.) Defendant Brown declares that her testimony included (1) a brief overview of Plaintiff's mental health history as reported to OMH staff by Plaintiff, (2) Plaintiff's most recent mental health status and diagnosis, (3) any recent crisis intervention, (4) compliance with psychiatric medications, and (5) prior disciplinary housing. (Dkt. No. 139-3 at ¶ 16.) Defendant Brown also provided a clinical opinion concerning whether Plaintiff was "fit" to proceed with the hearing. *Id.* at ¶ 17.

Here, Plaintiff fails to allege, nor does the record support, that Defendant Brown disclosed sensitive medical information expected to invoke discrimination, intolerance, or violence. (*See* Dkt. Nos. 119 and 144-2; *see, e.g.*, *Ruple v. Bausch*, No. 09-CV-1108 (NAM/DRH), 2010 WL 3171783, at *5 (N.D.N.Y. July 21, 2010) (disclosure of inmate's depression was not the type of medical information expected to "invoke discrimination, intolerance, or violence")).

However, the Court need not decide whether Plaintiff possessed a constitutional right to privacy in her "confidential" mental health records maintained by OMH. Even if Plaintiff did have a right to privacy over the disclosure of her mental health information, prison officials "can impinge on that right . . . to the extent that their actions are 'reasonably related to legitimate penological interests.'" *Powell*, 175 F.3d at 112 (citation omitted); *Shuler v. Brown*, No. 07-CV-

0937, 2009 WL 790973, at *6 (N.D.N.Y. Mar. 23, 2009) ("Prison officials may reveal a prisoner's medical condition, even an 'unusual' medical condition that is protected by the zenith of the prisoner's right to privacy, 'if the disclosure is reasonably related to legitimate penological interests.'"); *see also Williams*, 2009 WL 1652193, at *10-11 (holding no qualified right to privacy in inmate's psychiatric condition and treatment).  Thus, for example, the disclosure by prison officials of an inmate's medical information to law enforcement for purposes of an ongoing investigation does not give rise to liability.  *Webb v. Goldstein*, 117 F. Supp. 2d 289, 298-99 (E.D.N.Y. 2000).

Pursuant to DOCCS regulations, "when an inmate's mental status or intellectual capacity is at issue, a hearing officer shall consider evidence regarding the inmate's mental health condition or intellectual capacity at the time of the incident and the time of the hearing[.]"  N.Y. Comp. Codes R. & Regs. tit. 7, § 254.6(b).  Further, the hearing officer shall "out of the presence of the inmate and on a confidential tape, interview an OMH clinician as may be available concerning the inmate's mental condition at the time of the incident and the time of the hearing[.]"  *Id*. at § 254.6(c)(3).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right.  *Powell v. Coughlin*, 953 F.2d 744, 749 (2d Cir. 1991); *see also Lopez v. Whitmore*, No. 9:13-CV-952 (BKS/ATB), 2015 WL 4394604, at *10 (N.D.N.Y. July 16, 2015) ("As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, . . . is reasonably related

to legitimate penological interests and is an appropriate measure."); *Benitez v. Locastro*, No. 9:04-CV-423 (NAM/RFT), 2010 WL 419999, at \*16 (N.D.N.Y. Jan. 29, 2010) (finding no evidence to suggest that the inmate's due process rights were in any way violated when the hearing officer conducted a confidential interview, via telephone, from mental health staff at Clinton Correctional Facility to ascertain whether there "were any medical or legitimate psychiatric reasons that would mitigate any penalty" imposed upon the inmate).  Plaintiff does not challenge the constitutionality of this policy.  (Dkt No. 144-1 at 9.)

Defendant Brown declares that at all times relevant to this action, she was employed by OMH as a Social Worker II and assigned to Great Meadow to provide mental health services to inmates residing at that facility.  (Dkt. No. 139-1 at ¶ 2.)  As a Social Worker II for OMH, Defendant Brown's primary duties and responsibilities included conducting screenings and evaluations of inmates for mental health services.  *Id*. at ¶ 3.  Defendant Brown also conducted psychiatric interviews and counseling sessions with inmates.  *Id*.  Defendant Brown declares that she was also called upon from time to time to provide confidential mental health testimony at inmate disciplinary hearings.  *Id*. at ¶ 4.  OMH would provide Defendant Brown with a boilerplate checklist, which categorizes the type of information she was required to provide at Tier III disciplinary hearings.  *Id*. at ¶¶ 7-8.  Defendant Brown declares that she was not required to obtain Plaintiff's written authorization, or otherwise, from Plaintiff prior to providing this testimony to Defendant Birrell.  *Id*. at ¶ 10.

As discussed above, the record reveals that Defendant Brown's disclosure of Plaintiff's mental health information was limited in scope and purpose.  (Dkt. No. 144-2 at 16, 18-19.[3])

---

[3]  Page references are to the automatic pages assigned by the Court's CM/ECF electronic system.

Significantly, Defendant Brown did not "gratuitously" disclose Plaintiff's medical information, nor does Plaintiff allege that her medical information was disseminated to other inmates or staff, or that it was communicated through humor or gossip.  *See Leon v. Johnson*, 96 F. Supp. 2d 244, 252 (W.D.N.Y. 2000) (refusing to recognize a protected liberty interest where there was no evidence that a prisoner's condition was revealed to other inmates).

Finally, Plaintiff's reliance on Defendant Brown's purported violation of New York Mental Hygiene Law §§ 33.13 and 33.16 is misplaced.  (Dkt. No. 144-1 at 10-12.)  Even if Plaintiff is correct in her interpretation of the applicable provisions of New York's Mental Hygiene law, "[i]t is axiomatic that violations of state law alone are insufficient to state a claim for section 1983 relief."  *Powers v. Coe*, 728 F.2d 97, 105 (2d Cir. 1984) (citation omitted); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. 1983.") (collecting cases); *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985) (holding that a "state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983"); *Martinez v. Minogue*, No. 9:06–CV–546, 2008 WL 4241746, at *6, (N.D.N.Y. Sep. 11, 2008) ("It is well-established . . . that a violation of state law or regulation in and of itself will not establish a constitutional violation or support a civil rights claim under 42 U.S.C. § 1983.") (citations omitted).  Accordingly, a violation of New York's Mental Hygiene Law, without more, does not give rise to a constitutional right of privacy.

For these reasons, the Court recommends granting Defendants' motion for partial summary judgment (Dkt. No. 139), and dismissing Defendant Brown from this action.

### C.    Qualified Immunity

In the alternative, Defendants seeks dismissal of Plaintiff's claims against Defendant Brown on qualified immunity grounds.  (Dkt. No. 140 at 10.)  Inasmuch as the Court is recommending that Defendant Brown be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 139) be **GRANTED**; and it is further

**RECOMMENDED** that the Court dismiss all claims against Defendant Brown and terminate her from this action; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: May 19, 2016
         Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2015 WL 417084
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Vincent BARROW, Plaintiff,
v.
Diane Van BUREN, Deputy Commissioner;
Brian Fischer, Commissioner; Bryan Hilton,
Superintendent of Programs; Charles Kelly, Jr.,
Superintendent, Marcy Correctional Facility; Dr.
Farago, Psychiatrist; Anthony Devitto, Executive
Director of Special Programing; BOB Lewis,
OMH Therapist; Lisa Kalies, Unit Chief, OMH,
Residential Mental Health Unit; Joseph Bellnier,
Deputy Commissioner of Program Service; Lucien
Lechaire, Assistant Commissioner; Maureen
E. Boll, Deputy Commissioner and Counsel; E.
Lindquist, Assistant Commissioner; Karen Ballamy,
Director, Inmate Grievance Program; Jeff McKoy,
Deputy Commissioner; Maureen Bossco, Executive
Director, Central New York Psychiatric Center,
Office of Mental Health; B. McArdle, Deputy
Superintendent of Marcy Correctional Facility;
Donald Selskey, Deputy Commissioner, Captain
Harper, Lieutenant Cory; Holanchuck, Defendants.

No. 9:12–cv–01268 (MAD/CFH).
|
Signed Jan. 30, 2015.

**Attorneys and Law Firms**

Vincent Barrow, Romulus, NY, pro se.

Office of the New York State Attorney General, Gregory J.
Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

MAE A. D'AGOSTINO, District Judge.

### I. INTRODUCTION

**\*1** Plaintiff *pro se* Vincent Barrow, an inmate in the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"), brought this action
pursuant to 42 U.S.C. § 1983, alleging violations of his
constitutional rights under the First, Eighth and Fourteenth
Amendment, as well as under Title II of the American
with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et
seq. and section 504 of the Rehabilitation Act ("RA"),
29 U.S.C. § 794. *See* Dkt. No. 50. Defendants, twenty
DOCCS employees, have moved to dismiss Plaintiff's Second
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6). *See* Dkt. No. 67. Defendants have
also moved to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(1). *Id.* In a Report–Recommendation and
Order dated September 25, 2014, Magistrate Judge Hummel
recommended that the Court grant in part and deny in part
Defendants' 12(b)(6) motion and deny the Defendants' 12(b)
(1) motion. *See* Dkt. No. 70.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Hummel's September 25, 2014 Report–
Recommendation and Order. *See* Dkt. No. 73.

### II. BACKGROUND

The following facts are not in dispute. At all relevant
times, Plaintiff was incarcerated at Marcy Correctional
Facility ("Marcy"). Dkt. No. 50 at ¶ 2. During this time,
the Residential Mental Health Unit ("RMHU") at Marcy
implemented "The Lewd Conduct Program" for inmates who
engage in lustful and inappropriate behaviors. Dkt. No. 50
at ¶ 25. Inmates subject to the program are required to wear
a control suit, which consists of a neon-green jumpsuit that
has its only opening along the back, is laced with a heavy
string, and is fastened with a padlock at the neck. *Id.* Another
component of the program requires that a fiberglass sign
displaying the word "Exposer" be hung above the inmate's
cell door at all times. Dkt. No. 50 at ¶¶ 26, 30.

Plaintiff was required to wear the jumpsuit on several
occasions following the issuance of numerous misbehavior
reports for lewd conduct. *See id.* at ¶¶ 29–31. Plaintiff alleges
that several inmates and staff have verbally insulted and
ridiculed him for wearing the jumpsuit. *See id.* at ¶¶ 32–
33. As a result, Plaintiff has refused to wear the jumpsuit
out of his cell and has thus been unable to attend programs
and medical appointments. *See id.* at ¶ 36. Contrary to
Defendants' contentions that the lewd conduction program
has been implemented for security measures, Plaintiff argues
that the program is specifically targeted to humiliate and

lower the self esteem of inmates at Marcy. *See id.* at ¶¶ 34–35, 43.

Plaintiff commenced this civil rights action on August 13, 2012. *See* Dkt. No. 1. Upon leave of court, Plaintiff filed an Amended Complaint to include a description of new events that had taken place since the complaint's initial filing. *See* Dkt. No. 11, 12. On April 1, 2014, Plaintiff was permitted to submit a Second Amended Complaint for review. *See* Dkt. No. 50. In response, Defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 67. Plaintiff subsequently opposed the motion. *See* Dkt. No. 69.

**\*2** On September 25, 2014, Magistrate Judge Hummel filed a Report–Recommendation and Order recommending that Defendants' Motion to Dismiss be granted in part and denied in part. *See* Dkt. No. 70 at 40. Plaintiff filed written objections on October 10, 2014, objecting to Magistrate Judge Hummel's recommendations in full. *See* Dkt. No. 73 at 7.

### III. DISCUSSION

**A. Standard of Review**

When objections to a magistrate judge's report-recommendation and order are made, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). If, however a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the magistrate judge's recommendations are reviewed for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). The court will "ordinarily refuse to consider argument[s] that could have been, but [were] not, presented to the magistrate judge in the first instance." *Mosley v. Superintendent of Collins Corr. Facility,* No. 9:11–CV–1416, 2015 U.S. Dist. LEXIS 6985, \*5, 2015 WL 277133 (N.D.N.Y. Jan. 22, 2015) (citations omitted). Upon review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. Analysis**

*1. Misapplication of Case Law*

Plaintiff contends that the cases cited in Magistrate Judge Hummel's Report–Recommendation and Order "could have been used in favor of Plaintiff" and "should be used in his favor." *Id.* Upon careful review, the Court finds that Magistrate Judge Hummel applied the appropriate legal standards, accurately recited the facts as presented by Plaintiff, and correctly applied the law to those facts.

Accordingly, Plaintiff's objection regarding the misapplication of case law is rejected.

*2. Misapplication of Rule 12(b)(6)*

Plaintiff further contends that Rule 12(b)(6) "should have been used in his favor" and that "legal conclusions," in these circumstances, should be sufficient to survive a motion to dismiss. *See* Dkt. No. 73 at 1. When a defendant files a 12(b)(6) motion to dismiss, the court must "accept all factual allegations as true and draw every reasonable inference from those facts in plaintiff's favor." *La. Wholesale Drug Co. v. Shire LLC,* 754 F.3d 128, 133 (2d Cir.2014) (internal quotation marks and citations omitted). Nevertheless, "this indulgence does not relieve the plaintiff from alleging 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Plaintiff admits that "the complaint is not without error," and that he "did his best to inform the court" of the alleged violations despite having been denied counsel. *See* Dkt. No. 73 at 6–7. The Second Circuit has stated, however, that *"pro se* status does not exempt a party from compliance with relevant rules of procedure and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (internal quotation marks and citations omitted). Upon review, the Court finds that Magistrate Judge Hummel correctly applied Rule 12(b)(6) and surrounding case law to the facts presented. In his thorough and well-reasoned Report–Recommendation and Order, Magistrate Judge Hummel correctly determined that the allegations in the Second Amended Complaint were insufficient to plausibly suggest the personal involvement of Defendants Bossco, Fischer, Harper, McArdle, VanBuren, Holanchuck, Perlman, LeClaire, Boll, McKoy, Bellamy, and Lindquist. Additionally, Magistrate Judge Hummel also correctly determined that the Court should grant Defendants' motion as to Plaintiff's First Amendment claims because some of the speech was not constitutionally protected and, even when it was, Plaintiff's allegations regarding the alleged retaliation are entirely conclusory.

**\*3** As to Plaintiff's Eighth Amendment conditions of confinement claim, Magistrate Judge Hummel correctly determined that the alleged deprivations were not sufficiently serious to amount to an " 'excessive risk' to his safety and health.' " Dkt. No. 70 at 24 (citing *Farmer,* 511 U.S. at 837; *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012)). The report also properly determined that Plaintiff has failed to plausibly allege claims of deliberate medical indifference regarding the denial of treatment for his foot arches and exhibitionism.

The Court has reviewed Plaintiff's remaining claims and finds them to be without merit; and, therefore, Magistrate Judge Hummel's September 25, 2014 Report–Recommendation and Order is adopted in its entirety.

### 3. Deliberate Indifference

Lastly, Plaintiff reiterates his concerns regarding the denial of necessary medical and mental health care. Dkt. No. 73 at 5. In this respect, the Court wholly agrees with Magistrate Judge Hummel's analysis governing Plaintiff's Eighth Amendment claim for medical indifference related solely to the denial of treatment for depression. *See* Dkt. No. 70 at 29. In order to have a valid claim under the Eighth Amendment for cruel and unusual punishment arising out of a claim for medical indifference, a plaintiff must show "that his medical condition is objectively a serious one" and that "[each] defendant acted with deliberate indifference to [the plaintiff's] medical needs." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citations omitted). A finding of deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Plaintiff states that at the time he was admitted to RMHU he was diagnosed with "Major Depression Disorder." Dkt. No. 50 at ¶ 46. The Court is mindful that depression, in some circumstances, has been objectively deemed a serious medical need. *See Zimmerman v. Burge,* No. 06–CV–0176, 2009 U.S. Dist. LEXIS 88344, *34–35, 2009 WL 9054936 (N.D.N.Y. Apr.20, 2009)* (finding that depression is a "sufficiently serious" medical condition when it is not self-diagnosed). In light of these facts, the Court is satisfied that Plaintiff has met its burden under the first prong.

In or around May 2011, Plaintiff states that Defendant Farago stopped providing Plaintiff with depression medication and was instead "pretending" to treat him. Dkt. No. 50 at ¶¶ 47–48. Plaintiff had been taking this medication to treat his depression for over fifteen years. Dkt. No. 50 at ¶ 47. In his objections, Plaintiff attempts to substantiate his need for the medication by alleging "many 'crisis' situations,' " including two "attempted suicides" and a single occasion of hospitalization. Dkt. No. 73 at 4. Plaintiff does not, however, provide any specific dates or documentation regarding these events. Nevertheless, the Court agrees that "a complete ... cessation of medication that [Plaintiff] had been taking for fifteen years could pose a risk of serious harm to his mental well-being." Dkt. No. 70 at 29 (citing *Brock,* 315 F.3d at 162–63).

**\*4** Accordingly, the Court finds that Magistrate Judge Hummel correctly determined that the Court should deny Defendants' motion to dismiss as to this claim.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the September 25, 2014 Report–Recommendation and Order by Magistrate Judge Hummel is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for lack of subject matter jurisdiction is **DENIED;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's Second Amended Complaint for failure to state a claim is **GRANTED** in part and **DENIED** in part; and the Court further

**ORDERS** that Plaintiff's following claims are **DISMISSED;** (1) all First Amendment claims; (2) all Eighth Amendment claims insofar as they allege inadequate prison conditions, inadequate treatment, and deliberate indifference to Plaintiff's exhibitionism and foot condition; (3) all Fourteenth Amendment claims; (4) the ADA claim; and (5) the RA claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is **DENIED** with respect to Plaintiff's Eighth Amendment claim insofar as it alleges deliberate indifference to Plaintiff's depression; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**

**REPORT–RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Vincent Barrow ("Barrow"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty DOCCS employees, violated his rights under the First, Eighth and Fourteenth Amendments as well as Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Second Am. Compl. (Dkt. No. 50), at 1–16. Presently pending is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and FED. R. CIV. P. 12(b)(1). Dkt. No. 67. Barrow opposed. Dkt. No. 69. For the following reasons, it is recommended that (1) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(6) be granted in part and denied in part and (2) defendants' motion to dismiss under FED. R. CIV. P. 12(b)(1) be dismissed.

## I. Background

The facts are related herein in the light most favorable to Barrow as the non-moving party. *See* subsection II(A) infra. At all relevant times, Barrow was an inmate at the Marcy Correctional Facility ("Marcy").

### A. Lewd Conduct Program

**\*5** At Marcy, the Residential Mental Health Unit ("RMHU") had implemented "The Lewd Conduct Program" for inmates who had engaged in lewd behaviors. Second Am. Compl. ¶ 25. The program included use of a control suit, a neon-green jumpsuit that is laced up the back—its only opening—with heavy string and secured with a padlock at the neck. *Id.* Another component of the program is the placement of a sign that says "Exposer" above the inmate's cell door. *Id.* ¶¶ 26, 30.

Although Barrow was advised by defendants Joseph Bellnier, Deputy Commissioner of Program Service; Lieutenant Cory; Captain Harper; Bryan Hilton, Superintendent of Programs; Lisa Kalies, Unit Chief, Office of Mental Health, Residential Mental Health Unit; and B. McArdle, Deputy Superintendent of Marcy, that the lewd conduct program was imposed for security reasons, Barrow contends that he was discriminated against because other inmates who had smuggled in contraband by concealing it in their groin area were not placed into the program. Second Am. Compl. ¶¶ 27–28. Barrow has informed Bellnier; Hilton; and Bob Lewis, OMH Therapist of this claim. *Id.* ¶ 35. Barrow further alleges that the program participants are disproportionately minority inmates. *Id.* at 15. Hilton advised Barrow that the lock prevents him from ripping off the jumpsuit, but also serves to humiliate and "change" his "cognizence [sic]." *Id.* ¶¶ 42–43. Barrow argues that a lock at one's neck is a symbol of hate and oppression of minorities harkening back to times of slavery and racial segregation. *Id.* ¶ 42. Thus, Barrow states that the lewd conduct program is imposed not for security purposes, but to humiliate inmates and deter future exhibitionist conduct. *Id.* ¶¶ 34–35, 43.

On March 28, 2011, Barrow was made to the wear the jumpsuit after being issued a misbehavior report for lewd conduct. Second Am. Compl. ¶ 29. A disciplinary hearing was not held in connection with that report. *Id.* On or about November 10, 2011, Barrow was again ordered to wear the jumpsuit and have the exposer sign hang on his door for thirty days. *Id.* ¶ 30. A disciplinary hearing was held regarding this alleged violation. *Id.* More recently, Barrow was ordered to wear the jumpsuit in January 2013 and from July 17, 2013 to August 17, 2013. *Id.* ¶¶ 31, 71.

In December, 2011, Barrow notified RMHU staff that he had not had a hearing for the March 28, 2011 lewd conduct allegations. Second Am. Compl. ¶ 38. After submitting this complaint, Barrow began to receive more misbehavior reports for lewd conduct. *Id.* ¶ 39. Between September 2008 and May 2011, Barrow had received eighteen misbehavior reports for lewd conduct. Dkt. No. 50, at 23 (CORC Grievance Denial), 26 (same). Barrow also contends that he was issued misbehavior reports for repeatedly requesting a prison transfer and filing sexual harassment charges against staff members. Second Am. Compl. ¶ 41.

**\*6** Barrow complained to defendants Anthony Devitto, Executive Director of Special Programming; Hilton; Michael Hoagan, Deputy Commissioner, Office of Mental Health, DOCCS; Kalies; Charles Kelly, Jr., Superintendent of Marcy; and Lewis that the lewd conduct program violated his rights under the Eighth Amendment and the ADA.[2] Second Am. Compl. ¶ 33. Barrow contends his condition, which he claims to be exhibitionism, is confidential, and only inmates being treated for this condition should be privy to this information. *Id.* He suggests that the sign and jumpsuit deprive him of confidentiality. *Id.*

Barrow is also upset that other inmates and staff ridicule and use racial epithets against him when he is in the jumpsuit. Second Am. Compl. ¶¶ 32–33. Barrow alleged that, on one occasion, in Hilton and Bellnier's presence, several inmates verbally insulted him regarding the jumpsuit, but neither defendant intervened. *Id.* ¶ 32.

Barrow alleges that the lewd conduct program, as applied to him, is over broad because he is required to wear the jumpsuit even when there are no females present, despite the fact that he has no history of lewd conduct toward male employees. Second Am. Compl. ¶ 34. Because Barrow is made to wear the jumpsuit when no females are present, Barrow claims that the jumpsuit is not a security measure. *Id.*

Because he is embarrassed by the jumpsuit, Barrow refused to wear it out of his cell. Second Am. Compl. ¶¶ 39, 42. Barrow is concerned that his absence from programming has adversely affected his parole release date. Second Am. Compl. ¶ 39. He informed defendant Kenneth S. Perlman, Deputy Commissioner of Program Services, of his parole concerns. *Id.* ¶ 59. Due to his refusal to leave his cell in the jumpsuit, Barrow was unable to attend programs or his medical appointments. *Id.* ¶ 36; *see* Dkt. No. 50 at 17–26 (prison documents pertaining to grievances filed and rulings on them). Barrow also contends that because he lacks arches in his feet, he requires the use of a lift in his right shoe, "otherwise [he] is in severe pain up and down the right side of his back." Reply (Dkt. No. 69), at 2. Barrow has been unable to receive medical treatment for his foot because he would not go to his appointments while wearing the jumpsuit. *Id.*

### B. Mental Diagnoses and Treatment

Barrow first arrived at RMHU with diagnoses of major depression and anti-social disorder and has since been diagnosed with poly-substance abuse. Second Am. Compl. ¶ 46. Three of Barrow's urine tests came back positive for cannabis, but he has never tested positive for any other substance; thus, he does not believe that poly-substance abuse is an accurate diagnosis. *Id.* Barrow contends that defendant Dr. Farago, his psychiatrist, attempts to "intellectually badger" him into wearing the jumpsuit; thus, he "only wished to talk about issues related to his profession" during their sessions. *Id.* ¶ 47. Shortly after telling Dr. Farago that he did not wish to discuss the lewd conduct program, Barrow's depression medication, which has been administered to him for approximately fifteen years, was terminated. *Id.* Barrow has since been "begging" for medication. *Id.* ¶ 48.

**\*7** In or around May or June of 2011, Barrow filed a complaint against Dr. Farago to Kalies, stating that Dr. Farago was conducting meetings outside of his cell in violation of his right to privacy. *Id.* ¶ 49.[3] Although Barrow was told that in the future Dr. Farago would hold meetings in private, Dr. Farago would arrive at Barrow's cell, wait for him to get up, then walk away. *Id.* ¶ 50. Kalies indicated that the log book indicates that Barrow was seen by Dr. Farago; however, she did not permit Barrow review of the videotapes of those meetings. *Id.* ¶ 51. Barrow contends that, rather than treat him, Dr. Farago would turn away from the camera and make comical faces at him when he asked for his depression medication. *Id.* ¶ 52. Barrow alleges that defendants Devitto, Hoagan, Kalies, and Lewis were aware of his concerns regarding Dr. Farago because he wrote to them and spoke with them. *Id.* ¶¶ 53–56.

Barrow alleges that the remaining defendants were involved in the alleged constitutional violations in various ways. Bellnier and Hilton initiated the Lewd Conduct Program at Marcy. Second Am. Compl. ¶ 57. Brian Fisher, Commissioner; Holanchuck; and Perlman were aware of Barrow's situation because he sent them letters and spoke with them. *Id.* ¶¶ 58–59, 71. Boll and LeClaire were aware of Barrow's concerns because he talked with them about the lewd conduct program. *Id.* ¶¶ 60, 61. E. Lindquist, Assistant Commissioner in charge of the programs at RMHU, knew about the program. *Id.* ¶ 62. Bellamy affirmed grievance determinations. *Id.* ¶ 63. Maureen Bossco, Executive Director of Central New York Psychiatric Center, and Jeff McKoy, Deputy Commissioner, were aware of the alleged constitutional violations because they spoke with him about the sign. *Id.* ¶ 64. Diane VanBuren, Deputy Commissioner, knew of Barrow's issues at RMHU because of her supervisory status. *Id.* ¶ 70.

Most of the misbehavior reports issued against Barrow were written for exhibitionism, but Barrow was refused treatment for such. Second Am. Compl. ¶¶ 66–68. RMHU had demanded that Barrow attend a sex offender program, but Barrow thinks it is inappropriate for his disorder because the sex offender program focuses on pedophiles and rapists —conduct of which he was never convicted. *Id.* ¶ 69.

Barrow seeks both compensatory damages and injunctive relief. Second Am. Compl. at 16.

## II. Discussion [4]

Barrow contends that defendants violated his: (1) First Amendment rights by retaliating against him for his expression of protected speech; (2) Eighth Amendment rights by (a) subjecting him to cruel and unusual punishment, and (b) denying him medical treatment; (3) Fourteenth Amendment rights by (a) failing to provide him due process prior to imposing the lewd conduct program, (b) treating him differently from similarly-situated inmates, and (c) violating his right to privacy regarding his exhibitionism. Barrow also argues that defendants have violated the ADA and section 504 of the Rehabilitation Act. [5]

### A. Legal Standard

**\*8** Under FED. R. CIV. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (internal citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally." (internal citations omitted)).

### B. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501

(2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

  **\*9** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

### 1. Bossco and Fischer

Here, Barrow alleged in a conclusory fashion that Bossco and Fischer were (1) aware at all times of his issues at Marcy and (2) that he spoke to them and sent several letters to them about such issues. Second Am. Compl. ¶¶ 58, 65. The gravamen of Barrow's complaints against these defendants is that they were in a position of power, thus, they were involved with all aspects of his incarceration. Nevertheless, attempts to establish personal involvement based upon the supervisory role that these defendants occupied is inappropriate. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003), quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.").

To the extent that Barrow seeks to establish defendants' knowledge of his complaints through letters, such an attempt must also fail. Until recently, a plaintiff's claim that he or she sent a letter or grievance to a defendant, where the defendant did not take action on the letter or respond, was generally insufficient at the pleading stage to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."; *but see Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). However, the Second Circuit recently concluded that,

> [a]t the pleading state, even if [plaintiff] had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference—if his amended complaint contained factual allegations indicating that the Letter was sent to the Warden at an appropriate address and by appropriate means—that the [defendant] in fact received the Letter, read it, and thereby became aware of the alleged conditions of which [plaintiff] complained

  **\*10** *Grullon v. City of New Haven,* 720 F.3d 133, 131 (2d Cir.2013); *see also Toliver v. City of New York,* 530 F. Appx. 90, 93 (2d Cir.2013) (citing *Grullon,* 720 F.3d at 141–42); *Ferrer v. Fischer,* No. 9:13–CV–0031, 2014 WL 1763383 (N.D.N.Y. May 1, 2014). Barrow does not provide sufficient factual detail to support his claim that the letters establish personal involvement. He does not allege that he sent the letters to the proper addresses by appropriate means or that defendants received the letters and read them. Thus, he has not established personal involvement through the sending of letters. *Grullon,* 720 F.3d 133 at 141–42.

Further, although Barrow alleged that he had spoken with the defendants, Barrow does not state when these conversations took place. *Eldridge v. Kenney,* No. 11–CV–6459, 2014 WL 2717982, at \*3 (W.D.N.Y. June 16, 2014) ("While Plaintiff's

Response ... contains references to the ... *Colon* factors, they suffer from the same fatal flaw: they contain nothing more than conclusory statements and formulaic recitations of the *Colon* factors and are wholly unsupported by facts."). Moreover, Barrow presents no factual allegations to support a claim that defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Barrow's rights. *Colon,* 58 F.3d at 873. Thus, Barrow has failed to plausibly allege that Bossco or Fischer had personal knowledge of the alleged constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

**2. Harper, McArdle, and VanBuren**

Barrow has also failed to establish personal involvement of Harper, McArdle, and VanBuren in the alleged constitutional violations. Barrow states that VanBuren was aware of the violations because she "was at all times aware of the actions and functions ... at the RMHU." Second Am. Comp. ¶ 70. Similarly, Barrow alleged that Harper knew about all programs at RMHU and, during a conversation, Harper told him that the lewd conduct program was implemented as a security measure. *Id.* ¶¶ 23, 27. Barrow contends that McArdle, as a "higher-up," advised him that the jumpsuit was imposed for security and failed to issue him a review notice for the lewd conduct program. *Id.* ¶¶ 27, 44.

With respect to the alleged conversations with Harper and McArdle, Barrow fails to provide details such as the date and manner of such conversations, rendering his claim insufficient to establish the requisite knowledge for personal involvement. *See Eldridge,* 2014 WL 2717982, at *3 (conclusory allegations are insufficient). Instead, Barrow merely contends that the lewd conduct program was discussed. *See Barnes v. Prack,* No. 11–CV–857, 2012 WL 7761905, at *5 (N.D.N.Y. Sept. 7, 2012) (same). To the extent that Barrow's complaint may suggest that Harper, McArdle, and VanBuren allowed for the continuance of a unconstitutional policy or custom, he does not demonstrate that defendants had investigated the program, were aware of his specific concerns and complaints regarding the jumpsuit and sign, or that they otherwise participated in decision making, policy making, or had any input relating to the alleged constitutional violations.

*11 Furthermore, as noted, personal involvement cannot be established solely upon a defendant's supervisory role. *Wright,* 21 F.3d at 501. As such, Barrow has failed to plausibly allege the personal involvement of either Harper, McArdle, or VanBuren. Accordingly, defendants' motion on this ground should be granted.

**3. Holanchuck, Perlman, LeClaire, Boll, and McKoy**

Barrow has similarly failed to demonstrate the personal involvement of Holanchuck, Perlman, LeClaire, Boll, and McKoy. Barrow essentially argues that these defendants had personal knowledge of the alleged constitutional violations because (1) he spoke with them about the lewd conduct program and/or its negative effect on him and (2) they held supervisory positions at Marcy yet failed to address his concerns. Specifically, Barrow argues that Holanchuck had personal knowledge of the alleged violations because Barrow "had many talks with Defendant about the violation of plaintiff['s] rights, all to no avail." *Id.* ¶ 71. In response, Holanchuck told him that the lewd conduct program "was being done in other states." *Id.* Barrow also indicates that Holanchuck, as Deputy Commissioner, "was aware of all actions and functions here at the RMHU," and, thus, responsible due to his supervisory position. *Id.*

Barrow contends that LeClaire knew of the alleged violations because "Plaintiff talked to him about the "outright shocking racist presentment of this Lewd Conduct Program." Second Am. Compl. ¶¶ 22, 60. However, Barrow's reference to a conversation with LeClaire wherein he expressed his belief that the lewd conduct program was implemented in a racially-discriminatory manner does not demonstrate that LeClaire was aware of the personal affect the program had on Barrow.

Barrow states that Perlman "knew at all times [about the] situation" as he spoke to Perlman of "the need of programs to gain parole" and, in response, Perlman told him that "he should program in spite of the Control suit." Second Am. Compl. at 59. Barrow also argues that he spoke with Boll "upon visiting the RMHU" and that, as Deputy Commissioner, she "was in [a] position to stop and had the duty to stop the violation of plaintiff['s] 14th and 8th Amendments [sic]" *Id.* ¶ 61. Barrow additionally alleges that he spoke with McKoy about the "exposer" sign, yet McKoy allowed the sign to remain. *Id.* ¶ 64.

Barrow's passing references to conversations he alleges to have had with Holanchuck, Perlman, LeClaire, Boll, and McKoy are insufficient to establish their personal involvement. Barrow fails to specify when he had such discussions with defendants. Further, Barrow's attempts to establish personal involvement based upon the supervisory role the defendants occupied must fail. *Wright,* 21 F.3d at 501.

Accordingly, defendants' motion on this ground should be granted.

### 4. Bellamy

Barrow argues that Bellamy, as Director of the Inmate Grievance Program, violated and was "in gross deliberate indifference to [his] 8th and 14th Amendments [sic]." Second Am. Compl. ¶ 63. He contends that defendant Bellamy was aware of these alleged violations because he "appealed many grievances" to her, which she affirmed. *Id.* Merely affirming the denial of a defendant's grievance is insufficient to establish personal involvement, without more. See *Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (concluding that affirming *and modifying* the penalty imposed in an allegedly constitutionally infirm disciplinary proceeding can satisfy the second Colon factor). Moreover, insofar as Barrow appears to claim personal involvement based on defendant's status as a director, this does not establish that she was personally involved with the alleged Eigth Amendment violations. *Wright,* 21 F.3d at 501.

**\*12** Accordingly, defendant's motion on this ground should be granted.

### 5. Lindquist

Barrow argues that Lindquist, due to his supervisory role as Assistant Commissioner, was aware of the Lewd Conduct Program and "the grave harm it was doing" to him. Second Am. Compl. ¶ 62. Inasmuch as Barrow suggests that Lindquist was aware of the alleged violations because of his supervisory position, as noted, attempts to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501. Barrow further argues that the fourth *Colon* factor is implicated. He contends that Lindquist "was grossly negligent in that he did not adequately supervise the subordinates who violated Plaintiff['s] 14th and 8th Amendment [rights]."

Second Am. Comp. ¶ 62. However, Barrow does not provide any support for his claim that Lindquist negligently supervised his subordinates. Such a conclusory reference to a *Colon* factor is insufficient to support a claim of personal involvement. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights." (internal citations omitted)). Inasmuch as Barrow suggests that defendant was aware of the alleged violations because of his supervisory position, as noted, an attempt to establish personal involvement based upon the supervisory role defendant occupied is inappropriate. *Wright,* 21 F.3d at 501.

Accordingly, defendant's motion on this ground should be granted.

### C. Eleventh Amendment

Barrow brings all claims against all defendants in their official and individual capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an

official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Insofar as Barrow demands money damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS, these claims are barred by the Eleventh Amendment. *Id.* at 169.

**\*13** Accordingly, Barrow's claims for money damages pursuant to section 1983 against all defendants in their official capacities should be dismissed.

### D. First Amendment

Barrow argues that expressing his concern over the lewd conduct program, requesting prison transfers, and filing sexual harassment charges against staff members is protected speech, and defendants filed false misbehavior reports against him in retaliation for his exercise of this speech.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St. LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). However, a retaliation claim may survive a defendant's motion to dismiss if a plaintiff alleges facts tending to establish that "(1) the speech or conduct that led to the allegedly retaliatory conduct is the sort of speech or conduct that is protected by the Constitution; (2) defendant(s) took adverse action against the plaintiff; and (3) there is a causal connection between the protected speech or activity and the adverse action." *See Jones v. Harris,* 665 F.Supp.2d 384, 398 (S.D.N.Y.2009). Adverse action has been defined objectively as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Further, an inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). Thus, to the extent that a plaintiff seeks damages because "he was subjected to an accusation that turned out not to stand up under scrutiny," such would not be an actionable claim under section 1983. *Jones v. Harris,* 665 F.Supp.2d 384, 400 (S.D.N.Y.2009).

Thus, Barrow fails to present a prima facie claim for a violation of his First Amendment rights.

First, it does not appear that Barrow's transfer requests were constitutionally-protected speech as an inmate has no constitutional right to be housed in a facility of his choosing. *See generally, McMahon v. Fischer,* 446 Fed. Appx. 354 (2d Cir.2011) ("A prisoner has no right to housing in a particular facility"). Although complaining about the lewd conduct program and filing good-faith sexual harassment charges are constitutionally-protected activities (*Carl v. Dirie,* No. 9:09–CV–724, 2010 WL 3338566 at \*5 (N.D.N.Y. Mar.29, 2010) (quoting *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) ("The Supreme Court has noted that the right to petition government for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights' ")), Barrow's claim is wholly conclusory. He does not state which of the named defendants filed misbehavior reports against him, when most of these alleged misbehavior reports were filed, the temporal proximity between the constitutionally-protected behaviors and the misbehavior reports, the prison rule violations with which he was charged, or whether any action was taken as a result of the misbehavior reports filed against him. Second Am. Compl. ¶ 41; *cf. Shaheen v. McIntyre,* No. 9:05–CV–0173, 2007 WL 3274835 at \*9 (N.D.N.Y. Nov.5, 2007) (plaintiff demonstrated adverse action was taken by contending misbehavior reports were filed against him in retaliation of his exercise of speech, resulting in several days of keeplock confinement); *see also Mateo v. Fischer,* 682 F.Supp.2d 423, 435 (S.D.N.Y.2010) (filing of misbehavior report one day after prisoner filed sexual harassment grievance against corrections officer was sufficiently close in time to support causation element in retaliation claim). Furthermore, because Barrow does not specify which charges were filed against him in the misbehavior reports, he fails to demonstrate that the issuance of misbehavior reports was causally connected to his protected speech rather than an actual violation of prison rules. [7] *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (When it is undisputed that an inmate committed the prohibited conduct, no retaliatory discipline claim can be sustained)).

**\*14** Although Barrow contends that, "[w]hen and if [he] gets his day in Court, records of inmates misbehavior reports can easily inform the Courts of any information it may need," his conclusory claims as presented in his complaint are insufficient to withstand a motion to dismiss. Reply, at 3; *DeLeon v. Wright,* No. 10–CV–863, 2012 WL 3264932, at \*7 (N.D.N.Y. July 5, 2012) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone")).

Accordingly, defendants' motion on this ground should be granted.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. AMEND. VIII. The prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). A viable Eighth Amendment claim is twofold; the plaintiff must demonstrate both objective and subjective components. The objective question asks whether the deprivation of which the inmate complains was sufficiently serious. *Farmer,* 511 U.S. at 834. This component "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. Thus, the prisoner must show that "the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The subjective component requires the inmate to show that the defendant demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834.[8] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The Supreme Court has held that "[p]rison administrators ... be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security ." *Whitley v. Albers,* 475 U.S. 312, 321–22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (internal quotation marks and citation omitted). However, although "the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities ... [d]isciplinary measures that violate civilized standards of human decency are proscribed." *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972).

### 1. Conditions of Confinement

**\*15** Addressing the objective component of the analysis, the alleged deprivation Barrow raises appears to raise is his denial of right to be free from humiliation, shaming, and verbal harassment from other inmates and staff. Barrow argues that he was subjected to cruel and unusual punishment because defendants forced him to wear the jumpsuit and have the exposer sign positioned above his cell door as a means to humiliate him and to perpetuate racism, rather than for genuine security concerns. Second Am. Compl. ¶¶ 34, 43, at 15. Barrow also contends that the jumpsuit makes him a target for verbal assaults and racially-fueled remarks from other inmates and staff. *Id.* at 15; Reply at 4. Barrow appears to argue that because the lock symbolizes oppression of African–Americans, being forced to wear it causes him grave harm, such as stress, reduced self-esteem, and "depression brought on top of [the] normal depression Plaintiff suffers from." Second Am. Compl. ¶ 40. Finally, Barrow states that the weight of the lock on the back of the jumpsuit requires him to continuously adjust the collar of the jumpsuit to "keep from being slowly choked." Reply at 1–2.

Barrow does not provide the names of any staff members who have verbally assaulted him while he was in the jumpsuit. Although Barrow states that defendants Bellnier and Hilton failed to intervene on one occasion where he was being harassed by inmates in their presence (Second Am. Comp. ¶ 32), there is no constitutional right to be free from verbal assault. *Lunney v. Brureton,* No. 04–Civ.–2438, 2005 WL 121720, at \*11 (S.D.N.Y. Jan.21, 2005) ("general allegations of threats and harassment are insufficient to state a claim because comments that are merely insulting or disrespectful do not give rise to a constitutional violation") (internal citations and quotation marks omitted); *see also Cuoco v. Mortisugu,* 222 F.3d 99, 109 (2d Cir.2000). Thus, although

infliction of mental anguish may sometimes rise to the level of cruel and unusual punishment (*see e.g. Hudson v. McMillian, 503 U.S. 1, 16, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)* (Blackmun, J., concurring)), it appears that the racially-fueled harassment Barrow has faced from fellow inmates and some staff while wearing the jumpsuit—even if it impacts his depression and lowers his self-esteem—does not amount to a disregard of an "excessive risk" to his safety and health. *Farmer, 511 U.S. at 837; Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir.2012).*

Further, the physical discomfort of the lock pulling on the collar of the jumpsuit appears to be little more than an annoyance that is easily alleviated by adjusting the collar. There is no evidence that the padlock poses an excessive risk of serious injury. A *de minimus* discomfort is not a violation of an inmate's Eighth Amendment rights. *See e.g. Kearney v. N.Y.S. D.O.C.S., No. 9:11–CV–1281, 2013 WL 5437372, at *12–13 (N.D.N.Y. Sept.27, 2013)* (a long walk to recreational yard, which caused discomfort for mobility-impaired inmate, along with bathroom facilities that required the plaintiff to lean in uncomfortable manner while using them, were not sufficient to rise to Eighth Amendment violations).

**\*16** Accordingly, defendants' motion to dismiss on this ground should be granted.

## 2. Medical Indifference

Next, Barrow appears to contend that he was denied access to adequate medical care because (1) he was denied treatment for exhibitionism, (2) Dr. Farago refused to provide him with treatment for depression, (3) he was refused his depression medication, and (4) he was unable to attend medical appointments for a foot condition.

The Eighth Amendment extends to the provision of medical care. *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994).* " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003)* (quoting *Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).* What constitutes a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition

significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir.2003)* (quoting *Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)).* The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith, 316 F.3d at 185.* In claims for inadequate medical care, to satisfy the subjective component, the plaintiff must prove that defendant acted with deliberate indifference. Deliberate indifference requires the plaintiff "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance, 143 F.3d at 702.* Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).* "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance, 143 F.3d at 703.*

### a. Denial of treatment for Exhibitionism

Barrow contends that, despite the fact that most of the misbehavior reports filed against him are for exhibitionism, defendants have "refused to treat Plaintiff for the disorder." Second Am. Comp. ¶ 67. Assuming Barrow can establish that he suffers from exhibitionism, he must demonstrate that "a reasonable doctor or patient would find it important and worthy of comment," that the condition significantly affects his daily activities, or the condition causes him chronic and substantial pain. *Chance, 143 F.3d at 702* (internal quotation marks and brackets omitted). Although Barrow alleges that being made to wear the jumpsuit significantly impacts his daily activities, he does not demonstrate that the condition of exhibitionism itself significantly affects his daily activities or causes him chronic and substantial pain. *Id.* Although Barrow suggests that exhibitionism is "a living hell," he alleges that he was able to attend medical appointments without having any incidents of exposure; does not display exhibitionist tendencies toward males, and notes that there are often no females near him; and that he functions in the prison community for months at a time without lewd conduct infractions. Second Am. Compl. ¶¶ 34, 41–42; Dkt. No. 50, at 17; *Id.* at 25. Moreover, Barrow does not contend what harm, if any, the alleged inadequacy in treatment has caused or will likely cause him, beyond noting that a lack of programming has negatively impacted his parole date. [9] *Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir.2006)* (in determining whether a condition is sufficiently serious, a

court is to examine how the omission in medical treatment has caused, or will likely cause, harm to inmate).

**\*17** Even assuming exhibitionism is a sufficiently serious medical condition, Barrow fails to demonstrate that defendants acted with deliberate indifference to his exhibitionism. Although Barrow contends that he was intentionally denied programming and treatment for exhibitionism, as he was only offered sex offender programming, he did not demonstrate that the programming offered had no relevance to his alleged conditions. Further, insofar as could be discerned, at some point, defendant Farago attempted to discuss the jumpsuit and lewd conduct program with Barrow, but Barrow refused to discuss it. *Id.* ¶ 47. Disagreement over the appropriate programming is an insufficient basis for a section 1983 claim, so long as the treatment offered is adequate. *Chance,* 143 F.3d 698 at 703. Moreover, to the extent that Barrow contends that he was denied access to all programming at Marcy, Barrow refused to leave his cell because of the jumpsuit. Second Am. Compl. ¶ 39, 42. Thus, any denial of programming was a direct result of his refusal to leave his cell.

Accordingly, defendants motion, insofar as it seeks to dismiss the claim of medical indifference to Barrow's exhibitionism should be granted.

### b. Denial of treatment for depression

Barrow also contends that he was denied treatment for depression in violation of the Eighth Amendment. Little case law exists discussing whether depression is a sufficiently serious medical condition for Eighth Amendment purposes; however, it appears that mental disorders are considered serious medical needs. *See generally Zimmerman v. Burge,* No. 06–CV–80, 2009 WL 9054936, at \*6 (N.D.N.Y. Apr. 20, 2009), "treatment of mental disorders of mentally disturbed inmates is ... a serious medical need"; *Hamilton v. Smith,* No. 06–CV–805, 2009 WL 3199531, at \*14 (N.D.N .Y. Jan. 13, 2009) (same). Although Barrow provides little insight into the severity of his depression and how it impacts his daily activities, he contends that he received treatment and was medicated to alleviate these mental health symptoms for fifteen years. Second Am. Compl. ¶ 47. Taking these allegations as true, Barrow has alleged a sufficiently serious medical need as it necessitated medical and pharmacological intervention for a sustained and continuous period of time. Such a condition was clearly "perceived by a reasonable

physician as important and worthy of comment ...." *Randle v. Alexander,* 940 F. Supp 457, 481 (S.D.N.Y.2013) (internal quotation marks and citation omitted). Thus, Barrow has satisfied the first prong of the Eighth Amendment analysis.

Next, Barrow must demonstrate defendants' deliberate indifference to his depression. Barrow states that he was denied therapy because defendant Farago pretended to treat him cell-side. Farago would "come to [Barrow's] cell, wait for [him] to get up to come to the gate and then walk away." Second Am. Compl. ¶¶ 50–51. Further, Barrow states that Farago "changed" his diagnosis of Major Depressive disorder and Anti-social disorder to poly-substance abuse, despite having only three positive urinalysis tests for cannabis in the past 15 years. *Id.* at 46. Farago also stopped providing Barrow's depression medication, which he had been taking for over 15 years. *Id.* ¶ 46. When Barrow "begged" for his medication, Farago would make "comical faces" at him while facing away from the camera. *Id.* ¶ 52. Assuming Barrow has a current diagnosis of depression and that the allegations against Farago are true, a complete denial of therapy and sudden cessation of medication that he had been taking for fifteen years could pose a risk of serious harm to his mental well-being. *Brock,* 315 F.3d at 162–63.

**\*18** Accordingly, defendants' motion to dismiss the medical indifference claim relating to the denial of treatment for depression, should be denied.

### 3. Denial of treatment for foot arches

Insofar as Barrow argues that defendants denied his access to medical treatment for his foot arches, this claim must fail. Even assuming Barrow's need for use of a shoe lift is a serious medical condition, Barrow was not denied medical treatment for his foot condition due to defendants' deliberate indifference to the condition, but for his choice to remain in his cell, rather than attend his appointment in the jumpsuit. *See generally Hardy v. Diaz,* No. 9:08–CV–1352, 2010 WL 1633379, at \*6 n. 12 (N.D.N.Y. Mar.30, 2010) (noting that skipping medical appointments and failing to comply with treatment directions can undermine an Eighth Amendment medical indifference claim).

Accordingly, any claim against defendants for a denial of treatment for Barrow's foot condition should be dismissed.

### F. **Fourteenth Amendment**

#### 1. **Procedural Due Process Claim**

Barrow argues that he was denied procedural due process because he was required to wear the jumpsuit after a lewd conduct misbehavior report was filed against him, but before a disciplinary hearing was held. Insofar as can be ascertained from his complaint, although a disciplinary hearing was held on at least one of the misbehavior reports, the lewd conduct program was never discussed as a part of his punishment. Second Am. Comp. ¶ 30.

To prevail on a procedural due process claim, "a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). However, the Supreme Court has held that such liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Marino v. Klages,* 973 F.Supp. 275 (N.D.N.Y.1997).

Here, Barrow fails to demonstrate that he was deprived of a cognizable liberty interest. Although Barrow states that he was held in his cell for a collective period of at least three months, he concedes that he independently made the conscious decision to refuse to leave his cell even though defendants permitted him to leave his cell in the jumpsuit. Barrow does not allege that he was otherwise restrained while wearing the jumpsuit. Similarly, defendants did not prevent him from attending programs while he was wearing the jumpsuit. In his grievance, which is incorporated by reference, Barrow states that he was offered the option of being "bonded to the restart chair, in 4 points" as an alternative to attending programming in the jumpsuit; however, he rejected this option as a "baric [sic] medieval form of bondage and sadism." Dkt. No. 50, at 25. Any lack of access to programming or services was self-imposed. [10] Thus, although Barrow was embarrassed by the jumpsuit and faced verbal harassment when he wore it, defendants were not physically restraining or otherwise limiting Barrow's movement. Therefore, Barrow failed to demonstrate that the jumpsuit imposed an "atypical and significant hardship ... in

relation to the ordinary incidents of prison life." *Sandin,* 585 U.S. at 484.

**\*19** Additionally, although Barrow may not have been granted a hearing before the imposition of the lewd conduct program, it appears that the jumpsuit and sign were implemented as a necessary security measure. Here, defendants are charged with the responsibility of ensuring the safety of the prison staff, personnel, visitors, and inmates. "A prison regulation that inadvertently impinges on prisoners' constitutional rights is valid " 'if it is reasonably related to legitimate penological interests,' such as 'deterrence of crime, rehabilitation of prisoners, and institutional security' " *Davis v. City of New York,* 142 F.Supp.2d 461, 463 (S.D.N.Y.2001) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Because the jumpsuit and sign serve to prevent inmates with a history of exposure and public masturbation from committing such acts, and Barrow has an extensive history of such conduct, Barrow fails to create an issue of fact as to whether defendants were deliberately indifferent to a serious risk of harm when requiring his participation in the lewd conduct program. *Whitley,* 475 U.S. at 319. Barrow admitted that he has exposed himself repeatedly, and that this is a "compolsive [sic] habit." Dkt. No. 50, at 25. Thus, even assuming that Barrow had a protected liberty interest, legitimate security concerns outweigh this interest. *Id.; Turner,* 482 U.S. at 79.

Accordingly, defendants motion to dismiss the complaint on these grounds should be granted.

#### 2. **Right to Privacy**

Finally, Barrow argues that defendants violated his right to privacy. The basis for Barrow's claim on this ground is that the jumpsuit and sign expose his medical condition to other inmates, visitors, and prison personnel. It is not clear whether he raises this claim under the Eighth or Fourteenth Amendment. Second Am. Compl. ¶ 33; Reply, at 4. Generally, the right to privacy is based on the "Fourteenth Amendment's concept of personal liberty and restrictions upon state action," (*Whalen v. Roe,* 429 U.S. 586, 598 n. 23 (1977); *Nolley v. County of Erie,* 776 F.Supp. 715, 729 (W.D.N.Y.1991)); however, claims relating to the disclosure of confidential medical information have also been reviewed under the Eighth Amendment. [11] *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–21 (S.D.N.Y.2003). The Supreme Court has recognized "that there exists in the

United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters,' " including " 'the right to protection regarding information about the state of one's health.' " *Powell v. Schriver,* 175 F.3d 107, 111 (2d Cir.1999) (quoting *Whalen,* 429 U.S. at 599). An inmate may prove a constitutional entitlement to protection from needless disclosure of a private medical condition if he demonstrates that (1) he suffers from an unusual or sensitive medical condition; and (2) if such condition were disclosed unnecessarily, he could be subjected to discrimination, intolerance, or violence. *Id.* at 111. The interest an inmate has in the privacy of his or her medical condition varies, depending on the condition. *Williams v. Perlman,* No. 9:06–CV–00936, 2009 WL 1652193, at *10–11 (N.D.N.Y. Feb.5, 2009) (citing *Rodriguez,* 287 F.Supp.2d at 229 (holding no qualified right to privacy in inmate's psychiatric condition and treatment)). Although disclosure of such a medical condition may, in some circumstances, be viewed as reasonably related to legitimate penological concerns, gratuitous disclosure may be a violation of privacy. *Id.* at 111–12 (discussing that disclosure of private medical condition for purpose of humor and gossip serves no legitimate penological interest and violates inmate's constitutional right to privacy).

### a. Fourteenth Amendment Right to Privacy

**\*20** Here, assuming Barrow can prove that he has been diagnosed with exhibitionism, he fails to demonstrate that exhibitionism is a condition on-par with HIV or transsexualism—conditions that other courts have found sufficient to trigger a constitutional right to privacy. *Compare Powell,* 175 F.2d at 112–13 (transsexualism protected); *Doe v. City of New York,* 15 F.3d 264, 266–67 (2d Cir.1994) (HIV-positive status protected); *Fleming v. State Univ. of New York,* 502 F.Supp.2d 324, 343 (E.D.N.Y.2007) (sickle cell amenia protected), *with Hamilton v. Smith,* No. 9:06–CV–805, 2009 WL 3199531, at *15 (N.D.N.Y. Jan.13, 2009), *adopted as modified by* 2009 WL 3199520 (N.D.N.Y. Sept.30, 2009) (Hepatitis A not protected), *and Wilson v. Brock,* No. 9:06–CV–528, 2008 WL 4239564, at *5 (participation in drug or alcohol rehabilitation not protected). Further, Barrow has not plausibly demonstrated that the prison community's knowledge of this condition could lead to discrimination, intolerance, or violence. *Powell,* 175 F.3d at 111. Although Barrow contends that he has suffered discrimination, harassment, and intolerance from fellow inmates, as noted, his complaint attributes this disparate treatment to the racist sentiment that the lock on the jumpsuit triggers, not the condition of exhibitionism itself. Second Am. Compl. at 15. Thus, although exhibitionism could arguably be considered sensitive medical information due to the nature of the condition, because Barrow has not demonstrated that he faced or would likely face harm as a direct result of public knowledge of his alleged condition, he has failed to plausibly argue that defendants violated a constitutional right by revealing this condition to others through use of the lewd conduct program. *Cf. Powell,* 175 F.3d at 112 (disclosure of inmate's status as transsexual and HIV positive could place inmate at risk "especially given that, in the sexually charged atmosphere of most prison settings, such disclosure might lead to inmate-on-inmate violence.").

Additionally, although the lewd conduct program reveals to the prison community the fact that the Barrow exposes himself, Barrow does not demonstrate that the program is needless. Defendants have demonstrated that there are significant penological interests in the sign and jumpsuit —to prevent Barrow from exposing himself and to warn others of his proclivity to do so, which, as Barrow stated, is a compulsive behavior. Dkt. No. 50, at 25. When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if reasonably related to legitimate penological interests. *Turner,* 482 at 89. *Turner* identified four factors to consider in making this determination:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it .... Moreover, the governmental interest must be a legitimate and neutral one .... A second factor ... is whether there are alternative means of exercising the right that remain open to prison inmates .... A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally .... Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation .... By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable ....

**\*21** 482 U.S. at 89–90 (quoting *Block,* 468 U.S. at 586).

Under the *Turner* analyis, it is clear that there is a valid and logical connection between mandating that offending inmates wear the jumpsuit—the inhibition and prevention of an inmate's ability to expose himself—and the prison's interest in maintaining institutional safety and security—preventing offending inmates from engaging in hostile, harassing, or sexually abusive behaviors in the prison community. *Id.* Next, there does not appear to be a less restrictive alternative to the jumpsuit. Absent the jumpsuit, in order to control compulsive acts of exposure and public masturbation, prisons would presumably have to resort to segregation or isolation of these inmates. *Id.* Segregation and isolation is not preferable to the lewd conduct program, which allows inmates to remain a part of the general prison population. In addition, the lewd conduct program as a *de minimus* impact on participating inmates. Although there exists a relatively minor discomfort for inmates, as discussed *supra,* the inmates are not restricted in their movement. Further, this ability to manage the conduct of inmates who demonstrate exhibitionist behavior, prison guards and other inmates would remain at risk of being subjected to this sexual misconduct. *Id.* Thus, for the reasons previously discussed, because the lewd conduct program is reasonable and there are no less restrictive "ready alternatives," the lewd conduct program is valid. *Id.* at 90.

Accordingly, defendants' motion to dismiss under the due process clause of the Fourteenth Amendment should be granted.

### b. Eighth Amendment Right to Privacy

Barrow also appears to argue that he was denied his right to privacy of his exhibitionism under the Eighth Amendment. As noted, it does not appear that Barrow's claim of exhibitionism demonstrates a sufficiently serious medical need. However, even if this condition constituted a serious medical need, the disclosure of the fact that Barrow exposes himself does not constitute deliberate indifference. As these measures were put in place to restrict Barrow's ability to expose himself and warn and protect others from being victimized this conduct, the lewd conduct program was limited enough in scope and purpose. *See generally Hamilton,* 2009 WL 3199531, at \*15 (disclosure of medical condition was not deliberate indifference where disclosures

were limited in scope and purpose and were necessary to investigate a grievance).

Accordingly, defendants motion to dismiss should be granted on this ground.

### 2. Equal Protection

Barrow argues that he was denied equal protection because (1) inmates who have smuggled in drugs or weapons in their groin did not have to wear the jumpsuit, (2) inmates who kick or spit on staff are not made to wear relevant restrictive devices, and (3) a disproportionate number of minorities were made to participate in the lewd conduct program.

**\*22** To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Barrow fails to demonstrate that similarly-situated inmates are treated differently. Despite Barrow's contention, inmates who have smuggled in drugs or weapons in their groin-area are not similarly situated to Barrow. Similarly, inmates who spit on or kick staff are also not similarly situated to him. Although inmates who smuggle in contraband by concealing it in their groin may pose a security risk, this risk differs from that presented by an inmate who compulsively exposes his genitals to staff, visitors, and other inmates. As such, those inmates do not necessarily require the same security measures to be taken. Because Barrow does not argue that other inmates who have exposed themselves were excused from participation in the lewd conduct program, he has failed to state a claim for an equal protection violation. *See Id.*

Finally, Barrow fails to plausibly argue that the lewd conduct program is intentionally made up of a disproportionate number of minorities. Reading the facts in the light most favorable to him, Barrow presents no evidence to support his argument that racial minorities who have exposed themselves are being treated differently from Caucasian or other inmates who have committed the same lewd conduct infractions. *See Id.* at 129 (2d Cir.2005) ("[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional discrimination").

Accordingly, defendants' motion to dismiss on this ground should be granted.

### G. Americans with Disabilities Act and Rehabilitation Act

Barrow argues that defendants violated the ADA and RA because the lewd conduct program improperly exposes his medical condition—exhibitionism—to members of the prison community. Second Am. Compl. ¶ 33. He contends that the lack of confidentiality regarding his exhibitionism has resulted in "scorn and ridicule and verbal assaults of all kind [sic]." *Id.* It appears that Barrow contends that the denial of programming or treatment for his exhibitionism also violates the ADA and RA.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, an inmate must demonstrate that:

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity

**\*23** *Byng v. Campbell,* No. 907–CV–471, 2010 WL 681374, at \* 17 (quoting *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995)); 42 U.S.C. § 12132. Similarly, the RA applies to any "qualified individual with a disability" and protects that individual from being "excluded from the participation in, ... [or] denied the benefits of," any federally-funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037–38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act").

For multiple reasons, Barrow fails to plausibly state a claim. First, Barrow cannot satisfy the first prong of the analysis. Barrow contends that his disability is exhibitionism; however, Barrow presents no evidence that his exhibitionism is anything other than self-diagnosed. The complaint provides

that his diagnosed conditions were major depressive disorder, anti-social disorder, and poly-substance abuse. Second Am. Compl. ¶ 46. Moreover, exhibitionism is specifically excluded from consideration as a disability under the ADA. 42 USC § 12211(b)(1). Thus, Barrow is not a qualified individual with a disability.

Further, Barrow does not establish the second prong—he does not allege that he was excluded from a service or program at Marcy due to his alleged exhibitionism or any of his diagnosed conditions. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 443 (S.D.N.Y.2003). As noted, Barrow states that he was not denied access to programming and medical trips because of lewd conduct, but because he refused to leave his cell while wearing the jumpsuit. Second Amend. Compl. ¶ 39. [12] Barrow's choice not to participate in the programming and services made available to him cannot now be transformed into unlawful acts by defendants serving as a basis for liability.

Accordingly, defendants' motion to dismiss on these grounds should be granted.

### III. Conclusion

**WHEREFORE,** based on the findings set forth above, it is hereby:

1. **RECOMMENDED,** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No 67) be **GRANTED** as to plaintiff's:

   a. First Amendment claims;

   b. Eighth Amendment claim insofar as it alleged inadequate prison conditions;

   c. Eighth Amendment claim insofar as it alleged inadequate treatment and deliberate indifference to plaintiff's exhibitionism and foot condition;

   d. Fourteenth Amendment claims;

   e. ADA claim;

   f. RA claim; and

   g. 11th Amendment claim;

2. Further **RECOMMENDED** that Defendants' motion to dismiss for failure to state a cause of action (Dkt. No. 7) be **DENIED** as to plaintiff's:

> a. Eighth Amendment deliberate indifference claim, regarding the condition of depression;

3. Further **RECOMMENDED,** that Defendants' motion to dismiss for lack of subject matter jurisdiction (Dkt. No. 67) be dismissed as no arguments were made in support of this motion.

**\*24 ORDERED,** that copies of this Report–Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**SO ORDERED.**

Dated: September 25, 2014.

**All Citations**

Slip Copy, 2015 WL 417084

Footnotes

1   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   Barrow also alleges that his rights were violated under the Patients' Bill of Rights. Second Am. Compl. ¶ 33. However, a violation of state law does not implicate a federal right for purposes of a section 1983 action. *Hanrahan v. Menon,* No. 07–CV–610, 2010 WL 6427650, at *13 (N.D.N.Y. Dec.15, 2010) (citations omitted) (finding claim of a violation under the Patients' Bill of Rights is not cognizable in a section 1983 action).

3   To the extent that it can be inferred that Barrow asserts a violation of the physician-patient privilege, such a claim cannot be sustained. Because Barrow commenced this case as a section 1983 action, federal law applies. As federal law does not recognize the physician-patient privilege, this claim would also fail. *Barnes v. Glennon,* 9:05–CV–0153, 2006 WL 2811821, at *4–*5 (N.D.N.Y. Sept.28, 2006).

4   Barrow does not specify which defendants have personal knowledge of each alleged constitutional violations. It appears that Barrow intends to argue that each defendant had personal knowledge of each alleged constitutional violation (*see* Second Am. Compl. at 15 ("All defendants mentioned in these papers ... has [sic] caused Plaintiff ... to be deprived of the 14th and 8th amendment rights secured by the U.S.A. [C]onstitution. Also, the A.D.A. [t]itle II and section 504 of the Rehabilitation Act")). Where Barrow does not identify which defendants he brings each cause of action against, unless otherwise indicated, this report assumes that Barrow is alleging personal involvement of each constitutional violation upon each defendant.

5   All unpublished decisions are attached to this Report and Recommendation.

6   Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision has affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

7   Indeed, Barrow concedes that he has had incidents of exposure while incarcerated. Dkt. No. 50, at 18.

8   The United States Supreme Court has held that "[w]hether one characterizes the treatment received by [the prisoner] as inhumane conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle [v. Gamble]." Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

9   Barrow did not include a claim regarding any of his parole concerns in the instant complaint. Even if he had, such claims should be dismissed. The Supreme Court has held that

while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's authority scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.

*Robles v. Dennison,* 745 F.Supp.2d 244, 263 (W.D.N.Y.2010) (citing *Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Board of Pardons v. Allen,* 482 U.S. 369, 371, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987)). The Second Circuit has determined that because New York's parole scheme delegates discretion to the Parole Board in granting an inmate parole, that scheme does not create a due process liberty interest in parole. *Barna v. Travis,* 239 F.3d 169, 170–71 (2d Cir.2001) (citing *Greenholtz,* 442 U.S. at 11–13). Because Barrow cannot allege that he has a liberty interest in his parole, to the extent that he has attempted, he has failed to state a due process claim.

10    Insofar as Barrow complains that his failure to attend programming negatively impacted his parole date, as noted (*supra* n. 8), even if this statement were sufficient to raise a denial of a liberty interest claim, such claim must fail, as there is no due process interest in parole. *See Barna,* 239 F.3d at 170–71.

11    To avoid repetition or confusion, to the extent Barrow may raise privacy claims under both the Eighth and Fourteenth Amendment, they will both be discussed in this section of the Report.

12    Even assuming Barrow alleged sufficient facts to state a claim under the ADA or RA, the individual defendants cannot be held liable for a violation of the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009).

---

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.    19

2010 WL 419999
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry BENITEZ, Plaintiff,

v.

J. LOCASTRO, Lt.; Lt. Miller; D. Selsky, Dir. of
Shu; J. Burns; Sgt. Martens; C. Gummerson, Capt.;
J. Rourke, Capt.; M. Bradt; C. Parmiter; J. Burge;
T. Eagen, Dir. of Corrections; J. Wilkinson; R.
Smith; C.O. Baranska; R.N.S. Lennox; J.Porten; J.
Mcnamara; John Does 1–6, C.O.s; R. Smith, R.N.;
W. Chilson, Sgt.; Sergeant Colon; R. Considine,
C.O.; Psych. Kneeland; V. Konecny; C.O. Clarke;
S. Crozier; John Doe, XII, C.O.; Cho Wolczyk;
Sergeant Smith; C.O. Miller; S. Yorkey, Sgt.;
Sgt. Murley; Lt. Easterbrook; C.O. Loomis; T.
Quinn; Sgt. Christopher; C.O. Roux; C.O. Leonello;
C.O. Meyers; M. Kessel; G. Maccucci, C.O.;
E. Amberman; and M. Melindez, Defendants.

No. 9:04–CV–423 (NAM/RET).
|
Jan. 29, 2010.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York State, Ed. J. Thompson, Assistant Attorney
General, Syracuse, NY.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., Assistant Attorney
General, of Counsel, Albany, N.Y., for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), brought this
action under 42 U.S.C. § 1983. The amended complaint
(Dkt. No. 5) alleges various constitutional deprivations in
connection with several incidents at Auburn Correctional

Facility in 2001 and 2002. Defendants moved for summary
judgment dismissing the action (Dkt. No. 118). Upon referral
pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c),
United States Magistrate Judge Randolph F. Treece issued
a thorough Report and Recommendation (Dkt. No. 139)
recommending that summary judgment be granted in part and
denied in part. Specifically, regarding the Eighth Amendment
excessive force/medical indifference claims stemming from
the events of July 9, 2002, Magistrate Judge Treece finds
questions of fact regarding exhaustion and recommends as
follows: that the claims against Nurse R. Smith be dismissed;
that summary judgment be denied as to all other July 9,
2002 excessive force claims (*i.e.,* the claims against J. Rourke
and the John Doe defendants); and that plaintiff be granted
leave to file a second amended complaint to substitute
named defendants for the John Doe defendants. Magistrate
Judge Treece recommends dismissal of plaintiff's Eighth
Amendment conditions-of-confinement claims relative to
the following: deprivation orders issued in November 2001
and July 2002; poor cell ventilation due to cell shield;
denial of meals; and injuries from tight shackles and cuffs.
Magistrate Judge Treece further recommends dismissal of
plaintiff's claims that the deprivation, restraint, and cell shield
orders were retaliatory. In addition, Magistrate Judge Treece
recommends dismissal of plaintiff's due process claims
regarding the disciplinary hearings of November 21, 2001,
July 11, 2002, and July 16, 2002.

Plaintiff filed an objection (Dkt. No. 140) to certain aspects
of the Report and Recommendation. As to all other portions
of the Report and Recommendation, by failing to object,
plaintiff waives further judicial review. *See Roldan v. Racette,*
984 F.2d 85, 89 (2d Cir.1993). Pursuant to 28 U.S.C. § 636(b)
(1)(C), this Court conducts a *de novo* review of the portions
of the Report and Recommendation to which plaintiff objects,
specifically the recommendations that the Court dismiss
plaintiff's medical indifference claim against Nurse R. Smith
stemming from the July 9, 2002 incident, and his Eighth
Amendment claims stemming from the deprivation orders
issued in November 2001 and July 2002. Upon *de novo*
review, the Court agrees with Magistrate Judge Treece's
factual summary, analysis, and recommendation regarding
these issues. Accordingly, the Court accepts the Report and
Recommendation in its entirety.

It is therefore

ORDERED that United States Magistrate Judge Randolph F. Treece's Report and Recommendation (Dkt. No. 139) is accepted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 118) is granted to the extent of dismissing all claims except the Eighth Amendment excessive force claims against Rourke and John Does Nos. 1–6 stemming from the events of July 9, 2002; and it is further

**\*2** ORDERED that plaintiff is granted 30 days from the date of this Memorandum–Decision and Order to file a motion to amend his amended complaint in order to identify John Does Nos. 1–6, which shall include a proposed second amended complaint attached thereto.

IT IS SO ORDERED.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Henry Benitez filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated during several events that allegedly occurred at Auburn Correctional Facility in 2001 and 2002. Specifically, Plaintiff alleges violations of his constitutional rights as guaranteed by the First Amendment (retaliation), Eighth Amendment (excessive force and conditions of confinement), and Fourteenth Amendment (due process). Dkt. No. 5, Am. Compl. Presently before the Court is Defendants' Motion for Summary Judgment, Dkt. No. 118, which Plaintiff opposes, Dkt. Nos. 137–38.

Previously, this Court issued a Report–Recommendation and Order addressing Defendants' Motion for Judgment on the Pleadings, which was adopted in its entirety by the Honorable Norman A. Mordue, Chief United States District Judge for the Northern District of New York. Dkt. Nos. 106 & 108. Chief Judge Mordue's Order dismissed the following Defendants: Amberman, Christopher, Colon, Easterbrook, Kessel, Konecny, Lennox, Leonello, Loomis, Maccucci, McNamara, Melindez, Meyers, C.O. Miller, Murley, Parmiter, Porten, Quinn, Roux, Sgt. Smith, Wilkinson, and Yorkey. Dkt. No. 108, Order at p. 2.

Defendants' current Motion is brought on behalf of the remaining Defendants.[1] For the reasons that follow, it

is recommended that Defendants' Motion for Summary Judgment be **GRANTED in part** and **DENIED in part.**[2]

## I. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages,*

*Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Eighth Amendment Claims

#### 1. *Excessive Force and the Events of July 9, 2002*

Plaintiff asserts that "[o]n July 9, 2002, [he] threw a liquid substance through the narrow food port of his cell, striking [Defendants] Lennox and Martens." Dkt. No. 5, Am. Compl. at ¶ 26. Shortly thereafter

> Porten, McNamara, and various other guards approached Benitez's cell and ordered him to submit to mechanical restraints. Benitez then requested to be allowed to speak to a captain. Sergeant Vasile (not a defendant) refused, whereupon Benitez threw a liquid substance though the narrow food port on the gate of his cell.

> About 10 minutes after the incident described [ ] [above], [Defendant] Rourke walked past Benitez's cell and gave Benitez the finger. Shortly thereafter, Rourke and Defendants John Does Nos. 1–6 approached Benitez's cell. Rourke then asked Benitez whether or not he would come out of his cell. Benitez responded in the affirmative. With a callous and malicious intent to subject Benitez to gratuitous humiliation and punishment, Rourke ordered John Does Nos. 1–6 to forcibly remove Benitez from his cell.

> Acting on Rourke's order, John Does Nos. 1–4 rushed into Benitez's cell, whereupon John Doe No. 1 maliciously and sadistically struck Benitez on the top of his head with a large body shield [made of] plexiglas, knocking Benitez on his bed face down and breaking his eyeglasses. John Does Nos. 1–4 then maliciously and sadistically punched Benitez in his face, head, neck, back, rib cage and arms rapidly and repetitiously, and Benitez passed out.

* * *

While punching Benitez about his body, John Does Nos. 1–4 maliciously and sadistically twisted Benitez's hands, fingers, and feet while simultaneously using enormous pressure to tighten too tightly handcuffs and leg irons that had been placed on Benitez.

> **\*4** John Does Nos. 1–6 forcibly removed Benitez from his cell and placed him in a strip cell.... There, John Does 1–6 cut Benitez's clothes off of his person. Benitez, who was then experiencing enormous pain about his entire body, was then "examined" by Defendant Nurse R. Smith.... Nurse Smith willfully and knowingly falsely wrote in Benitez's medical chart that he had minor injuries. Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain.

> Thereafter, John Does Nos. 1–6 walked Benitez naked cuffed and shackled with a restraining strap from P3–cell into A1–cell. There, John Does 1–3 maliciously and violently slammed Benitez against a metal bed frame, causing Benitez to severely strike his face against the metal bed frame. While forcibly holding Benitez['s] face down on the metal frame, John Does Nos. 1–3 maliciously and sadistically punched Benitez on his face, head, back, rib cage, and arms, even though he did not struggle nor resist. John Does Nos. 1–3 then removed the handcuffs, shackles, and restraining strap from Benitez's person and rushed out of the cell.

*Id.* at ¶¶ 26–33.

Plaintiff alleges to have suffered several injuries as a consequence of the above incidents, including a "laceration in the front of his head," bruising all over his body, and "permanent nerve damage [to his] [ ] wrists, hands, fingers, and ankles." *Id.* at ¶¶ 34–35.

Defendants assert Plaintiff has failed to exhaust all of his claims arising out of the July 9, 2002 incident. The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

The New York State Department of Corrections has created a three-step grievance process known as the Inmate Grievance Program ("IGP"). *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within twenty-one (21) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(a)(1) (2007). The complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC) to review the grievance. *Id.* at § 701.5(b). Second, if the inmate disagrees with the IGRC decision, then the inmate may appeal to the Superintendent. *See id.* at § 701.5(c). Third, if the inmate disagrees with the Superintendent's determination, an appeal may be taken to the Central Office Review Committee (CORC) who renders a final administrative determination. *Id.* at § 701.5(d). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)).

**\*5** The Second Circuit has suggested a three-step inquiry when, as here, the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667–68 (2d Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that

justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 676 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003)[.]

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181–82 (2d Cir.2005).

In response to Defendants' exhaustion argument, Plaintiff asserts that he was unable to exhaust these claims because (1) he was denied a pen and paper from July 9 through August 8, 2002; (2) from August 8–17, 2002, various Defendants refused to submit his outgoing mail and grievances; and (3) on September 4, 2002, he submitted a seven (7) page Grievance concerning the events of July 9th to Officer Hnatiw,[3] but Defendant Parmiter did not process that Grievance in order to obstruct his filing of a federal civil action. Dkt. No. 137, Pl.'s Mem. of Law at pp. 6–9 & Henry Benitez Decl., dated July 15, 2009, at ¶¶ 4–9; *see also* Am. Compl. at ¶¶ 51, 53, 55 & 86.

With respect to Plaintiff's first allegation, Defendants have submitted copies of Deprivation Orders indicating that Plaintiff was denied all in-cell property from, at the latest, July 14, 2002, through, at the earliest, July 25, 2002.[4] Dkt. No. 118–7, Mark L. Bradt Aff., dated Dec. 9, 2008, Ex. C, Deprivation Orders, dated July 9–25, 2002.

As per Plaintiff's second allegation, the record shows that he filed a Grievance, dated August 17, 2002, complaining that several Defendants refused to take his outgoing mail from August 8–17, 2002. Benitez Decl., Ex. B, Grievance, dated Aug. 17, 2002. The record also reflects that two of Plaintiff's Grievances, dated August 8, 2002, were not stamped received by the IGRC until August 21, 2002. Dkt. No. 118–5, Defs.' 7.1 Statement, Ex. P, Grievances, dated Aug. 8, 2002 (stamped received by the IGRC on Aug. 21, 2002). In one of those Grievances, Plaintiff asserted: "[o]n July 9, 2002, I was forcibly moved from SHU cell G–2 to SHU cell A–1 by an extraction team that, among other things, allegedly broke my glasses," and requested information about the status of the repairs to his broken glasses. *Id.,* Ex. P, Grievance, dated Aug. 8, 2002. That Grievance contains no other allegations concerning the events of July 9.

**\*6** With respect to Plaintiff's claim that Parmiter refused to process a Grievance he filed on September 4, 2002, there is no evidence presented before us by either side to support or rebut that claim. However, such allegation was arguably raised, albeit with less specificity, in Plaintiff's Amended

Complaint: "from August 8, 2002 to September 12, 2002, Parmiter willfully and knowingly wrongly refused to file numerous formal grievances submitted by Benitez." Am. Compl. at ¶ 86.[5]

Considering the above allegations about the obstruction of Plaintiff's grievances, and lack of evidence before us regarding those claims, we find that questions of fact exist with respect to whether the Defendants' own actions inhibited Plaintiff's ability to exhaust available administrative remedies, and therefore, whether they should be estopped from asserting the affirmative defense of failure to exhaust. The record shows that Plaintiff was deprived of all in-cell property for most of July 2002 and, as he points out, DOCS regulations require that grievances be submitted within twenty-one (21) days of the alleged occurrence. N.Y. CODES COMP. R. & REGS, tit. 7, § 705.1(a). Thus, it is possible that even if Plaintiff had filed a grievance after the Deprivation Orders were lifted it may have been denied as untimely. As such, there are also questions as to whether "special circumstances" exist that might justify Plaintiff's failure to exhaust. Therefore, we shall proceed to the merits of Plaintiff's claims surrounding the events of July 9, 2002.

Defendants assert that Plaintiff's excessive force claims against John Does Nos. 1–6 should be dismissed for failure to allege personal involvement on the part of any named Defendant. Defs'. Mem. of Law at p. 27. In response, Plaintiff argues that the Defendants' failure to timely respond to his discovery requests delayed the revelation of the John Doe Defendants' identities. Pl.'s Mem. of Law at pp. 2–3. We note that in an Order, dated August 29, 2006, this Court granted Plaintiff's Motions to Compel Defendants to respond to his outstanding discovery requests, some of which concerned the identities of the John Does. Dkt. No. 88 at pp. 6–7. Then, on June 12, 2007, this Court addressed Plaintiff's unopposed Motion for Sanctions against Defendants for their alleged failure to comply with our August 2006 Order; we denied Plaintiff's Motion for Sanctions, but ordered Defendants' compliance with our August 2006 Order. Dkt. No. 91, Order at p. 3.

Plaintiff now asserts that the "Defendants recently complied with the Court's June 12, 2007 Order by disclosing to Benitez the identities of the Defendants at issue." Dkt. No. 137, Pl.'s Mem. of Law at p. 3.[6] Moreover, Plaintiff asserts his intention to seek leave to file a motion to amend his Amended Complaint to assert claims against these would-be Defendants. *Id.* Given the mixed and prolonged history of

discovery in this case, we believe it is appropriate to allow Plaintiff to submit a motion to amend his Amended Complaint in order to identify John Does Nos. 1–6.[7] Therefore, Defendants' Motion is **denied** as to Plaintiff's excessive force claims against John Does Nos. 1–6. Should this Report–Recommendation and Order be adopted by the District Court, we shall afford Plaintiff **thirty (30) days** from the date of such adoption to file a motion to amend his Amended Complaint to include the names of John Does Nos. 1–6.

**\*7** Plaintiff's claim against Defendant Rourke should also survive the Defendants' Motion. Although Plaintiff does not allege that Rourke physically participated in the alleged use of excessive force, he claims that Rourke maliciously ordered John Does 1–6 to forcibly remove him from his cell despite his willingness to leave, and then shouted "stop resisting" in order to "encourage John Does Nos. 1–4 to continue to inflict gratuitous humiliation and extreme physical pain on Benitez, even though he knew that Benitez was not resisting John Does Nos. 1–4." Am. Compl. at ¶¶ 29–30. Liberally interpreted, Plaintiff has asserted a claim that Rourke failed to protect him once the alleged beating commenced, and then encouraged the John Does to continue in that conduct. Although the documents Defendants have attached as Exhibit C to their 7.1 Statement support their contention that Rourke had Plaintiff extracted from his cell in order to place him in a different cell with a more secure food hatch so as to prevent his continued throwing of feces on prison staff,[8] nothing in the record answers Plaintiff's allegations that Rourke allowed and encouraged the use of excessive force against him *during* that extraction. Therefore, it is recommended that the Motion be **denied** as to Plaintiff's claims against Rourke.

However, Plaintiff's claims against Defendant Nurse R. Smith should be **dismissed.** Plaintiff's Eighth Amendment claim against Defendant Nurse Smith is that after he was allegedly beaten by John Does Nos. 1–6 during the cell extraction, "Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain." Am. Compl. at ¶ 32. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element

ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183–84 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

Defendants argue that Plaintiff has failed to allege that he suffered from a serious medical injury. Defs.' Mem. of Law at pp. 28–29. Plaintiff alleges that at the time he was presented before Nurse Smith, he was suffering from "extreme pain," but he does not allege the nature of that pain, its location, nor whether he communicated to Nurse Smith the nature or location of any injury he might have suffered or his need for pain medication. Plaintiff does allege that as a result of the excessive force used against him, he suffered a "laceration to the front of his head, and abrasions and multiple areas of bright red bruising on his nose, back, chest, stomach, arms, hands, legs and feet," as well as "permanent nerve damage [to his] [ ] wrists, hands, fingers, and ankles." Am. Compl. at ¶¶ 34–35. However, Plaintiff does not allege that Nurse Smith was made aware of any of those aforementioned injuries, nor does he provide any factual basis for his conclusion that he suffered nerve damage. With respect to his claims of bruises and a laceration (the size and depth of which he does not allege), those generally pleaded injuries do not constitute serious medical conditions under the Eighth Amendment. *See, e.g., Dawes v. Coughlin,* 159 F.3d 1346 (2d Cir.1998) (holding that a small laceration on an inmate's elbow was not a serious injury under the Eighth Amendment); *see also Dallio v. Hebert,* 2009 WL 2258964, at *16 (N.D.N.Y. July 28, 2009) (holding that black eyes, bruising, red spots, kick marks, and lacerations did not constitute a serious medical need). Therefore, we agree with Defendants that Plaintiff's claim that he suffered from a serious medical injury is conclusory and for that reason his claim against Nurse Smith should be **dismissed.** [9]

### 2. *Deprivation Orders*

**\*8** Plaintiff alleges that in November 2001 and July 2002, various Defendants issued Deprivation Orders against him in violation of the Eighth Amendment. [10] Plaintiff's allegations regarding November 2001 are as follows:

> Upon Benitez's arrival at Auburn prisoner's SHU on November 14, 2001, Defendant J. Burns [ ] wantonly filed a Deprivation Order ... against Benitez in retaliation for his having sued Burns and various other Auburn

prison employees in 1989. As a result, Benitez was denied the following items and services from November 14 to November 26, 2001: all allowable in-cell property; sink and toilet water; showers; one-hour outdoor exercise period; and, among other things, law library services. Am. Compl. at ¶ 8.

As for the July 2002 allegations, we summarized those claims in our previous Report–Recommendation addressing Defendants' Motion for Judgment on the Pleadings as follows:

> Plaintiff claims that Defendants Bradt and Chilson either approved or issued unspecified deprivation orders causing Plaintiff to be without the following items and services from July 9 through July 14, 2002: all in-cell property, pen, bed sheets, mattress, toilet tissue, running water, showers, exercise periods, and law library services. Am. Compl. at ¶ 51. Plaintiff also claims that from July 14 through July 25, 2002, and from July 25 through August 8, 2002, Defendants Bradt, Chilson, and Martens approved or issued more unspecified orders depriving him of the same items and services listed above. [11] *Id.* at ¶¶ 53 & 55.

Dkt. No. 106 at pp. 12–13.

Plaintiff also claims in his Amended Complaint that the above-mentioned July 2002 Deprivation Orders were approved of by Defendants Burge, Kneeland, Rourke, Gummerson, and Wolczyk. Am. Compl. at ¶¶ 52, 54, & 56. In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). With respect to deprivation orders, the Second Circuit has held that it is appropriate to consider whether the order in question "was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Defendants assert that the Deprivation Orders enforced against Plaintiff were issued for valid penological reasons. Mark L. Bradt was a Deputy Superintendent of Security ("DSS") at Auburn from January 7, 2002 through April 30, 2004. Bradt Aff. at ¶ 1. Bradt avers that "in order to make determinations regarding appropriate levels of security and restraint for the inmates in the prison, [he] frequently consulted the disciplinary histories of the inmates at the prison." *Id.* at ¶ 5. Prior to his arrival at Auburn, Plaintiff had a lengthy disciplinary history, which included the following violations of DOCS rules:

> **\*9** 1. creating a disturbance (5 times); 2. assault on staff (4 times); 3. lewd conduct (8 times); 4. threats (6 times); 5. unhygienic act (11 times); 6. arson (2 times); 7. flooding (2 times); 8. loss or damage to property (3 times); and 9. violent conduct (2 times).

*Id.* & Ex. A, Pl.'s Disciplinary History.

Bradt states that upon Benitez's arrival at Auburn on November 14, 2001, he was issued an order that deprived him of water, all cell property, bucket, and personal property from November 14–25,[12] 2001, because of his history of disruption and throwing things. Bradt Aff. at ¶ 7 & Ex. C, Deprivation Order, dated Nov. 22, 2001. That Deprivation Order was issued by then-DSS John Burns, who rescinded the order on November 26, 2001. *Id.*

On July 9, 2002, Bradt issued Plaintiff an order depriving him of cell property because Plaintiff had thrown "liquid substances on two (2) occasions from his cell onto Auburn C.F. staff members," and had flooded his and other cells in his section. Bradt Aff. at ¶¶ 8–9 & Ex. C, Deprivation Order, dated July 9, 2002. In his Amended Complaint, Plaintiff confirms that he engaged in such conduct. Am. Compl. at ¶¶ 26 ("Benitez threw a liquid substance through the narrow food port of his cell, striking Lennox and Martens.") & 28 ("Benitez [again] threw a liquid substance through the narrow food port on the gate of his cell."). Based on his judgment that Plaintiff continued to pose a security threat, Bradt continued the Deprivation Order until July 14th. Bradt Aff. at ¶ 9. On July 14th, Defendant Sgt. Martens recommended that the July 9th Deprivation Order be renewed because "on 7–9–02 [Benitez] threw feces on staff/nurse" and on "7–10–02 spit on staff while being served misbehavior reports." *Id.* at ¶ 10 & Ex. C, Deprivation Order. On July 16th, Bradt authorized

the renewal of the July 9th Deprivation Order, which was apparently expanded [13] to include showers, cell property, sheets and mattress, and renewed it again on July 20, 22, 23, and 24, 2002, "because plaintiff posed a continued threat to the safety and security of staff, inmates, or State property." Bradt Aff. at ¶¶ 10–11 & Ex. C, Deprivation Order, dated July 20, 2002.

For his part, Plaintiff alleges that these deprivation orders were retaliatory in nature. He points to a July 24, 2002 letter Bradt sent to Kate Rainbolt, a Staff Attorney for Prisoner's Legal Services of New York, in which he stated:

> In response to your concerns be advised that inmate Benitez ... is house[d] in "A" tank in the Special Housing Unit at Auburn. He was involved in an Unusual Incident on 7/9/02 involving aggravated harassment. The throwing of ones own human waste on another person isn't normal. He was placed in A–1 cell as it has a more secure feed up hatch. A Mental Health referral was submitted and OMH advised that *because of his agitated state that he be deprived of any item that he could use to harm himself.* He has been given all of his entitled property. Inmate Benitez was placed on a restricted diet in accordance with procedures established in Deputy Commissioner LeClaire's memo dated 4/24/00.

**\*10** Benitez Decl., Ex. D, Lt., dated July 24, 2002 (emphasis added).

Plaintiff argues that the italicized portion of the above letter undermines Bradt's statement that the Deprivation Orders were implemented due to his behavior. Pl.'s Mem. of Law at p. 11. That argument is without merit. The above letter provides additional confirmation of Benitez's gross acts, which Bradt asserts were the basis for the Deprivation Orders. Although Bradt mentions that certain objects were removed due to concerns over Plaintiff's mental health, that does not contradict his averment that the water, sheets, and other items were removed due to Plaintiff's behavior.

It is clear from the record that the above Deprivation Orders were issued in response to Plaintiff's own actions and

history of misbehavior. *See Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)). Plaintiff has offered no evidence beyond his own accusations to suggest otherwise. Because there is no evidence of any deliberate indifference on Defendants' part, it is recommended that these Eighth Amendment claims be **dismissed.**

### 3. *Cell Ventilation*

Plaintiff alleges he filed a Grievance on January 26, 2002, complaining about lack of ventilation in his cell that was causing him "bronchospasm and great difficulty breathing." Am. Compl. at ¶ 15. Plaintiff asserts that Defendants J. Burge and T. Eagen reviewed his Grievance and failed to remedy the situation, which caused Plaintiff to suffer, on July 1, 2002, "great difficulty breathing and lost consciousness," and a severely injured head. *Id.* at ¶¶ 16–17 & 24.

The record reflects that Plaintiff filed a Grievance, dated January 26, 2002, in which he complained that the plexiglass shield used to cover the opening in his cell did not provide adequate ventilation. Defs.' 7.1 Statement, Ex. K, Grievance, dated Jan. 26, 2002. In a Memorandum, dated April 13, 2002, Sgt. Martens noted that "[t]here are numerous holes drilled in [the] cell shield for adequate ventilation," and that he noticed upon inspection that Benitez "had piled in front of his cell shield four (4) bags of legal work—blocking his ventilation holes." *Id.,* Mem., dated Apr. 13, 2002. Plaintiff appealed the January 26th Grievance to Superintendent Burge, who denied his appeal on April 15, 2002, stating that "[a] private contractor completed a scientific survey of the air quality of all cells in SHU," and that "[a]ll cells meet or exceed air quality standards." *Id.,* Sup't Decision, dated Apr. 15, 2002. CORC also denied Plaintiff's Grievance on appeal. *Id.,* CORC Decision, dated May 15, 2002.

In another Grievance, dated July 1, 2002, Plaintiff complained that

> **\*11** [o]n July 1, 2002, at about 7[ ] p.m., I began to sweat profusely and to experience great difficulty breathing normally (I suffer from asthma).

Thereafter, I "blacked out" (lost consciousness) and fell from my bed onto the floor, causing injury to my head. I have been experiencing difficulty in breathing normally and have been drifting in and out of [consciousness] for the past 6 months due to inadequate ventilation on the plexiglass which covers the entire front of my assigned cell.

Defs.' 7.1 Statement, Ex. N, Grievance, dated July 1, 2002.

That Grievance was denied after Nurse Administrator A. Driscoll reported that her examination of Plaintiff on July 3, 2002, had revealed no abnormality in Plaintiff's lungs, nor did he exhibit any difficulty breathing. *Id.,* Investigative Rep., dated July 10, 2002.

As Defendants point out, Plaintiff does not allege the nature of his alleged head injury, nor any other ventilation-related incident that occurred during the six-month period from January through July 2002 during which Plaintiff alleges to have been deprived of adequate ventilation. In addition, Plaintiff offers no evidence to substantiate his claims that he was denied adequate ventilation. The evidence available indicates that the protective plexiglass shield, which was imposed due to Plaintiff's affinity for throwing liquid substances from his cell, had holes in it, and that Plaintiff never presented to medical staff with breathing problems.

Given the evidence before us, we find that no questions of material fact exist with respect to these ventilation claims. Therefore, these claims should be **dismissed.**

### 4. *Denial of Meals*

In our previous Report–Recommendation addressing Defendants' Motion for Judgment on the Pleadings, we recommended dismissal of the majority of Plaintiff's claims regarding his alleged denial of meals. Dkt. No. 106 at pp. 11–12. However, we recommended against dismissal of Plaintiff's allegation that he was wantonly deprived breakfast and lunch on January 28, 2002, by Defendants Smith and Baranska, respectively. *Id.* at p. 12; Am. Compl. at ¶¶ 22–23.

Defendants have now submitted a Grievance, dated January 28, 2002, in which Plaintiff asserts that

[o]n 1/28/02, Sgt. Murler informed me that he had been advised that Sgt. Cooper or Lt. Easterbrook had placed me on a so-called pre-hearing restricted diet. I informed Sgt. Murler that any such pre-hearing diet would violate Directive 4933, § 304.2(b)(1)-(4) because that section does not authorize[d] imposition of a pre-hearing diet, and because I have not engage[d] in any misconduct that would warrant imposition of a restricted or pre-hearing restricted diet. Nevertheless, *I was offered a restricted diet for breakfast and for lunch, both of which I refused.*

Defs.' 7.1 Statement, Ex. J, Grievance, dated Jan. 28, 2002 (emphasis added).

Thus, by Plaintiff's own admission, he was offered both breakfast and lunch on January 28, 2002. Therefore, it is recommended that Plaintiff's remaining meal-deprivation claims be **dismissed.**

### 5. *Tightness of Shackles and Cuffs*

**\*12** Plaintiff alleges that on August 17, 23, 27, 28, and September 3, 2002, Defendant Considine "willfully and wantonly" placed handcuffs and shackles on his ankles and wrists too tightly, causing him "great pain and permanent nerve damage." Am. Compl. at ¶¶ 58–61. Plaintiff also alleges that on September 7, 2002, Defendant Clarke placed shackles on him too tightly, also causing him pain and nerve damage. *Id.* at ¶ 82. Defendants assert that the above allegations are conclusory and insufficient to state a valid claim under the Eighth Amendment as a matter of law. Defs.' Mem. of Law at pp. 30–33. We agree.

Although a cause of action may lie under the Eighth Amendment for injuries caused by the wanton use of extremely tight handcuffs and/or shackles, *see, e.g., Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994), in this case, Plaintiff does not state enough facts to state a valid claim. Plaintiff does not allege for how long the handcuffs and shackles were applied, nor the circumstances of their application. He simply alleges that they were applied "wantonly" and caused severe pain and nerve damage, without any explanation as to how

the nerve damage was caused or how he learned of such injury. *See Jemzura v. Public Service Com'n,* 961 F.Supp. 406, 413 (N.D .N.Y.1997) (citing *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987) for the proposition that "[e]ven a *pro se* Complaint must be dismissed if it contains only conclusory, vague or general allegations") (internal quotations omitted).

Therefore, it is recommended that these conclusory allegations be **dismissed** as a matter of law and pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii), which gives the Court the power to dismiss *at any time* a complaint brought by a prisoner proceeding *in forma pauperis* for failure to state a claim.

### D. Retaliation

Plaintiff alleges that the Deprivation, Restraint, and Cell Shield Orders discussed above were issued against him in retaliation for lawsuits he filed in 1989. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*13** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138–39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded).

Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995)).

### 1. *Deprivation Orders*

Plaintiff asserts that the November 2001 and July 2002 Deprivation Orders were issued in retaliation for lawsuits he filed against Burns and other Auburn employees in 1989. Am. Compl. at ¶¶ 8–11. The filing of lawsuits is conduct protected by the First Amendment, however, Plaintiff has failed to show a causal connection between the lawsuits he filed in 1989 and the issuance of the Depravation Orders. As discussed above, Plaintiff has offered no evidence to rebut Defendants proof that the Deprivation Orders were precipitated by Plaintiff's own actions and history of misbehavior. Furthermore, there is no evidence that the Deprivation Orders issued in 2001 were motivated by lawsuits he filed in 1989. Indeed, such a significant temporal gap undermines any allegation of a causal connection. Therefore, it is recommended that these retaliation claims be **dismissed.**

### 2. *Restraint and Cell Shield Orders*

Plaintiff asserts that Defendant Burns issued retaliatory Restraint and Cell Shield Orders against him on November 14, 2001, which were renewed through June 25, 2002, by Burns, Gummerson, Rourke, and Bradt. Am. Compl. at ¶¶ 8–11. Restraint orders "designate what restraints need to be placed on inmates when they are out of their cells, including hand cuffs and leg irons." Bradt Aff. at ¶ 20. A cell shield is "a transparent cell front covering, equipped to provide adequate ventilation," which are ordered to, *inter alia,* protect against "[s]pitting through the cell door, or the throwing of feces, urine, food, or other objects through the cell door." N.Y. COMP.CODES R. & REGS. tit. 7, § 305.6(a)-(b).

Bradt asserts that Plaintiff was issued Restraint and Cell Shield Orders upon his arrival at Auburn on November 14, 2001, due to "Benitez's extensive record of threats, violence, and unhygienic acts toward staff" and history of disruptive behavior. Bradt Aff. at ¶¶ 14, 18, 21 & Exs. D–E, Shield and Restraint Orders, dated Nov. 14, 2001 through Sept. 10, 2002.

Those Orders were subsequently renewed by Defendants Burns, Rourke, Gummerson, and Bradt on a weekly basis due to Plaintiff's disciplinary history. *Id.* at ¶¶ 15 & 22.

**\*14** Thus, Defendants have provided evidence that the Shield Orders were imposed for valid penological reasons. Beyond his allegations, Plaintiff offers no proof that the Shield and Restraint Orders were issued for any improper reason. Also, as mentioned above, the fact that he sued several Defendants in 1989 is not sufficient to demonstrate a causal connection to the Shield and Restraint Orders issued in 2001 and 2002. Therefore, it is recommended that these retaliation claims be **dismissed.**

### E. Due Process Claims

Plaintiff alleges that his due process rights were violated during the course of three separate Disciplinary Hearings conducted in November 2001 and July 2002. Am. Compl. at ¶¶ 2–7 & 41–50. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.* However, because Defendants do not challenge Plaintiff's assertion of a liberty interest, we move directly to the question of whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974).

A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four (24) hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action taken. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983)).

### 1. *November 2001 Disciplinary Hearing*

Plaintiff alleges Defendant Locastro violated his due process rights at a Disciplinary Hearing that commenced on

November 21, 2001. Am. Compl. at ¶¶ 1–6. Specifically, Plaintiff alleges that (1) he was denied the right to present a video as documentary evidence; and (2) Locastro improperly took confidential testimony from Wayne Crozier and, without offering any justification, refused to disclose the substance of such testimony. *Id.*

Plaintiff was transferred from Clinton Correctional Facility to Auburn on November 14, 2001. Am. Compl. at ¶ 8. On November 8, 2001, while still incarcerated at Clinton, Plaintiff was issued a Misbehavior Report accusing him of squirting a brown liquid that smelled like feces from a toothpaste tube on C.O. R. Duprey, [14] and charging him with the following violations: assault, threats, disruptive behavior, harassment, and committing an unhygienic act. Defs.' 7.1 Statement, Ex. B, Misbehavior Rep., dated Nov. 8, 2001.

**\*15** During the Disciplinary Hearing, which was held at Auburn after Plaintiff's transfer, Plaintiff requested a copy of a security videotape from Clinton that would show the incident and allegedly prove his innocence. *Id.,* Ex. S, Disciplinary Hr'g Tr., dated Mar. 21, 2002, at p. 10. Defendant Locastro, who presided over the Hearing, adjourned the proceeding so Plaintiff could make his evidentiary requests through an assistant. *Id.* at pp. 11–12. When the Hearing resumed, Locastro read into the record a memo from Defendant Lt. Miller indicating that "there is no videotape of the incident available" because the "system which would normally record all the areas of our Special Housing Unit was not operating on 11/08/01." *Id.* at p. 13. Locastro noted that he couldn't "produce something that's unavailable." *Id.* at p. 14.

Later in the Hearing, Plaintiff asserted that in another recent Disciplinary Hearing held at Auburn concerning charges against him that also stemmed from events occurring at the SHU in Clinton on November 8, 2001, he was provided a videotape of that incident and was able to prove his innocence therewith. *Id.* at pp. 30–33. Notwithstanding that argument and Plaintiff's production of proof of the favorable disposition he received in that Hearing, Locastro still found Plaintiff guilty of creating a disturbance, assault on staff, committing an unhygienic act, and harassment; Locastro found Plaintiff not guilty of making threats. *Id.* at p. 34. In rendering his decision, Locastro relied on the testimony of C.O. Duprey and the confidential testimony of Mr. Wayne Crozier. *Id.*

Plaintiff alleges that Locastro's failure to produce a videotape of the November 8, 2001 incident at Clinton violated his due process rights. The record shows that Locastro attempted

to obtain the video, but was informed of its unavailability in a memo from Defendant Miller. Locastro did not violate Plaintiff's due process rights when he relied upon Miller's statement that the videotape was unavailable. *See, e.g., Hodges v. Jones,* 873 F.Supp. 737, 744 (N.D.N.Y.1995) ("Due Process does not require that the hearing officer's credibility assessments or weighing of the evidence be evaluated; rather, the relevant standard is whether there is some evidence in the record to support the disciplinary decision.") (citing *Superintendent, Massachusetts Corr. Inst. v. Hill,* 472 U .S. 445, 455 (1985)). After reviewing the Hearing Transcript, it is clear that Locastro's disposition was based on "some evidence," which included Officer Duprey's testimony that Plaintiff squirted liquid fecal matter at him using a toothpaste tube. Defs.' 7.1 Statement, Ex. S, Disciplinary Hr'g Tr. at pp. 26–27. Finally, Plaintiff was provided notice of the charges against him, an opportunity to present other evidence and to question witnesses, and Locastro's disposition statement that included the evidence relied upon. *Id.* at pp. 1–35.

**\*16** Plaintiff also alleges that Locastro violated his due process rights when he took confidential testimony from Wayne Crozier. With respect to that testimony, Defendant Locastro has submitted an Affidavit asserting that

> [a]fter reviewing the record and hearing from plaintiff, I decided to conduct a confidential interview, via telephone, of the Mental Health Staff at Clinton CF. I did so to determine if there were any medical or legitimate psychiatric reasons that would mitigate any penalty I might impose on Plaintiff. I excluded plaintiff from the interview as standard DOCS procedure at the time, to protect the mental health care staff from any possible retaliation and to insure their candor in relating whether or not an inmate's behavior could be excused or explained as resulting from mental illness.

> I did not seek any evidence related directly to the charges in conducting the confidential interview. I only sought to determine if there were mental health concerns that might have been relevant to plaintiff's behavior.

Dkt. No. 132, Joseph Locastro Aff., dated June 1, 2009, at ¶¶ 3–4. [15]

Defendants note that pursuant to DOCS regulations, "[w]hen an inmate's mental state or intellectual capacity is at issue," the hearing officer "shall consider evidence regarding the

inmate's mental condition or intellectual capacity." N.Y. COMP.CODES R. & REGS., tit. 7, § 254.6(b). Plaintiff has not offered any response to Locastro's averments. There is no evidence to suggest that Plaintiff's due process rights were in any way violated when Locastro interviewed Crozier to ascertain if there existed any mitigating circumstances occasioned by Plaintiff's mental health.

Therefore, it is recommended that these due process claims be **dismissed.**

### 2. *July 11, 2002 Disciplinary Hearing*

On July 11, 2002, Defendant Gummerson presided over a Disciplinary Hearing concerning three separate Misbehavior Reports all issued on July 9, 2002. Plaintiff alleges that on July 11, 2002, Defendants C. Clarke and S. Crozier "willfully and knowingly falsely told Gummerson that Benitez had refused to attend [the hearing]." Am. Compl. at ¶ 41. Benitez asserts that Gummerson

> wilfully and wantonly commenced the hearing ... without making an attempt to interview [him] personally in order to ascertain (a) whether Benitez had been provided a copy of the misconduct reports ...; (b) whether Benitez had made a knowing, voluntary, and intelligent waiver of his right to attend the hearing; and (c) whether Benitez had been advised of the consequences of his failure to attend the hearing.

*Id.* at ¶ 42.

Furthermore, Plaintiff asserts that after he was found guilty of charges, Clarke and Crozier refused to provide him with a copy of the hearing disposition sheet. *Id.* at ¶ 44.

Defendants have provided a copy of a Waiver Form, dated July 11, 2002, signed by Defendant Crozier, which indicates that Plaintiff refused to attend the Hearing and also refused to sign the waiver form acknowledging such refusal. Defs.' 7.1 Statement, Ex. D, Waiver Form, dated July 11, 2002. Defendants have also submitted a copy of an Inter–Departmental Communication from Clarke to Gummerson, in which Clarke states that on July 11, 2002, he delivered a copy of the disposition rendered in the July 11th Tier III Disciplinary Hearing as well as an appeal form to Benitez.

*Id* ., Inter–Dep't Comm., dated July 11, 2002. Finally, a case data worksheet reflects that Plaintiff was provided copies of the three Misbehavior Reports on July 10, 2002. *Id.,* Case Data Worksheet, dated July 10, 2002.

**\*17** Beyond his own accusations, Plaintiff has offered nothing to rebut the Defendants' documentary case. *See* Pl.'s Mem. of Law at pp. 16–19. Although Plaintiff alleges that Gummerson knew that he did not have copies of the July 9th Misbehavior Reports because he was under Deprivation Orders and "that Clarke and Crozier had falsely notified him [on July 11, 2002] that Benitez had refused to attend the hearing," Pl.'s Mem. of Law at p. 17, there is nothing in the record to substantiate those claims. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."). Furthermore, Plaintiff has offered no legal support for his conclusion that a hearing officer is required to personally interview an inmate in order to assure the voluntariness of his waiver of appearance, nor has the Court's research revealed any precedents supporting such conclusion. Therefore, because Plaintiff received a copy of the Misbehavior Report, waived his right to attend the Disciplinary Hearing, and was provided a copy of its disposition, it is recommended that these claims be **dismissed.** *See Dawes v. Carpenter,* 899 F.Supp. 892, 897 (N . D.N.Y.1995) (citing *Boddie v. Connecticut,* 401 U.S. 371 (1971) for the proposition that "[d]ue process requires only that an accused have an opportunity to be heard, an opportunity that can be waived").

### 3. *July 16, 2002 Disciplinary Hearing*

Plaintiff makes similar allegations concerning his July 16, 2002 Disciplinary Hearing: (1) John Doe No. 7 denied him a copy of the Misbehavior Report; (2) Clarke and Considine "falsely told Defendant Wolcyzk [ ] that Benitez had refused to attend" the Disciplinary Hearing; (3) Wolcyzk "wantonly commenced the hearing without making an attempt to interview Benitez personally" in order to determine if his waiver was voluntarily and intelligently made; and (4) Clarke and Crozier "refused to provide [him] a copy of the hearing disposition sheet." Am. Comp. at ¶¶ 45–47 & 49.

The July 16, 2002 Disciplinary Hearing concerned a Misbehavior Report issued against Plaintiff on July 10, 2002. Defs.' 7.1 Statement, Ex. E, Misbehavior Rep., dated July 10,

2002. Once again, Defendants have submitted documentary evidence that Plaintiff waived his right to be present at the Disciplinary Hearing and was provided a copy of the disposition. A "Refusal to Attend Hearing" Form, dated July 16, 2002, reflects that Plaintiff refused to attend the July 16 Tier III Hearing and also refused to sign the refusal form. *Id.,* Refusal to Attend Hr'g Form, dated July 16, 2002. Also in the record is an Inter–Departmental Communication from Clarke to Wolcyzk indicating that he delivered Plaintiff a copy of Wolcyzk's disposition on July 17, 2002, as well as an appeal form. *Id.,* Inter–Dep't Comm., dated July 16, 2002. Finally, a Case Data Worksheet shows that Plaintiff was given a copy of the July 10 Misbehavior Report. *Id.,* Case Data Worksheet, dated July 11, 2002.

**\*18** Contrariwise, Plaintiff has offered no evidence in support of his allegations. Therefore, because Plaintiff has failed to show a material question of fact exists with respect to these due process claims, it is recommended that they be **dismissed.**

### F. Failure to Serve

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m).[16] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

In this case, there is no indication that the Defendants John Does Nos. 1–7, and C.O. Smith[17] were properly served. Because Plaintiff's claims against John Doe No. 7 and C.O. Smith lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against John Doe No. 7 and C.O. Smith be **dismissed.** As previously discussed, we have recommended that Plaintiff's claims against John Does Nos. 1–6 not be dismissed. Should the District Court adopt that recommendation, we will afford

Plaintiff the opportunity to file a motion to amend his Amended Complaint in order to name John Does Nos. 1–6. If such motion is submitted and granted, we would at that time direct the effectuation of service on John Does Nos. 1–6.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 118) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that should the District Court adopt this Report–Recommendation, the only remaining Defendants will be Rourke and John Does Nos. 1–6; and it is further

**ORDERED,** that should the District Court adopt this Report–Recommendation, Plaintiff shall be afforded ***thirty (30) days*** from the date of such adoption to file a motion to amend his Amended Complaint in order to identify John Does Nos. 1–6, which shall include a proposed Second Amended Complaint attached thereto; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 419999

---

Footnotes

1    The remaining Defendants are: Locastro, Lt. Miller, Selsky, Burns, Martens, Gummerson, Rourke, Bradt, Burge, Eagen, R. (C.O.) Smith, Baranska, (R.N.) Smith, Chilson, Kneeland, Clarke, Considine, Crozier, and Wolcyzk. *See generally* Dkt.

2   Because of the volume of claims and Defendants, the Court will recite the undisputed/disputed material facts as it addresses each claim.

3   Officer Hnatiw is not a Defendant in this action.

4   The first Deprivation Order, dated July 9, 2002, indicates that Plaintiff was deprived only of cell water. Bradt Aff., Ex. C, Deprivation Order, dated July 9, 2002. On July 16, 2002, Bradt signed a Deprivation Order Renewal of the original July 9 Order, but also listed "cell property" as one of the deprivations. *Id.,* Deprivation Order, dated July 16, 2002. Thus, it is unclear if the "cell property" was omitted from the original July 9 Order, or if it was added as an additional deprivation upon renewal of that Order. Also, although Plaintiff alleges that these Deprivation Orders were continued through August 8, 2002, the copies of the Orders provided to the Court run only to July 25, 2002. Am. Compl. at ¶¶ 53 & 55; Bradt Aff., Ex. C.

5   In our previous Report–Recommendation, we dismissed any due process claim Plaintiff might have intended to assert concerning the failure to process grievances as an independent constitutional violation. Dkt. No. 106 at pp. 20–21.

6   In that respect, the Court notes that documents submitted in support of the Defendants' current Motion clearly indicate the names of the correctional officers involved in the July 9, 2002 cell extraction. *See* Defs.' 7.1 Statement, Ex. C.

7   The Court is aware that any such motion to amend will face serious and possibly fatal hurdles. The Second Circuit's interpretation of the "relation back" doctrine imbedded in Federal Rule of Civil Procedure 15 may leave Plaintiff no recourse as his failure to identify the John Doe Defendants was arguably not do to a mistake, but rather, to his own lack of knowledge. *See Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 470 (2d Cir.1995) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities."). However, several courts in this Circuit, including this one, have held that the aforementioned rule may not be applicable in all circumstances, particularly when a defendant has prevented the plaintiff from discovering the identity of the John Doe defendants and the plaintiff has taken reasonable affirmative steps to discover their identities. *See Jennings v. Dep't of Justice Serv.,* 2008 WL 2967533, at *5 (N.D.N.Y. Mar. 26, 2008) (Report–Recommendation and Order) *adopted in part and rejected in part on other grounds sub nom. by Jennings v. Ciciarelli,* 2008 WL 2967530 (N.D.N.Y. July 30, 2008); *see also, e.g., Byrd v. Abate,* 964 F.Supp. 140, 146 (S.D .N.Y.1997) (stating that "[t]o hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery requests until the statute of limitations has ended"); *Maccharulo v. Gould,* 2009 WL 2495780, at *6 (S.D.N.Y. Aug. 14, 2009) ("Where a plaintiff tries diligently during the limitations period to ascertain the identities of the intended defendants, failure to ascertain the correct names within the period, combined with some 'John Doe' or other generic identification in the pleading, may suffice to establish a factual 'mistake' supporting relation back."). Therefore, it would be rash at this juncture for the Court to rule out the possibility that Plaintiff's forthcoming second amended complaint will not relate back to his original Complaint under Rule 15.

8   For example, in a copy of a memorandum from Rourke to Deputy Superintendent of Security Bradt dated July 9, 2002, Rourke states that he "went to SHU to help facilitate the move of [Benitez] to A–1 cell which has a more secure cell hatch. On 7/9/02 this inmate had already thrown on (4) staff members in SHU." Defs.' 7.1 Statement, Ex. C–9, Mem. dated July 9, 2002.

9   Plaintiff does not allege that Nurse Smith participated in or was witness to any of the alleged acts of excessive force taken against him.

10  Plaintiff also asserts these Deprivation Orders were motivated by retaliatory animus. We address his retaliation claims below in Part I.D.

11  In addition to the items listed, Plaintiff asserts he was denied "a water bucket" from July 25 though August 8, 2002. Am. Compl. at ¶ 55.

12  The original Deprivation Order was to last from November 14–22, but was renewed on November 23, 24, and 25, 2002. Bradt Aff., Ex. C, Deprivation Order.

13  *See supra* footnote 4.

14  R. Duprey is not a Defendant in this action.

15  In their Motion for Summary Judgment, Defendants submitted separately to Chambers for an *in camera* review a portion of the November 2001 Disciplinary Hearing Transcript that contained the confidential testimony of Wayne Crozier, which was identified as Exhibit T. Dkt. No. 118. Thereafter, the Court returned Exhibit T to Defendants' counsel and ordered that it would only approve an *in camera* review upon the submission of a formal request from Defendants. Dkt. No. 119. Thereafter, Defendants filed a Formal Application for permission to submit Exhibit T for an *in camera* review, which was denied. Dkt. Nos. 120 & 129. Subsequently, Defendants submitted Locastro's Affidavit in lieu of submitting Exhibit T. Dkt. No. 132.

16     Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

17     C.O. Smith is named "R. Smith" on the Docket, but we have referred to him as "C.O. Smith" in order distinguish him from Defendant Nurse R. Smith. *See* Dkt. No. 106 at p. 4 n. 3. Nurse R. Smith has been served with process, Defendant C.O. Smith has not. Dkt. Nos. 13 & 37.

---

**End of Document**          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 681374
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Kevin V. BYNG, Plaintiff,
v.
James L. CAMPBELL, et al., Defendants.

No. 907-cv-471 (GLS/DRH).
|
Feb. 24, 2010.

**Attorneys and Law Firms**

Kevin V. Byng, Utica, NY, pro se.

Robert P. Roche, Esq., Albany, NY, for Albany County defendants.

Thuillez, Ford, Gold, Butler & Young, LLP., Karen A. Butler, Esq., Kelly M. Monroe, Esq., William Iam C. Firth, Esq., of CounseL, Albany, NY, for Correctional Medical defendants.

### *MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, District Judge.

### I. *Introduction*

**\*1** Pro se plaintiff Kevin Byng, formerly incarcerated at the Albany County Correctional Facility, brings this action under Title II of the ADA,[1] § 504 of the Rehabilitation Act,[2] and 42 U.S.C. § 1983. (*See* 2d Am. Compl. ¶ 20, Dkt. No. 100.) Byng alleges that defendants, Albany County Sheriff's Department and three of its employees, and Correctional Medical Services, Inc. (CMS) and five of its employees, violated his rights under the Eighth, Ninth, and Fourteenth Amendments. (*See id.*) CMS defendants and County defendants filed motions for summary judgment. (Dkt.Nos.112, 125.) Byng subsequently moved to strike certain affidavits submitted by County defendants. (Dkt. No. 194.) In a Report-Recommendation and Order (R & R) filed on October 13, 2009, Magistrate Judge David R.

Homer denied Byng's motion to strike and recommended that CMS defendants' motion should be granted, and that County defendants' motion should be granted in part and denied in part. (Dkt. No. 199.)[3] Pending are County defendants' objections to the R & R, (Dkt. No. 202), and Byng's objections to the R & R and responses to defendants' objections, (Dkt.Nos.201, 204, 205, 208). For the reasons that follow, the R & R is adopted in its entirety.

### II. *Discussion*[4]

#### A. *Order Denying Motion to Strike*

In deciding non-dispositive pretrial issues, magistrate judges in this district are afforded the broadest discretion, and will be reversed only when that discretion is abused. *See Miller v. Loughren,* 258 F.Supp.2d 61, 61 (N.D.N.Y.2003) (citation omitted). This court will modify or set aside any portion of the magistrate judge's non-dispositive order only if it is found to be "clearly erroneous or contrary to law." FED. R. CIV. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A); *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990). Because Judge Homer's denial of plaintiff's motion to strike the County defendants' affidavits was not an abuse of discretion, clearly erroneous, or contrary to law, it is affirmed.

#### B. *Report-Recommendation and Order*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See Almonte v. N.Y. State Div. of Parole,* No. 04-cv-484, 2006 WL 149049, at *6-7 (N.D.N.Y. Jan. 18, 2006) (italics omitted). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews a magistrate judge's findings and recommendations for clear error. *See id.*

#### 1. County Defendants' Objections

County defendants object to Judge Homer's finding that questions of material fact remain regarding whether Byng's failure to exhaust his administrative remedies is excusable and whether Delong and Rose used excessive force against Byng. (*See generally* Dkt. No. 202.) However, these objections amount to no more than misconstructions and misapplications of well-established law. While County

defendants seek judgments as to credibility and weight and engage in an existential discussion of "proof" and "fact," they forget that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Accordingly, having reviewed Judge Homer's recommendations regarding exhaustion and excessive force for clear error, and finding none, the court concludes that summary judgment on the claim of excessive force against Delong and Rose would be unwarranted at this juncture.

### 2. Byng's Objections

**\*2** Byng has filed several submissions which the court will treat as serial objections to Judge Homer's R & R. (*See* Dkt. Nos. 201, 204, 205, 208.) However, Byng's objections either contest inconsequential aspects of Judge Homer's factual findings, or are non-specific, conclusory,[5] and fail to address the recommendations. Thus, upon review of the R & R for clear error, the court finds that Judge Homer correctly concluded that the remaining claims-minus the excessive force claim-against the CMS and County defendants should be dismissed.

In closing, the court is satisfied that the remainder of the R & R contains no clear error.

### III. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Homer's order denying Byng's motion to strike is **AFFIRMED;** and it is further

**ORDERED** that Magistrate Judge Homer's October 13, 2009 Report-Recommendation and Order is adopted; and it is further

**ORDERED** that CMS defendants' motion for summary judgment (Dkt. No. 112) is **GRANTED** and Byng's claims against CMS defendants are **DISMISSED** and Correctional Medical Services, Inc., Dr. Robinowitz, Dr. Salzman, Rich, Debbie, Gloria Cooper, and Jill Harrington are hereby terminated from this action; and it is further

**ORDERED** that County defendants' motion for summary judgment (Dkt. No. 125) is **DENIED** in part as to Byng's claim against D. Delong and M. Rose for excessive force; and it is further

**ORDERED** that County defendants' motion for summary judgment (Dkt. No. 125) is **GRANTED** insofar as Byng's remaining claims against County defendants are **DISMISSED** and James Campbell and Albany County Sheriff's Department are hereby terminated from this action; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Kevin V. Byng ("Byng") was formerly incarcerated at the Albany County Correctional Facility ("ACCF") in the custody of defendant Albany County Sheriff's Department ("ACSD") as a pretrial detainee. Byng brings this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S .C. § 12101 *et seq.,* § 504 of the Rehabilitation Act ("RA"), and the Civil Rights Act of 1871, 42 U.S.C. § 1983, alleging that defendants, ACSD and Albany three employees of ACSD ("County defendants") as well as the Correctional Medical Services Inc. "CMS") and five of its employees [2] ("CNS defendants") violated his Eighth, Ninth, and Fourteenth Amendment rights. Second Am. Compl. (Docket No. 16).

Presently pending are motions for summary judgment by both the County defendants (Docket No. 125) and the CMS defendants (Docket No. 112) pursuant to Fed.R.Civ.P. 56. Byng opposes both motions. Docket Nos. 173, 187. Also pending is a motion to strike certain submissions in the County defendants' reply to Byng's opposition. Docket No. 194. The County defendants oppose that motion. Docket No. 195. For the following reasons, (1) the motion of the CMS defendants should be granted in part and denied in part [3], (2) the County defendants' motion should be granted in part and denied in part, and (3) Byng's motion is denied.

### I. Background

**\*3** The facts are related herein in the light most favorable to Byng as the non-moving party. *See* subsection II(A) *infra.* Byng was held at ACCF in pretrial detention from January 30 to June 12, 2007 when he was transferred to state custody. Second Am. Compl. ¶ 2. Byng's seven causes of action concern events occurring during his incarceration at ACCF.

### A. Medical Treatment

In November 2004, Byng learned that he had acquired Hepatitis C. Byng Dep. (Docket No. 112-8) at 13. While incarcerated in 2005, Byng received over forty weeks of hepatitis treatment but did not receive the entire course of the drug therapy. *See generally* Docket No. 112, Ex. F; *see also* Docket Nos. 112-10 & 11 at 27-53, 108-12; Docket No. 112-11 at 118, 120-21 (over sixty-give ambulatory health entries documenting Byng's injections, side effects, mood, and refusals); Docket No. 112, Ex. F at 113-35 (detailing the daily administration of hepatitis drug therapy); Byng Dep. at 15-16.

In the Fall of 2006, prior to his incarceration at ACCF, Byng briefly treated with Dr. Richter, a gastroenterologist. Docket No. 112, Ex. E at 12-13; Docket No. 173 at 56-2A; Docket No. 173 at SE 56-91A-B. During a November 2006 appointment, the prior drug therapy was deemed successful in decreasing Byng's viral load, Byng had remained free of drug and alcohol abuse since January 2004, but treatment with Interferon and Ribavirin "is not at this time a current recommendation ... surveillance ... and ultrasound once a year and [liver functions tests] and [blood work] every six months comprises the current recommendations." Docket No. 112, Ex. E at 12; Docket No. 173 at SE 56-91A. Byng agreed to this treatment plan. Docket No. 112, Ex. E at 13; Docket No. 173 at SE 56-91 B; *but see* Byng Dep. at 23-25 (testifying that he did not have a complete recollection of the encounter or the entire conversation and what the actual recommendation was from the physician).

On January 20, 2007, just prior to his reincarceration in ACCF, Byng was hospitalized for complaints of sore throat, wheezing, and shortness of breath. Docket No. 173 at SE 56-95D. Byng noted a history of alcohol abuse to the staff. *Id.* at 95D6. Ten days later, when Byng arrived at ACCF, Byng reported that he drank a six-pack of beer per day, his last drink being at 10 a.m. that morning, and that he uses cocaine. Docket No. 112, Ex. E at 34;[4] Byng Dep. at 19-20,

28 (detailing a two-week relapse where alcohol and cocaine when utilized on multiple occasions).

On January 31, 2007, Byng complained of difficulty breathing. Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A. While Byng's lungs were clear, he was placed on the list for evaluation. Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A. On February 2, 2007, when Dr. Salzman, a defendant, attempted to see Byng, Byng was unavailable as he was appearing in court. Docket No. 112, Ex. E at 38; Docket No. 173 at 56-3A; Byng Dep. at 30-31; Salzman Aff. (Docket No. 112-14) ¶ 10. Later that day, Byng again requested treatment for stomach and chest pains. Docket No. 112, Ex. E at 59. On February 5, 2007, Byng was seen by Dr. Salzman who noted Byng's previous Hepatitis C conditions and neutropenia[5] as well as the fact that his prior drug therapy was deemed ineffective. Docket No. 173 at 56-3H; Salzman Aff. ¶ 12. Byng also provided more of his medical history including anxiety, insomnia, anorexia, and blurry vision. Salzman Aff. ¶ 12.

**\*4** On February 7, 2007, Byng again requested treatment for his liver disease and pain as well as to see an optometrist. Docket No. 112, Ex. E at 60. The following day, Byng was told that he was on the list for an infectious disease ("ID") consultation. *Id.* Byng was found to be doing well. *Id.* at 38; Docket No. 173 at 56-3A. On February 9, 2007, Dr. Salzman evaluated Byng and wrote him a prescription.[6] Docket No. 112, Ex. E at 38.

On February 12, 2007, Byng was examined by ID physician Dr. Rabinowitz, a defendant herein.[7] Docket No. 112, Ex. E at 73-74; Docket No. 173 at 56-9T, B; Byng Dep. at 33. Rabinowitz ordered blood tests to assess Byng's liver function. Salzman Aff. ¶ 17. Rabinowitz's notes outlined a history of (1) substance abuse per the recent emergency room records,[8] (2) Hepatitis C for which treatment was initiated but proved unsuccessful,[9] and (3) neutropenia aggravated by the Hepatitis treatments. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Byng also reported that he had completed approximately forty-five weeks of hepatitis drug therapy. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Byng was scheduled for a further visit. Docket No. 112, Ex. E at 74; Docket No. 173 at 56-9B.

On February 14, 2007, Byng sought treatment from the optometrist, claiming that the optometrist previously informed Byng that he could not receive glasses "unless [he

had] a life threatening illness." Docket No. 112, Ex. E at 61. Byng had last seen an optometrist on February 8. *Id.* On February 16, Byng submitted another treatment request, this time for his neutropenia. Docket Nos. 173 at 56-10 B & T; 56-75AA. On February 17, 2007, a physician ordered blood tests and wrote a prescription for ibuprofen. Docket No. 112, Ex. E at 44; Docket No. 173 at 56-3D; Salzman Aff. ¶ 20.

On February 22, 2007, blood tests revealed that Byng's viral load had drastically increased, other critical measures were elevated, and his white blood cell count had decreased. Docket Nos. 173 at 56-12 A & C; SE 56-85 A & B; Byng Dep. at 35. Three days later, Byng requested treatment for a cough, trouble breathing, and a fever. Docket No. 112, Ex. E at 63. Examination revealed that his lungs were clear and his temperature was slightly elevated. *Id.;* Salzman Aff. ¶ 22. Cold medicine was ordered. Salzman Aff. ¶ 12.

On February 27, 2007, Byng requested medical attention after he fell coming out of the shower, injuring his nose. Docket No. 112, Ex. E at 62; Byng Dep. at 35-36. Byng was examined by a physician's assistant and was given antibiotics and a cream for his injured nose. Docket No. 112, Ex. E at 44, 62; Salzman Aff. ¶ ¶ 23-26; *see also* Byng Dep. at 36 (testifying that his treatment was "good").[10] On March 1, Byng was seen by an optometrist and provided a prescription for bifocals. Docket No. 112, Ex. E at 79-80; Docket No. 173 at 56-66D. On March 14, 2007, Byng requested new lenses for his bifocals because vision was blurry out of one lens. Docket No. 112, Ex. E at 67. Byng was placed on the schedule for optometry, was evaluated less than one month later, and was provided with new glasses. *Id.* at 67, 70-71; Docket No. 173 at 56-3F; Byng Dep. at 31-32.

 **\*5** On March 11, 2007, Byng again requested treatment for his liver and sought health shakes because he was losing weight. Docket No. 112, Ex. E at 66; Docket No. 173 at 56-13 C1; Salzman Aff. ¶ 32. Health shakes were denied as not indicated since Byng had gained eleven pounds since his admission to ACCF. Docket No. 112, Ex. E at 66; Docket No. 173 at 56-13 C1; Salzman Aff. ¶ 33. However, Dr. Salzman ordered Byng's weight be recorded weekly for three weeks and then monthly for three months. Docket No. 173 at 56-3F; Salzman Aff. ¶ 34. Dr. Salzman received a complaint from Byng on March 18, regarding his weight, pain, and hepatitis. Docket No. 112, Ex. E at 56-58; Docket No. 173 at 56-14 T & B; Salzman Aff. ¶ 37.

From March 24 until April 17, Byng made five requests for treatment for pain in his feet,[11] treatment for his hepatitis, pain, and scratched nose, medicine for his sore throat, and assistance repairing his broken glasses. Docket No. 112, Ex. E at 51-55; Docket Nos. 173 at 56-15; 56-16; 56-17; 56-20. On April 15, Dr. Salzman examined Byng, who was still requesting retreatment for his hepatitis. Salzman Aff. ¶ 47. Byng had normal vital signs and Dr. Salzman requested another consultation with Dr. Rabinowitz. *Id.*

On April 18, Byng was again evaluated by Dr. Rabinowitz. Docket No. 112, Ex. E at 21, 75-76; Docket No. 173 at 56-30. Dr. Rabinowitz noted Byng's complaint of right flank and upper quadrant pain. Docket No. 112, Ex. E at 75; Docket No. 173 at 56-30A. The pain Byng was complaining of was inconsistent with the hepatitis process; however, pain from hepatitis is not uncommon. Docket No. 112, Ex. E at 75-76; Docket No. 173 at 56-30; Rabinowitz Aff. ¶ ¶ 46-47. Therefore, he recommended a higher dose of pain medication to alleviate Byng's discomfort. Docket No. 112, Ex. E at 76; Docket No. 173 at 56-30B.[12] Additionally, Dr. Rabinowitz noted that Byng did not require health shakes and that any further retreatment for the Hepatitis C would be contraindicated because of Byng's history of alcoholism and substance abuse. Docket No. 112, Ex. E at 76; Docket No. 173 at 56-30 B; *see also* Rabinowitz Aff. (Docket No. 112-13) ¶ 65 ("After careful assessment ... including Mr. Byng's history, treatment, complications including neutropenia, recent drug and alcohol use and based upon standards of medical care in 2007 ... I determined Mr. Byng was not a candidate for retreatment ...."); *see also* CMS Policy at 21 (discouraging treatment for "pre-trial and nonsentenced federal detainees ... [because t]he potential for interrupted antiviral therapy ... places the inmates at risk for a number of undesirable outcomes, including treatment failure ... and adverse effects from medications ....").[13]

Beginning on April 19, 2007, Byng sent grievances to numerous individuals concerning the medical care he was receiving for his hepatitis and pain. *See* Docket No. 173 at 56-23 (grievance to defendant Cooper dated April 17, 2007); Docket No. 112, Ex. E at 4, 17, 18, 24, 26 (complaint dated April 19, 2007 to Sheriff Campbell); Docket No. 173 at 56-27 (same); Docket No. 112, Ex. E at 25 (informal oral grievance dated April 28, 2007 to Campbell); Docket No. 173 at 56-28 (same); Docket No. 112, Ex. E at 46-48 (letters of complaint dated April 28 and 29 to Dr. Rabinowitz); *id.* at 30 (grievance to unnamed third party checking status of April 23 grievance); Docket No. 173 at 56-32 (same);

Docket No. 112, Ex. E at 3 (grievance to New York State Commission of Corrections dated May 3, 2007); Docket No. 173 at 56-34, 56-66B (same); Byng Dep. at 60-71 (detailing official grievances and informal letters of complaint sent during incarceration). The New York State Commission of Corrections initiated an investigation and concluded that Byng was receiving appropriate care and that the bulk of his complaints involved a disagreement with the treatment he was receiving, and the Commission deferred to the medical judgment and recommendations. Docket No. 112, Ex. E at 14-16; Docket No. 173 at 56-39; Docket No. 173 at SE56-92. After the decision was announced, Byng grieved the outcome in a letter dated May 15, 2007, to an unnamed third party. Docket No. 173 at 56-41 A-C.; *see also Id.* at 56-60 (additional correspondence dated June 21, 2007 seeking outcome of Commission decision from May 10).

**\*6** On June 12, 2007, Byng was transferred to state custody at Downstate Correctional Facility. [14] Docket No. 112, Ex. F at 4. Byng continued to complain of right upper quadrant pain. *Id.* at 5-6. On August 31, 2007, Byng first reported a small lump on his abdomen which was still accompanied by right upper quadrant pain. *Id.* at 7. On December 1, 2007, possible signs of a hernia were observed and a hernia was diagnosed on January 3, 2008. *Id.* at 11; Docket No. 173 at 56-71 D. The hernia was repaired on March 7, 2009. Docket No. 173 at 56-72; Byng Dep. at 10.

Additionally, after Byng was transferred from ACCF, he continued to seek retreatment for his hepatitis. Retreatment was denied on November 2, 2007 at Fishkill. Docket No. 112, Ex. F at 9. However, as of the Fall of 2008, it appeared that retreatment might be possible. Docket No. 173 at 56-77A. One reason why the initial treatment in 2005 was interrupted was Byng's neutropenia. *Id.* at 56-77B. After the ID consult, an unnamed, third party corrections commissioner commented that prior treatment was not ultimately successful, Byng's viral load had increased substantially, but Byng retained normal liver function which could be monitored unless the levels began to elevate in which case retreatment would be considered, hopefully with a more effective therapy than that which is currently available. *Id.* at 56-77B-C.

On December 4, 2008, Byng received correspondence from a liver specialist at St. Luke's Hospital in Utica recommending that Byng be retreated with drug therapy for his hepatits. Docket No. 173 at SE 56-85E1. This correspondence also indicated that another physician agreed with the

recommendation. *Id.* The correspondence also advised that the "laboratory data suggest[ed] that [his] hepatitis C virus did damage [Byng's] liver, putting it on a quite rapid pathway towards cirrhosis, which is the worst degree of liver damage ... [and i]f there is a good time to treat, it is now. Abusing various chemical substances will not necessarily disqualify you from treatment .... " but continued alcohol abuse contributes to liver damage and continued substance abuse puts you at risk for developing new infections and viruses. Docket No. 173 at SE56-85G.

**B. Excessive Force**

Byng contends that on May 23, 2007, he was assaulted by defendants Rose and Delong. Shortly before the incident, Byng filed a grievance against CMS for failure to provide appropriate medical care, and alleges that he became the object of verbal harassment by Rose and Delong for complaining about his care. Byng Dep. at 46-48. Byng contends that on the evening of May 23, medical staff gave him his medication in a crushed form and, when he asked what the powder was, he discovered that the medical staff had almost given him the incorrect medication. Docket No. 187-3, ¶ 49(P1). [15] After receiving the correct medication, Byng made a remark to Delong asking whether he would ever believe Byng and cease harassing him. *Id.* The gate to Byng's tier was opened [16] and Delong entered, with Rose and others, and slammed Byng's right hand into the gate and elbowed Byng in the back by his right kidney. Docket No. 187-3, ¶ 54(c); Docket No. 187-7 at 66-67, ¶ 8,.

**\*7** Byng was then brought to the officer's desk at Rose's direction, where his face was pushed into the steel control box and Delong "slammed his knuckled fist down ... hard on top of [Byng's] head." Docket No. 187-3, ¶ 54(e); Docket No. 187-7 at 66-67, ¶ 8. Byng was then elbowed under his right eye, verbally threatened, and then pushed back into the vestibule. Docket No. 187-3, ¶ 54(f)-(g). Byng was then escorted off the tier.. Docket No. 187-3, ¶ 57, 59(2)-(3); *see also* Harris Aff. (Docket No. 187-7 at 60-63) ¶¶ 6, 8, 18-19, 23-24,26-29. [17] When Sgt. Frambach arrived, Byng was alone. Frambach Aff. (Docket No. 125-4) ¶ 3. Frambach ordered Byng to pack and leave the tier and Byng complied. *Id.* ¶ 4.

Later that evening, Byng wrote a letter to non-party Wigger, complaining of the events of May 23, 2007. Wigger Aff. (Docket No. 125-2 at 1-3) ¶ 2; Docket No. 125-2 at 6.

A second letter was also sent to Wigger naming Rose and Delong as the assailants and reporting their refusal to provide him with a grievance form. Docket No. 173 at 56-47. Byng was charged with a disciplinary violation for which he eventually agreed to fifteen days of cell confinement. Wigger Aff. ¶ 6; *see also* Docket No. 173 at 56-51 (inmate disciplinary report form charging Byng with belligerence to medical staff). On May 24, 2007, in a letter to Frambach, Byng officially made a statement which indicated that he did "not want to file a grievance or sign any statement against any officer," explained what his version of the events of the evening were, and sought expungement of the disciplinary charge. Docket No. 125-2 at 22; Docket No. 173 at 56-53. After receiving the charge, Byng wrote a second letter to Frambach dated May 24 stating that he received a wrongful disciplinary charge based on retaliatory motives, he had been harassed and threatened by Delong and Rose, and his previous use of neutral language, such as "restrained", was solely because he was afraid he would suffer more retaliation if he exposed the truth. Docket No. 173 at 56-54 A-B.

On May 24, 2007, Byng requested medical attention after the assault. Docket No. 112, Ex. E at 50; Docket No. 173 at 56-55. Later that evening, Byng was evaluated. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. Byng complained of right hand pain and swelling but retained full range of motion and a normal grasp. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. Additionally, Byng alleged pain and tenderness in his right flank, but there was no visible swelling. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. Byng also alleged that he was thrown head first into metal objects but, although his right eye was swollen, his eye glasses were undamaged. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49. X-rays were ordered for Byng's face, hand, and flank, and it was noted that he walked normally and without assistance, was provided with Tylenol, and sent back to his cell. Docket No. 125-2 at 20; Docket No. 112, Ex. E at 35; Docket No. 173 at 56-49.

**\*8** Radiology reports were returned on May 29, 2007. Docket No. 112, Ex. E at 68; Docket No. 173 at 56-50. The reports for the ribs and hands were negative with no evidence of fracture or osteoporosis. Docket No. 112, Ex. E at 68; Docket No. 173 at 56-50. The facial bones showed no evidence of fracture or dislocation. Docket No. 112, Ex. E at 68; Docket No. 173 at 56-50. Photographs were taken of Byng, although he complained that the documentation was inadequate as there were no photographs taken of his bruised

back. Docket No. 173, at 56-57 B-C. On June 10, 2009, a CT scan of Byng's head was completed showing two low dense lesions in his brain consistent with old conditions. Docket No. 173 at 56-110 A.

## II. Discussion

Liberally construing Byng's Second Amended Complaint, he alleges that medical treatment was withheld and that he was assaulted in retaliation for filing grievances against CMS. Additionally, Byng claims that the CMS defendants were deliberately indifferent to his serious medical needs and that the County defendants used excessive force against him on May 23, 2007 in violation of his Fourteenth Amendment rights. Byng also claims that the CMS defendants released his confidential medical records without his consent to the attorneys representing both the CMS and County defendants. Finally, Byng claims that the denial of drug therapy for his Hepatitis C constituted a violation of the ADA.

The CMS defendants assert that Byng's Fourteenth Amendment claims of deliberate indifference are meritless, Byng waived any right of privacy or confidentiality he possessed in his medical records by filing the instant law suit, Byng's ADA claims are also meritless, and Byng has failed to exhaust his administrative remedies. The County defendants also assert that Byng has failed to exhaust his administrative remedies and that his Fourteenth Amendment claims of excessive force are meritless.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*9** When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).. However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Exhaustion

As a threshold matter, defendants contend that Byng has failed to exhaust his administrative remedies. Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v. Nussle,* 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). A court must conduct a three-part inquiry to determine if an inmate's failure to folow the applicable

grievance procedures is fatal to his or her claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. *Id.* at 688. Courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* No. CV-04-4587 (DST), 2007 WL 389003, at \*8 (E.D.N.Y.2007) (internal citations omitted).

**\*10** The ACCF maintained a three-step procedure for inmates to file grievances concerning the conditions of their confinement. ACCF Rules & Regs. (Docket No. 125-8) at 22 (handbook given to inmates upon admission). First, an inmate must file a grievance with the Grievance Coordinator. *Id.* If dissatisfied with the Coordinator's determination, an inmate may then appeal to a Chief Administrative Officer within the facility. *Id.* If still dissatisfied, an inmate may then appeal to the state Commission on Corrections. *Id.* This procedure required that a grievance be filed in writing on a particular form to be provided to an inmate by the unit supervisor upon request of the inmate. *Id.*

Byng contends that his efforts to pursue administrative remedies here were impeded by defendants' failures to provide him with the inmate handbook describing the grievance procedure and the necessary grievance form. Viewing the facts in the light most favorable to Byng,

defendants' failures, if proven, would constitute behavior excusing Byng's failure to exhaust. Docket No. 187-2, ¶ 13(b); Docket No. 187-3, ¶ 11. The necessity for Byng to file his grievances on the form designated by ACCF is underscored by the ACCF inmate handbook. *See* ACCF Rules & Regs. at 22. Thus, if proven, defendants' failure to provide either the facility rules and regulations or the necessary form when requested by Byng reasonably prevented compliance with the procedures. *Id.* Repeated failures by defendants to provide inmates with the facility rules to apprise them of grievance procedures and failure to provide inmates with the form when requested would deter a similarly situated individual from attempting to pursue a grievance. *See* Harris Aff. ¶ 30 (stating that he also did not receive the ACCF rules upon his entrance into the facility).

Assuming their truth for purposes of this motion, Byng's assertions suffice to raise material questions of fact as to whether Byng received the inmate handbook or the requested form. These questions of fact defeat defendants' motions on this ground. Accordingly, defendants' motions on this ground should be denied.

## C. Retaliation

Byng contends that the CMS defendants failed to provide him with drug therapy for his hepatitis and that the County defendants assaulted him, both in retaliation for the grievances that he filed against CMS. To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) *(citing Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

*11 In this case, Byng has failed to allege facts sufficient to support a retaliation claim. Byng's actions in filing grievances constitutes an activity protected by the First Amendment. However, with respect to the CMS defendants, Byng has failed to show that he was subject to deliberate indifference or intentional delay of any medical treatment. As such, he has failed to prove any adverse action caused by the CMS defendants which he suffered. Moreover, to the extent that Byng's contentions can be construed as proof of an adverse action, Byng has made only conclusory allegations to demonstrate that the filing of his grievances was a substantial factor in any CMS defendant's decisions on treatment. These conclusory allegations, without more, are insufficient to maintain the present claims. *Id.* With respect to the County defendants, Byng alleges no facts other than conclusory allegations to demonstrate that the filing of his grievance against CMS was a substantial factor in the May 23 assault. As previously stated, these conclusory allegations, without more, are insufficient to maintain the present claims. *Id.*

Accordingly, Byng has failed to present sufficient evidence to withstand a motion for summary judgment on his retaliation claims and defendants' motions as to those claims should be granted.

## D. Personal Involvement

Defendants contend that Byng has failed to establish the personal involvement of Sheriff Campbell or of CMS. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Campbell

Campbell was the Albany County Sheriff during the period of Byng's detention at the ACCF. Campbell Aff. (Docket No. 191-3) ¶ 1. Campbell's responsibilities included the management and operation of the ACCF. *Id.* Byng does not contend that Campbell was directly involved in any of the constitutional violations but that by virtue of Campbell's position and a letter of complaint sent to Campbell, Campbell was personally involved. To the extent that Byng claims that his grievances involved Campbell, those contentions are misplaced.

 **\*12** First, grievances alone will not suffice to sustain a claim for personal involvement. *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation). Thus, even construing the amended complaint in the light most favorable to Byng, any allegations of personal involvement by Campbell still lack any factual basis. Second, even assuming that a letter was filed, received by Campbell, and forwarded on, such actions would not alone suffice to give notice to Campbell of any deprivation. Additionally, such allegations fail to demonstrate that Campbell actually investigated or became involved in the conduct at issue as all that has been shown is that the letter was forwarded on to others. *See Atkins v.. County of Orange,* 251 F.Supp.2d 1225, 1234 (S.D.N.Y.2003) ( "Personal involvement will be found, however, if an official acts on a prisoner's grievances or otherwise responds to them.") (citations omitted).

Finally, to the extent that Byng claims that Campbell instituted health policies, no evidence other than conclusory assertions have been proffered by Byng. Additionally, Campbell explained without contradiction that "all medical services ... have been outsourced to an independent corporate entity ..." since 2002 and that the contractor is responsible

for all decisions involving medical treatment. Campbell Aff. (Docket No. 191-3) ¶ 2. Thus, Campbell had no power to create or institute any of the medical policies with which Byng disagrees. *Id.* ¶ 6. Moreover, there is no evidence that Campbell created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing other defendants.

Accordingly, the County defendants' motion on this ground should be granted as to Campbell.

### 2. CMS

CMS moves for summary judgment based on their lack of personal involvement. CMS Defs. Mem. of Law (Docket No. 112-24) at 9. "Private employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort." *Rojas v. Alexander's Dep't Store, Inc.,* 924 F.2d 406, 408 (2d Cir.1990) (internal quotation marks and citations omitted). "Such a claim cannot be based on the theory of respondeat superior [and] ... there must be proof of such a custom or policy in order to permit recovery on claims against individual ... employees ...." *Perez v. County of Westchester,* 83 F.Supp.2d 435, 438 (S.D.N.Y.2000) (citations omitted). Byng asserts that there was a CMS policy in effect denying inmates hepatitis drug therapy because of its cost. As this was a medical decision over which CMS had exclusive jurisdiction, Byng's evidence suffices to raise a question of fact on the personal involvement of CMS. Moreover, Drs. Salzman and Rabinowitz relied upon CMS policies regarding Byng's ineligibility for drug therapy in denying and delaying that therapy for Byng. This evidence provides and additional question of fact as to CMS' personal involvement.

 **\*13** Accordingly, CMS' motion for summary judgment on this ground should be denied.

### E. Fourteenth Amendment

Byng asserts various of his claims under the Eighth Amendment which explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Byng was held at the ACCF as a pretrial detainee from January to June, 2007 when he was transferred to state custody following his criminal conviction. Second Am. Compl. ¶

2. The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause. *Benjamin v. Fraser,* 343 F.3d 35, 49-50 (2d Cir.2003) (citing cases). Claims concerning the conditions of confinement brought by a pretrial detainee, such as Byng here, must be analyzed under the Fourteenth Amendment Due Process Clause. *Id.*

The standards under the Eighth and Fourteenth Amendments are not identical but are strikingly similar. For example, claims under the Eighth Amendment require proof of both serious injury to the plaintiff and deliberate indifference to a known danger by the prison official. *See Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Claims under the Fourteenth Amendment require proof of actual or imminent harm to the plaintiff and deliberate indifference by the prison official. *See Benjamin,* 343 F.3d at 50-51 & n. 17; *see also Shane v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter, medical care, and reasonable safety ...."). Accordingly, cases analyzed under the Eighth Amendment may provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment.

### 1. Medical Care

The Fourteenth Amendment prohibition extends to the provision of medical care. *Shane,* 489 U.S. at 199-200. The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834; *Benjamin,* 343 F.3d at 51 n. 17. Second, the prisoner must show that the prison official demonstrated deliberate indifference by knowing of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9

(1992)); *see also Benjamin,* 343 F.3d at 51 n. 17. Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

**\*14** Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

### i. Hepatitis C

Defendants do not contest that Hepatitis constitutes a serious medical condition. CMS Defs. Mem. of Law (Docket No. 112-24) at 5. However, defendants do contend that they were not deliberately indifferent to Byng's medical condition.

Byng alleges that the CMS defendants were deliberately indifferent to his medical needs by failing to provide him with drug therapy for his hepatitis. However, Byng's complaints essentially boil down to a difference of opinion over treatment and such disagreements are insufficient to maintain a constitutional claim. *Sonds,* 151 F.Supp.2d at 312. Medical records demonstrate that alcohol and substance abuse diminished the efficacy of treatment, that a six-months of abstinence and sobriety should first be achieved before treatment, and the drug therapy included serious possible side effects such as neutropenia. Rabinowitz Aff. ¶¶ 26-36, 59; CMS Policy at 17-18, 20, 26, 28-30; Docket No. 173 at SE56-85D.

It is undisputed that immediately prior to entering ACCF, Byng relapsed, began using drugs and alcohol, and also had a documented case of neutropenia. Docket No. 112, Ex. E at 73; Docket No. 173 at 56-9B. Moreover, blood tests on February 22, 2007 indicated that Byng's white blood cell counts were low, a condition which would be exacerbated by the drug therapy and leave Byng at risk due to a compromised immune system. Docket Nos. 173 at 56-12 A & C; SE56-85 A & B; Byng Dep. at 35. Dr. Rabinowitz evaluated Byng on two occasions in two months, and, based upon the aforementioned, determined that pain relief was appropriate but retreatment was not. This decision was based on multiple visits and examinations of Byng as well as a detailed review of Byng's records. Such extensive involvement refutes any claims of indifference or delay. Moreover, Byng had already received treatment, relapsed, and no recommended course for retreatment existed, and newer and more effective medication was expected to be available soon. Mendell Aff. ¶ 10; CMS Policy at 17. Thus, CMS policy and recommendations from a state commissioner also supported Dr. Rabinowitz's treatment decisions. Docket No. 173, at 56-77 B-C.

*15 To the extent that Byng contends that his current medical treatment discredits that rendered by the CMS defendants, such contentions are misplaced. First, the physicians from St. Luke's Hospital, Byng's current treating sources, recognize the importance of sobriety prior to drug therapy to achieve the best possible outcome. Docket No. 173, at SE56-85G. In 2007, Byng had an admitted relapse with drugs and alcohol, and according to all medical advice, his sobriety was essential prior to reconsidering any drug therapy. Deferring such treatment for six months was consistent with policies and opinions on treatment in Byng's circumstances and reasonable given all relevant factors bearing on the decision. No question of fact has been raised to demonstrate deliberate indifference or delay by any defendant. Additionally, any differences in treatment between the physicians at St. Luke's Hospital and the CMS defendants do not indicate a constitutional violation but rather, at most, a reasoned difference of opinion. Chance, 143 F.3d at 703. As previously discussed, the CMS defendants provided reasonable and adequate treatment to Byng and based on the medical evidence and policies in effect at the time Byng was incarcerated at ACCF.

Accordingly, the CMS defendants' motion for summary judgment as to Byng's Fourteenth Amendment claims of deliberate indifference should be granted as to all such claims and defendants.

**ii. Chronic Pain**

Byng also contends that the CMS defendants were deliberately indifferent to his chronic right, upper quadrant pain. Defendants do not challenge that such pain constituted a serious medical need. Without deciding that issue, based on the medical evidence submitted, it is clear that the CMS defendants were not deliberately indifferent to Byng's pain.

Byng was examined by Dr. Salzman on multiple occasions for a variety of medical conditions. Based on Byng's history of hepatitis and neuropenia, Dr. Salzman referred Byng to an ID specialist. Docket No. 173 at 56-3 H; Salzman Aff. ¶ 12. In addition, Dr. Salzman attempted to alleviate Byng's pain by prescribing pain relievers on multiple occasions. Docket No. 112, Ex. E at 38, 44, 85-90; Docket No. 173 at 56-4 B-C. To the extent that Byng complains that these pain relievers were ineffective and should have been stronger, such statements represent a difference of opinion as to the appropriate medications which is insufficient to prove a deliberate indifference claim. Sonds, 151 F.Supp.2d at 312.

Moreover, to the extent that Byng claims that the CMS defendants were deliberately indifferent in failing to diagnose his hernia sooner, such complaints at worst assert negligence which is insufficient to state a constitutional claim. Byng's specific pain was inconsistent with the hepatitis, but the complaints of generalized pain were consistent with the progression of the disease. Moreover, Byng did not report a lump in his abdomen, the best indication of a hernia, until August 2007 and exhibited no signs of a hernia until December 2007. Docket No. 112, Ex. F at 7, 11; Docket No. 173 at 56-71 D. The absence of specific symptoms until the Fall of 2007 supports defendants' decision to treat the unspecified pain with pain relievers. If further diagnostic tests should, or could, have been ordered, such an omission would support a claim of malpractice at worst. See Estelle, 429 U.S. at 107 ("[W]hether an X-ray ... is indicated is a classic example of a matter for medical decision. A medical decision not to order an X-ray ... does not represent cruel and unusual punishment. At most it is medical malpractice ...."). This is still insufficient to sustain a claim for deliberate indifference. Id. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

**\*16** Accordingly, the motion of the CMS defendants on this ground should be granted in all respects. [18]

## 2. Excessive Force [19]

To sustain a claim of excessive force, a pretrial detainee must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999); *see also United States v. Walsh,* 194 F.3d 37, 47-48 (2d Cir.1999) (holding that an excessive force claim by a pretrial detainee must be analyzed under the Fourth rather than the Eighth Amendment, but the standards under the two amendments are identical). The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant [constitutional] protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims,* 230 F.3d at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7).

Byng has sufficiently raised a question of fact as to whether he was the victim of excessive force. Construing the facts in the light most favorable to him, Byng has offered evidence that Delong struck him without good reason. Docket No. 173 at 56-110A. Additionally, Byng offers evidence that he was separated at all times from the medical staff by a locked gate, that he could not have contact with the medical staff or the corrections officer escort due to the locked gate, and that there was no danger or reasonable need to exert any type of force given the absence of any threat to staff or any inmate. Docket No. 187-3, ¶ 57, 59(2)-(3); Docket No. 187-7 at 65, ¶ 4. Thus, if proven, the actions of Delong and Rose in opening the gate and entering solely to inflict harm on Byng represent the type of malicious behavior and bad faith against which the Constitution seeks to protect. Viewing the facts in the light most favorable to Byng, then, he has raised a question of fact as to what occurred on the evening of May 23.

Accordingly, the County defendants' motion for summary judgment on these claims should be denied.

## 3. Disclosure of Medical Records

Byng claims that his Fourteenth Amendment right to privacy was violated when the CMS defendants released his medical records to counsel for both the CMS and the County defendants in this case without his prior consent or written authorization.

Claims surrounding disclosure of confidential medical information are analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218-21 (S.D.N.Y.2003). However, "[a] plaintiff's privacy right in his medical records is neither fundamental nor absolute." *Barnes v. Glennon,* No. 05-CV-153 (LEK/RFT), 2006 WL 2811821, at *3 (N.D.N.Y. Sept. 28, 2006) (citations omitted); *see also Doe v. Marsh,* 918 F.Supp. 580, 585 (N.D.N.Y.1996) ("[I]t also was clear that the privacy right, at least as it applied to medical information, was not absolute."); *Jarvis v. Wellman,* 52 F.3d 125, 126 (6th Cir.1995) ("[T]he court approved the release of medical records ... based upon the legitimate nature of the requests for information. The district court inferred from this approach that a non-legitimate release of confidential medical information would violate a constitutional right ....") (internal quotation marks and citations omitted). Accordingly, "[w]hen an inmate files suit against prison officials, subsequent release of 'medical records in defense of litigation does not violate any right of the inmate [.]' " *Barnes,* 2006 W L 2811821, at *3 (citing *Woods v. Goord,* No. 01-CV-3255 (SAS), 2002 W L 731691, at *11). Waiver of privacy rights occurs when one places his or her medical condition at issue in a lawsuit. *Id.* (citations omitted); *Doe,* 918 F.Supp. at 585 ("A plaintiff may waive the privilege when his medical condition is at issue in a lawsuit.").

**\*17** Moreover, such privacy rights can be outweighed by a strong government interest, such as investigation into policies and procedures and marshaling a defense to constitutional claims. *Doe,* 918 F.Supp. at 585 ("The right to privacy in one's medical history is a conditional right that may be overcome by the government's interest in having or using the information.") (citations omitted). Such governmental uses must "advance a substantial state interest" while using the most "narrowly tailored [amount of confidential information] to meet the legitimate interest." *Id.* (citations omitted); *see also Rodriguez,* 287 F.Supp.2d at 219-20 (upholding Fourteenth Amendment protection where the prisoner "has an unusual medical problem which,

if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298-99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell.*" ).

In this case, it is clear that Byng's claims directly relate to his medical conditions. As such, he affirmatively placed the conditions at issue and waived his right to object to any subsequent release of his records. *See Midalgo v. McLaughlin,* No. 9:06-CV-330, 2009 WL 880544, at *2 n. 5 (N.D.N.Y. Mar. 3, 2009). Additionally, to the extent a privacy interest may still exist, the nature of the lawsuit, which alleges that the State failed to provide necessary medical treatment for a person in its custody, represents the type of strong and legitimate penological interest contemplated by the disclosure exceptions. Moreover, the medical information was released only to necessary parties, the attorneys defending the respective individual defendants. The information was not widely disseminated, and as such, no unnecessary third parties became privy to the material.

Accordingly, the motion of the CMS defendants as to this claim should be granted.

### F. ADA and RA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of ... a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to state inmates. Docket No. 34; *Giraldi v. Bd. of Parole,* No. 04-CV-877 (FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008). To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

**\*18** *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995); 42 U.S.C. § 12132.

Similarly, the RA protects any "qualified individual with a disability ... [from] be[ing] excluded from the participation in, ... [or] denied the benefits of," any federally funded program "solely by reason of his or her disability ...." 29 U.S.C. § 794(a); *see also Clarkson,* 898 F.Supp. at 1037-38 ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act"); *Robinson v. Burlington County Bd. of Soc. Servs.,* No. 07-CV-2717 (NLH), 2008 WL 4371765, at *6 (D.N.J. Sept. 18, 2008) ("Given the similar language in the ADA and RA statutes, the analysis under the ADA is the same as the analysis under the RA.") (citations omitted).

First, individual defendants cannot be held liable under the ADA or RA. *See Lee v. City of Syracuse,* 603 F.Supp.2d 417, 448 (N.D.N.Y.2009) (holding that an individual cannot be held liable under the ADA); *Lane v. Maryhaven Ctr. of Hope,* 944 F.Supp. 158, 165 (E.D.N.Y.1996) (dismissing ADA and RA claims against individual defendant). Therefore, the action cannot be maintained against Drs. Salzman and Rabinowitz or Cooper.

Additionally, Byng has failed to identify any programs from which he was excluded during his incarceration at ACCF. Instead, he contends that he was prevented from enrolling in a program to receive hepatitis drug therapy. Such complaints concerning medical treatment are insufficient to state a claim under the ADA or RA. *See United States v. Univ. Hosp.,* 729 F.2d 144, 156-60 (2d Cir.1984).

Accordingly, the motion of the CMS defendants as to these claims should be granted in their entirety.

### G. Other Claims

Byng makes additional claims under various provisions of federal and state law. Byng claims that his Ninth Amendment rights were violated by the CMS defendants' conduct. However, "[n]o independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action." *Rini v. Zwirn,* 886 F.Supp. 270, 289-90 (E.D.N.Y.1995) (citing cases). Additionally, § 4504 of the New York Civil Practice Law and Rules does not confer a private right of action upon an

individual. *Doe v. Community Health Plan-Kaiser Corp.,* 268 A.D.2d 183, 187 (3d Dep't 2000). The same is true for § 6509 of the New York Education Law. *MacDonald v. Clinger,* 84 A.D.2d 482, 482 (4th Dep't 1982) (holding that CPLR § 4504 and Education Law § 6509 are important evidence of the public policy of New York State "but that there is a more appropriate theory of recovery than one rooted in public policy.").

Furthermore, § 6530 of the New York Education Law sets forth the definitions for professional misconduct and any prosecution based on such definitions is accomplished by the New York State Department of Health. N.Y. Educ. Law § 6530; N.Y. Pub. Health Law § 230-a. Similarly, the Public Health Law specifies that the New York Attorney General is vested with the power to bring an action for violations of § 12. N.Y. Pub. Health Law § 12(5). Lastly, identical reasoning holds true for violations of the New York Mental Hygiene Law. *McWilliams v. Catholic Diocese of Rochester,* 145 A .D.2d 904, 904-905 (4th Dep't 1988) ("The Mental Hygiene Law is a regulatory statute by which the Commission of the Office of Mental Retardation and Developmental Disabilities is empowered to plan and provide comprehensive services to the State's mentally retarded citizens. No private cause of action is authorized for violations of the Mental Hygiene Law.")

**\*19** Accordingly, there is no private right of action for any of these remaining claims and the motion of the CMS defendants should be granted as to all such claims.

### III. Motion to Strike

Byng filed a separate motion pursuant to Fed.R.Civ.P. 12(f) seeking to strike three affidavits, submitted by the County defendants in reply to Byng's response to their motion. Docket No. 194. Under Fed.R.Civ.P. 12(f), a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." However, motions to strike portions of affidavits or evidence of support thereof are not consistent with the purpose of Rule 12(f). *See Dragon v. I.C. Sys ., Inc.,* 241 F.R.D. 424, 425-26 (D.Conn.2007). Such materials are not technically pleadings but "courts have been willing to view motions to strike as calling the propriety of affidavits into question." *Id.* (citations omitted).

In this case, the three affidavits in question were submitted in support of the County defendants' reply. These affidavits were based on personal knowledge and are probative. In Byng's response, he repeatedly referenced the County defendants' failure to adhere to their own protocol in providing inmates with the facility rules, which justified Byng's failure to exhaust his administrative remedies. Given the relevance of the affidavits and their supporting documents to the issues raised by Byng is his pleadings, the County defendants did not improperly submit the supporting papers.

Accordingly, Byng's motion to strike is denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. The motion of the CMS defendants for summary judgment (Docket No. 112) be **GRANTED** as to all defendants and all claims and that this action be terminated as to all CMS defendants; and

2. The motion of the County defendants for summary judgment (Docket No. 125) be:

   A. **DENIED** as to Byng's claim of excessive force against defendants Delong and Rose; and

   B. **GRANTED** in all other respects and that defendants Campbell, and the Albany County Sheriff's Department be terminated from this action; and

**IT IS ORDERED** that Byng's motion to strike (Docket No. 194) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 681374

## Footnotes

1    Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

2    29 U.S.C. § 794.

3    The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

4    The court incorporates the factual recitations contained in Judge Homer's R & R. (*See* R & R at 3-14, Dkt. No. 199.)

5    In response to Byng's continued opposition to the kind of treatment he received, the court reiterates that "[m]ere disagreement over proper treatment does not create a constitutional claim ... [s]o long as the treatment is adequate ...." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) (citation omitted); *see also Sonds v. St. Barnabas Hosp. Corr. Health* Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ( "[D]isagreements over medications, diagnostic techniques ..., forms of treatment, or the need for specialists ... are not adequate grounds for a Section 1983 claim.").

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Byng has requested that defendants Rich, Debbie, and Harrington, three CMS employees, be withdrawn as defendants. Docket No. 173 at 2-16, ¶ 2. The CMS defendants deem this to be a dismissal with prejudice while Byng seeks dismissal without prejudice. Under Fed.R.Civ.P. 41(a)(1)(A)(ii), a plaintiff may dismiss an action against a defendant where, as here, that defendant has answered, only by stipulation of that defendant. None of the three defendants have stipulated to dismissal without prejudice and Byng has not agreed to dismissal with prejudice. Accordingly, Byng's purported withdrawal of the action as to these three defendants is ineffective and affords no basis to dismiss the action as to those defendants. Dismissal on this ground should be denied.

3    In the reply of the CMS defendants, they assert that because Byng exceeded the total number of pages allowed for his memorandum of law, the additional pages which were submitted should be disregarded. Docket No. 174-2 at 7-8. Given Byng's *pro se* status, the failure to comply with the page limitation in the local rules is excused in this instance only.

4    Byng's addiction to drugs and alcohol was regularly noted in his psychiatric records as well, which identifies polysubstance abuse as one of his major diagnoses and addiction as a basis for treatment. *See* Docket No. 173, SE 56-97 (progress notes outlining diagnosis); Docket No. 112, Ex. F at 170-74, 181-85 (admission screening records for state incarceration outlining multiple diagnoses, including addiction); Docket No. 187-8 at 33 (letter outlining mental health treatment Byng had received since May 12, 2009, including that for addiction); Docket No. 187-8 at 36 (same).

5    Neutropenia occurs when blood marrow is suppressed and can result in a marked decreased in the body's immunities and ability to fight against infection. Rabinowitz Aff. (Docket No. 112-13) ¶ ¶ 30, 32.

6    Byng was regularly provided both Tylenol and Ibuprofen throughout his incarceration at ACCF. Docket No. 112, Ex. E at 85-90; Docket No. 173 at 56-4 B-C.

7    This defendant's name is spelled "Robnowitz" in the caption as it is spelled in the original complaint. Compl. (Docket No. 1). The name is spelled "Robinowitz" in the Second Amended Complaint. The correct spelling is "Rabinowitz." *See* Rabinowitz Aff. (Docket No. 112-13) 1. The correct spelling will be utilized herein.

8    "A six-month abstinence (at least) from alcohol and drug use is imperative in patients with a substance abuse history prior to starting therapy." Rabinowitz Aff. ¶ 29. Byng acknowledged that immediately prior to his incarceration, he used both alcohol and cocaine. *Id.* ¶ 56. "Alcohol intake, even in small quantities, will typically render ... therapy useless." Mendell Aff. (Docket No. 112-12) ¶ 11; *see also* CMS Chronic Hepatitis Pathway (Docket No. 112-19) at 17-18, 20, 29-30 (hereinafter "CMS Policy") (instructing patients that they are prohibited from drinking alcohol for the remainder of their life as high levels of alcohol consumption expedite the disease progression and stating that abstinence must be achieved prior to treatment to optimize its effectiveness); Docket No. 173 at SE56-85D (citing National Institute of Health Consensus Statement which provides that "treatment of patients who are drinking significant amounts of alcohol or who are actively using illicit drugs should be delayed until these habits are discontinued for at least 6 months .... Treatment for addiction should be provided prior to treatment for hepatitis C.").

9    "In 2005, the standard for treatment [of Hepatitis C] was the use of combination therapy using two medications, Ribavirin ... and Peginterferon ...." Rabinowitz Aff. ¶ 21. Such therapy carries serious side effects, including mental health illnesses, suppressed bone marrow and decreased white blood cell and platelet production, organ failure, and death; therefore, "[t]herapy is ... used with caution." *Id.* ¶ ¶ 26-28, 30-36; *see also* CMS Policy at 26, 28-30 (outlining side effects of treatment). Additionally, medical evidence indicates that "[i]f therapy fails or the virus returns (relapses), it is very unlikely to respond to another round of treatment. In addition, there is no generally accepted treatment for relapse, nor is there an ... approved therapy." Mendell Aff. ¶ 10; *see also* CMS Policy at 17 (explaining that "[c]urrent drug treatment options

for chronic hepatitis C are moderately effective. Newer medications should be available in the future that will improve treatment options.")

**10**    Byng contends that the fall was a result of migraine headaches and dizziness which occurred sporadically and for which he never received treatment. Byng Dep. at 85-86.

**11**    Byng was seen by medical staff on March 25, 2007 regarding his sneaker request. Salzman Aff. ¶ 40. Additionally, pain relievers were provided to Byng, by Salzman, to alleviate the pain he was allegedly experiencing in his feet and ankles. *Id.* ¶ 41.

**12**    Byng continually asserts that the pain relievers he was provided were ineffective and that he disagreed with the physicians' judgment in prescribing them, suggesting that he should have received a narcotic or other more potent medication. Byng Dep. at 41.

**13**    Byng claims that he was denied treatment due to an unconstitutional policy of saving money, about which he was advised by five ACCF employees who remain anonymous. *See e.g.* Docket No. 187-2 ¶ 28; Docket No. 187-3 ¶¶ 43(b), 44(b).

**14**    Byng has not named any individuals as defendants in the present litigation who provided him medical treatment while he was at Downstate.

**15**    Byng's mental health medications were delivered in a crushed form because of a prior instance in which he hid his medication in his cheek, refusing to take it. Docket No. 173 at SE56-86 B; Byng Dep. at 75-79 (admitting that on one occasion Byng hid his medication in his mouth to avoid taking it)

**16**    According to facility procedure, the gate was locked when medication was being dispensed and inmates reached through the bars to take their cups of medication from a cart located on the other side of the locked gate. Docket No. 187-7 at 65, ¶ 4; Harris Aff. ¶¶ 5-6. Accordingly, the inmates were prevented from having any physical contact with the medical staff or corrections officers who escorted them.

**17**    According to Delong, no altercation occurred. Delong escorted medical staff on rounds during the night in question. Delong Aff. (Docket No. 125-3) ¶ 4. Byng was loud, aggressive, vulgar, and belligerent, berating the nurse for providing the wrong medication in the wrong form. *Id.* ¶ 5. Delong "stepped between [ ] Byng and the nurse, and told him to consume his meds as they had been given to him ... He became irate, waving his arms and shouting and calling [Delong] names." *Id.* ¶ 7. Delong was unable to restore order, so he called Sgt. Frambach to the tier to escort Byng elsewhere. *Id.* ¶¶ 9-10. Delong's version of the evening was corroborated by the inmates in adjoining cells who claimed that they never heard or saw anything resembling a physical altercation (Docket No. 125-2 at 8-12; Docket No. 187-7 at 46-49) and the nurse who attested to Byng's noncompliance, anger, and aggressiveness, and the lack of any violence (Docket No. 125-2 at 14; Docket No. 187-7 at 50). Rose supported Delong's assertions that Byng became belligerent and that no one assaulted Byng. Rose Aff. (Docket No. 125-5).

**18**    If it is construed that Byng claims deliberate indifference as to his weight, scraped nose, blurred vision, or sore feet, such contentions fail to meet the deliberate indifference prong. Despite Byng's contentions, his weight increased during his incarceration at ACCF, so additional dietary supplements were not indicated. Docket No. 112, Ex. E at 66; Docket No. 173 at 56-3F, 56-13 C1. Despite the objective medical evidence indicating a weight problem, Dr. Salzman still ordered that Byng's weight be monitored. Salzman Aff. ¶ 34. Other action sought by Byng only represented a difference of opinion over treatment which is insufficient to state a constitutional claim. *Sonds,* 151 F.Supp.2d at 312. Byng testified that the medical department was good in responding to and treating his nose after he fell. Byng Dep. at 36. The following day, antibiotics and cream were given to Byng. Docket No. 112, Ex. E at 62. This evidence conclusively contradict any allegations of indifference or delay. Byng also made multiple trips to the optometrist and received multiple bifocal prescriptions. Additionally, when Byng complained that his right lens was blurry, another examination and lens were provided. Docket No. 112, Ex. E at 67, 70-71, 79-80; Byng Dep. at 31-32. Lastly, Byng was also examined and provided pain medication for his complaints of sore feet. Salzman Aff. ¶¶ 40-41. Although Byng was not provided with the sneakers he requested, such a request was deemed unnecessary by medical staff and constitutes a mere difference of opinion over treatment. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

**19**    To the extent that Byng claims constitutional violations based on alleged verbal harassment by Delong and Rose, such claims must fail. See *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (holding that verbal harassment was insufficient to state a cognizable constitutional claim).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green Haven
is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22,

1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being

released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4265844
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ervin CUMMINGS, Plaintiff,

v.

CLINTON COUNTY
LEGISLATURE, et al., Defendants.

No. 9:14–CV–281 (DNH/ATB).
|
Signed Aug. 26, 2014.
|
Filed Aug. 27, 2014.

**Attorneys and Law Firms**

Ervin Cummings, pro se.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Ervin Cummings brought this civil rights action. On July 22, 2014, the Honorable Andrew T. Baxter, United States Magistrate Judge, advised by ReportRecommendation that plaintiff's complaint be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) (i)-(iii). No objections to the Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Plaintiff's complaint is DISMISSED WITH PREJUDICE as to all claims against defendants Clinton County Legislature; Commission of Correction; Clinton County Jail; and Clinton County Medical Department;

2. Plaintiff's complaint is DISMISSED WITHOUT PREJUDICE to plaintiff filing an amended complaint with respect to medical care claims against defendant Favro/and or

others as stated in the Report–Recommendation within sixty (60) days of the date of this Decision and Order; and

3. The Clerk is directed to serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

The Clerk has sent to the Court a civil rights complaint, transferred from the Southern District of New York, filed by pro se plaintiff Ervin Cummings. (Dkt. Nos.2, 3). Plaintiff has also filed an application to proceed in forma pauperis ("IFP"). [1] (Dkt. No. 6). For the following reasons, this court will grant plaintiff's IFP application, but will recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

### I. *IFP Application*

A review of plaintiff's IFP application shows that he declares he is unable to pay the filing fee. (Dkt. No. 2). This court agrees, and finds that plaintiff is financially eligible for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327; *Harkins v. Eldridge,* 505 F.2d 802, 804 (8th Cir.1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility

to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

## II. *Complaint*

In a very confusing complaint, plaintiff appears to allege that he was denied proper medical care on October 10, 2013, when he was incarcerated at the Clinton County Jail ("CCJ"). (Compl.¶ III(A)—III(C)). He also appears to allege that, in various ways, the Clinton County Jail staff violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d–6.

Plaintiff states generally, that he has a variety of injuries, resulting from a tractor trailer crash. (Compl.¶ III(C)). He states that he is in a great deal of pain, has trouble sleeping, and suffers from "emotional distress." (*Id.*) Plaintiff states that when he informed "medical" of his ulcers, pain, and inability to sleep, he was given "psyche meds to sleep, trasithon [sic]," [2] for pain." (*Id.*) In a paragraph, labeled "Injuries," plaintiff states that he received "lower back and knee surgery, special shoes, [and] proper medication," but then states that he received "nothing, but over the counter med. no infirmary refuse to be taken to hospital." (Compl.¶ IV).

Attached as a separate page to the complaint is, what plaintiff entitles: "HIPPA [sic] Law Confidentiality Privacy Act (Law)" violations, although not all of these alleged violations are related to HIPAA or privacy. (Compl. at CM/ECF p. 5). This list contains eight general statements about CCJ, including that (1) inmates are denied outside medical attention for pain and severe illness; (2) there is no medical infirmary for inmates at CCJ; (3) there is no 24–hour nurse or medical staff available; (4) inmates are prescribed

over-the-counter pain medicines, and they are distributed by corrections officers, rather than medical staff, in violation of HIPAA; (5) inmates who attempt suicide are left in general population "for the rest of the inmate's [sic] to know the personal behavior of person(s) under severe stress, causing them further anxiety or depression"; (6) when inmates contact their attorneys to inform them of these violations, HIPAA is violated because the conversations are monitored; (7) there are "call spending limits"; and (7) when plaintiff sent his personal and/or papers to be photocopied, they were read and "scrutinized" by "random staff" in violation of HIPAA. (*Id.*) Plaintiff claims that the Clinton County Legislature and the Sheriff of Clinton County should be "held accountable" for the conduct that occurs at the CCJ. (*Id.*) Plaintiff seeks only monetary relief. (Compl.¶ V).

## III. *HIPAA*

### A. Legal Standards

**\*3** "Courts have overwhelmingly concluded that there is no private right of action under HIPAA." *Coon v. Burkly,* No. 1:13–CV–1306, 2014 WL 1976669, at *8 (N.D.N.Y. May 15, 2014) (citing *Wilkerson v. Shinseki,* 606 F.3d 1256, 1267 n. 4 (10th Cir.2010); *Miller v. Nichols,* 586 F.3d 53, 59 (1st Cir.2009); *Acara v. Banks,* 470 F.3d 569, 572 (5th Cir.2006); *Rosado v. Herard,* No. 12 Civ. 8943(PGG)(FM), 2013 WL 6170631, at *3, 2013 (S.D.N.Y. Nov. 25, 2013), *report and rec. adopted in part and modified in part on other grounds,* 2014 WL 1303513 (S.D.N.Y. Mar. 24, 2014); *Mascetti v. Zozulin,* No. 3:09 Civ. 963(PCD), 2010 WL 1644572, at *4 (D.Conn. Apr. 20, 2010); *Cassidy v. Nicolo,* No. 03 Civ. 6603(CJS), 2005 WL 3334523, at *5 (W.D.N.Y. Dec. 7, 2005) (collecting cases)). Enforcement of HIPAA is reserved exclusively to the Secretary of Heath and Human Services. *Rzayeva v. United States,* 492 F.Supp.2d 60, 83 (D.Conn.2007).

### B. Application

Plaintiff alleges various HIPAA violations by all defendants. However, it is clear that plaintiff may not bring an action based upon alleged HIPAA violations, regardless of who, or what entity, plaintiff names. Any claims based upon HIPAA may be dismissed with prejudice.

## IV. *Constitutional Right to Privacy*

### A. Legal Standards

The Fourteenth Amendment Due Process Clause protects an inmate from the unwanted disclosure of personal health information. *Myers v. Dolac,* No. 09–CV6642P, 2013 WL 5175588, at *6 (W.D.N.Y. Sept. 12, 2013) (citing *Davidson v. Desai,* 817 F.Supp.2d 166, 191 (W.D.N.Y.2011)). Whether an inmate is entitled to constitutional protection against the disclosure of a particular medical condition is determined on a case-by-case basis. *Id.* (citing *Matson v. Bd. of Educ. of City Sch. Dist. of New York,* 631 F.3d 57, 66 (2d Cir.2011)). In order to merit constitutional protection against disclosure, the medical condition must be both serious in nature, and of the type that is "excruciatingly private and intimate in nature," likely to provoke "an intense desire to preserve one's medical confidentiality" *Id.* (citations omitted).

When determining whether a particular condition justifies constitutional protection, courts examine whether the disease is contagious, or attributed to "socially repugnant" conduct, and whether society as a whole views the disease as "directly associated with any disease which might conceivably be characterized as loathsome." *Id.* In the prison context in particular, the constitutional right to confidentiality in a medical condition applies only to " 'unusual medical condition[s] which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when word of the conditions is likely to spread through humor or gossip.' " *Id.* (citation omitted).

In this circuit, courts have accorded constitutional privacy protection only to a handful of medical conditions, including HIV, transsexualism, and sickle cell anemia. *Id.* (citations omitted). Courts have declined to recognize constitutional protection for many other medical conditions, including fibromyalgia, arthritis, sleep apnea, participation in mandated alcohol and drug rehabilitation, and Hepatitis A. *Id.* (citing *Matson,* 631 F.3d at 68 (fibromyalgia); *Barnes v. Abdullah,* No. 11 Civ. 8168, 2013 WL 3816586, at *8 (S.D.N.Y. July 22, 2013) (arthritis); *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (sleep apnea). *See also Hamilton v. Smith,* No. 9:06–CV–805, 2009 WL 3199531, at *15 & n. 18 (N.D.N.Y. Jan. 13, 2009) (rejecting plaintiff's Eighth and Fourteenth Amendment claims for disclosure of Hepatitis A condition, finding Hepatitis A was not "serious medical need" and disclosures were "necessary to investigate ... pending grievances"), *report and rec. adopted as modified by,* 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009); *Wilson v. Brock,* No. 9:06–CV–528, 2008 WL 4239564, at *5 (N.D.N.Y. Sept. 11, 2008) (no constitutionally protected confidentiality in parolee's participation in mandated drug or alcohol rehabilitation program).

**\*4** In this case, plaintiff alleges that corrections officers are allowed to distribute medication and "over-the-counter" pain medicine. [3] (Compl. at 5). Plaintiff states that he has injuries resulting from a tractor-trailer crash, including back pain and a torn meniscus. (*Id.* ¶ III(c)). He states that he takes "mental sleeping meds," but that he only received over-the-counter medications. None of these conditions warrants constitutional privacy protection under the case law cited above. Plaintiff receiving over-the-counter pain medication from corrections officers is not the type of "disclosure" that would likely result in ridicule, discrimination, or violence.

Plaintiff vaguely claims in his attached "list," that inmates' telephone calls are "monitored" and his papers were read by "random staff" when the papers were "sent" for photocopying at some unknown time. There is no statement of what highly confidential information might have been disclosed, and these claims are so conclusory that no constitutional privacy claim is stated. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (conslusory allegations insufficient to state a constitutional claim).

Thus, based upon the facts in this complaint, plaintiff has failed to state a constitutional privacy claim as against any of the defendants, and to the extent that the complaint may be interpreted as raising constitutional right to privacy claims in addition to the HIPAA claim, it may be dismissed.

## V. *Agency Defendants, Clinton County, and County Legislature*

### A. Legal Standards

### 1. Clinton County Jail/Medical Department

Departments that are merely administrative arms of a municipality do not have a legal identity separate from the municipality and may not sue or be sued. *Rose v. County of Nassau,* 904 F.Supp.2d 244, 247 (E.D.N.Y. Nov. 9, 2012) (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) (dismissing claim against the police department); *Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999) (same); *Umhey v. County of Orange,* 957 F.Supp. 525, 530–31 (S.D.N.Y.1997) (dismissing case against the County Board of Ethics); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) (dismissing

against police department). Therefore, claims asserted under 42 U.S.C. § 1983 will be dismissed against an administrative department or sub-division of a municipality or county. *Id. See also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999) (because the county sheriff's office was an administrative arm of the county, it was not the appropriate party in a section 1983 action)).

**2. Sheriff Dave Favro/Clinton County**

A municipality itself, however, may be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.,* 436 U .S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.; Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir.1979).

**\*5** The Sheriff may be sued in his individual capacity or in his official capacity. A section 1983 action against municipal officers in their official capacities is treated as an action against the municipality itself. *Coon v. Town of Springfield,* 404 F.3d 683, 687 (2d Cir.2005) (citing *Brandon v. Holt,* 469 U.S. 464, 471–73 (1985)).

**B. Application**

In this case, plaintiff names the CCJ and the CCJ Medical Department. (Compl.¶ I(B)). Plaintiff may not sue either one of these entities, and the complaint may be dismissed in its entirety with prejudice as against CCJ and CCJ Medical Department. Plaintiff also names Sheriff Dave Favro as a defendant. To the extent that he names Sheriff Favro in his "official capacity," [4] as stated above, plaintiff is essentially suing the County, and he would have to show that a County policy caused the violation of his civil rights. *Monell, supra.*

In the page attached to plaintiff's form-complaint, he makes some general allegations that could conceivably related to "policy," not involving the HIPAA claims, which were discussed above. He claims that inmates *in general* are denied outside medical attention for pain and severe illness; there is no infirmary at CCJ, there is no 24–hour medical staff on duty, and inmates who attempt suicide are left in general population. (Compl. at 5). Plaintiff has not related any of these allegations to specific instances of harm to him, other than vague references to being given only over-thecounter medications and vague references to the lack of an infirmary. Such conclusory allegations are insufficient to state a claim under section 1983. *Barr v. Abrams,* 810 F.2d at 363.

**VI.** *Medical Care*

**A. Legal Standards**

In order to state a claim for cruel and unusual punishment under the Eighth Amendment, based on constitutionally inadequate medical treatment, a sentenced prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's cruel and unusual "punishment" clause is not directly applicable to prisoners who have not been convicted. *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2d Cir.2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994) [5], should be applied to constitutional medical care claims of pretrial detainees under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 F. App'x at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n. 4. [6]

**B. Application**

**\*6** It is unclear from plaintiff's complaint whether he was a pre-trial detainee or a convicted prisoner when the conduct

alleged in the complaint occurred. Regardless of plaintiff's status, as stated above, the constitutional analysis is the same. The complaint may be interpreted as alleging that plaintiff did not receive adequate medical care because he did not receive anything but over-the-counter medications for his pain. He also claims that his rights were violated because the CCJ has no "infirmary" and either he refused to go to the hospital or CCJ officials refused to take plaintiff to the hospital. The fact that the County Jail does not have an infirmary in the jail or does not have medical personnel on duty 24–hours per day does not necessarily state any claim for relief. Plaintiff also makes the conclusory allegation, without any factual support whatsoever, that "inmates" are denied outside medical attention for pain and severe illness.

Even if read extremely liberally and this court found that plaintiff stated a claim, based upon his conclusory allegations of the denial of medical care, as stated above, plaintiff has failed to name anyone who has denied him proper medical care. To the extent that plaintiff has included allegations of the alleged denial of medical care to other inmates, plaintiff may not raise such a claim. *See Murray v. Palmer,* No. 9:03–CV–1010, 2008 WL 2522324, at *8 (N.D.N.Y. June 20, 2008) (court noting that plaintiff may not assert the rights of other inmates because the suit was not a "class action"). Thus, this court will recommend dismissing plaintiff's medical care claim without prejudice to plaintiff filing an amended complaint naming a proper defendant or defendants or at least making more specific allegations about the alleged denial of medical care so that discovery could allow him to identify proper defendants.

## VII. *County Legislature*

### A. Legal Standards

While departments that are administrative arms of the municipality may not be sued separately from the county itself, it has been held that the County Legislature is a legislative body, not an administrative arm of the County, and thus is a "suable entity." *Nassau County Employee "L" v. Nassau County,* 345 F.Supp.2d 293, 298 (E.D.N.Y.2004) (citations omitted); *Fishman v. County of Nassau,* No. 10–CV–3231, 2013 WL 1339466, at *14 (E.D.N.Y. April 1, 2014) (citations omitted). However, in order to name the Legislature, plaintiff would have to cite some unconstitutional action taken by the Legislature as a whole. *Id.*

### B. Application

Plaintiff in this case cites absolutely no conduct taken by the Legislature as a whole, or even by individual members of the Legislature. Plaintiff is seeking only money damages in this case, and there is no indication that any of plaintiff's alleged violations were the responsibility of the Clinton County Legislature. Thus, the complaint may be dismissed in its entirety with prejudice as against the Clinton County Legislature.

## VIII. *Commission of Correction*

### A. Legal Standards

**\*7** The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3.

### B. Application

The New York State Commission of Correction is an executive agency of New York State. *Smith v. Donaher,* No. 12–CV–6035, 2013 WL 2531750, at *4–5 (W.D.N.Y. June 10, 2013). As such, a suit against the Commission itself is tantamount to a suit against New York State and would be precluded by the Eleventh Amendment. *Id.* Thus, any claim as against the Commission of Correction may be dismissed with prejudice.

## IX. *Opportunity to Amend*

### A. Legal Standard

Generally, when the court dismisses a pro se complaint *sua sponte,* the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

### B. Application

In this case, amendment would be futile with respect to any HIPAA claims or privacy claims. Amendment would also be futile with respect to any claims against the Clinton County Legislature, the Commission of Correction, the Clinton County Jail, and the Clinton County Medical Department.

Thus, the court will recommend dismissal with prejudice as to these claims and these defendants.

Plaintiff has also failed to state a claim as against defendant Favro either his individual capacity as Sheriff of Clinton County or in his "official capacity" as representative of Clinton County itself. However, it is conceivable that plaintiff could submit an amended complaint that would properly allege a denial of proper medical care. In order to do so as against defendant Favro in his individual capacity, plaintiff would have to allege that the Sheriff was "personally involved" in the constitutional denial of medical care as relates to plaintiff himself. In order to state a claim as agasint defendant Favro in his "official capacity," or against Clinton County, plaintiff would have to allege facts showing that the constitutional medical care claims he asserts were caused by a policy or custom of the County. Plaintiff may also state a constitutional claim as against other individual defendants who may have denied him proper medical care. Thus, the court will recommend dismissing plaintiff's medical care claim without prejudice to plaintiff submitting a proposed [7] amended complaint for this court's review. **WHEREFORE,** based on the findings above, it is

**ORDERED,** that plaintiff's application to proceed IFP (Dkt. No. 6) is **GRANTED,** and it is

**RECOMMENDED,** that the complaint be **DISMISSED WITH PREJUDICE** as to all claims against defendants **CLINTON COUNTY LEGISLATURE, COMMISSION OF CORRECTION, CLINTON COUNTY JAIL,** and **CLINTON COUNTY MEDICAL DEPARTMENT,** and it is

**\*8 RECOMMENDED,** that the complaint be dismissed **WITHOUT PREJUDICE TO PLAINTIFF FILING AN AMENDED COMPLAINT** with respect to Medical Care claims as against **DEFENDANT FAVRO/and or OTHERS** as stated above, **WITHIN SIXTY (60) DAYS OF A DECISION APPROVING THIS REPORT,** and it is

**RECOMMENDED,** that if the District Court approves this Report, and plaintiff thereafter timely files a proposed amended complaint, the Clerk send the proposed amended complaint to me for review, and it is

**ORDERED,** that the Clerk serve a copy of this Order and ReportRecommendation on plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Filed July 22, 2014.

**All Citations**

Slip Copy, 2014 WL 4265844

---

Footnotes

1    Plaintiff's original application to proceed IFP was incomplete, based upon his failure to file an Inmate Authorization Form, and on March 14, 2014, District Court Judge David N. Hurd ordered plaintiff to file a properly completed form. (Dkt. No. 5). Plaintiff filed a new form, together with his Inmate Authorization Form. (Dkt.Nos.6, 7). Although plaintiff has still failed to properly complete the application, the court is able to determine that he meets the financial eligibility requirements, and the case is now before me for review of the complaint.

2    It is clear that plaintiff has misspelled the medication that he states he was given. "Trasithon" is not a pain or sleep medication, however, the actual medication is irrelevant to this order.

3    The court notes that plaintiff alleges that the defendants' conduct took place on October 10, 2013. (Compl.¶ III(B)). Plaintiff has not specified what this one incident was or who was involved in this incident. His complaint is filled with generalities about how officers are allowed to distribute medications and how inmates' telephone calls are monitored. It is almost impossible to determine what plaintiff is actually challenging or when much of the alleged conduct actually occurred.

4    Plaintiff does not allege whether he is suing the Sheriff in his individual or official capacity. To the extent that plaintiff is attempting to sue the Sheriff in his individual capacity, any such claim must be dismissed because plaintiff alleges absolutely no personal involvement by Sheriff Favro in any of the claims asserted. Personal involvement is a prerequisite

to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

5 Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

6 As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates.' " 581 F.3d at 71–72 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 649 (5th Cir.1996) (en banc)).

7 Plaintiff's proposed amended complaint would be subject to initial review and would not automatically be served.

---

**End of Document**       © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 3152393
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Wellington HANSBERRY, Plaintiff,

v.

FATHER FLANAGAN'S BOYS' HOME, Defendant.

No. CV–03–3006(CPS).
|
Nov. 28, 2004.

**Attorneys and Law Firms**

Jay M. Weinstein, Woodmere, NY, for Plaintiff.

Jennifer Beth Courtian, Jackson Lewis, LLP, New York, NY, for Defendant.

MEMORANDUM AND ORDER

SIFTON, Senior J.

**\*1** Wellington Hansberry brings this action against Father Flanagan's Boys' Home ("Father Flanagan") alleging that his employment was terminated in violation of Title VII, New York Executive Law § 290 *et seq.,* [1] and New York City Administrative Code § 8–101 *et seq.* [2] Hansberry also alleges a common law claim—that he was wrongfully discharged in violation of Father Flanagan's employee handbook. Presently before the Court is Father Flanagan's motion for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56.

For the reasons that follow, the motion for summary judgment is granted in its entirety.

BACKGROUND

Unless otherwise noted, the following facts are taken from the parties' depositions, affidavits, and Local Rule 56.1 statements. Disputes are noted. [3]

Father Flanagan operates shelters in New York City for "at risk" youth. Father Flanagan hired Hansberry, an African American, in February, 1998, to be as a Youth Care Worker ("YCW") during the overnight shift in its Bergen Street Shelter. At the time he was hired and periodically throughout his employment, Hansberry received copies and updates of Father Flanagan's employee handbook. Father Flanagan did not tell Hansberry that he was to be employed for a specific duration or that he would not be terminated. Nor did the parties enter into an employment contract. During the duration of his employment with Father Flanagan, Hansberry worked a second job during the day as a welfare fraud investigator for the City of New York.

In June, 2000, Hansberry was promoted to the position of Shift Supervisor. Of the three other shift supervisors at the shelter, two were Hispanic and one was African American.

Hansberry's shift at the shelter ran from about 10:00 P.M. to 8:00 A.M. His primary responsibility was to ensure the safety of the children occupying the shelter. In addition, Hansberry was required to ensure that two logbooks and a checklist were maintained during each shift.

Anthony DiLauro, who was white, was Hansberry's supervisor from October, 2001, until Hansberry was fired.

In response to a report that youth had engaged in sexual activity while shelter workers were sleeping on the job in its Bronx shelter, Father Flanagan's management in Nebraska decided to conduct an internal audit of the overnight shift operations and staff at its shelters throughout the country.

On August 7, 2002, Father Flanagan's program directors conducted a surprise inspection of the overnight staff at the Brooklyn shelters. Lyn Corbett, the African American Program Operations Manager assigned the task of inspecting the shelter at which Hansberry worked. (Corbett Aff. ¶ 11.) Meanwhile, Lyn and Marcus Corbett inspected another of Father Flanagan's shelters. (Corbett Aff. ¶ 11.) The events that occurred during the inspection of Hansberry's shelter are in dispute.

DiLauro testified that when he approached the shelter, he observed that the window to the conference room was slightly ajar. (DiLauro Dep. 133–34.) The lights were off in the conference room, and there was a figure slumped over in a chair with a blanket over his head. (DiLauro Dep. 134–37.) DiLauro stated that he observed the figure for over two minutes. (DiLauro Dep. 137.) He then entered the building,

setting off an initial alarm and deactivating it. (DiLauro Dep. 139.)

**\*2** After entering the building, DiLauro observed Hansberry in the hallway between the entrance to the shelter and the conference room. DiLauro asked Hansberry why he was in a dark room with the lights out, to which Hansberry replied, "That's where I be at." DiLauro stated, "I don't understand that, what do you mean? Why are you in there with the lights off? And it looks like you were sleeping." According to DiLauro, Hansberry's response was to hang his head and look embarrassed. (DiLauro Dep. 140.)

In his affidavit in opposition to summary judgment, Hansberry states that he entered the conference room and observed someone peering through the window. Hansberry became concerned that the person might be a potential intruder. "In an effort to dissuade the potential intruder from entering," Hansberry states, "I grabbed a blanket and covered myself." (Hansberry Aff. ¶ 9.) He then didn't move until he heard the alarm go off. (Hansberry Aff. ¶ 9.)

At his deposition, Hansberry testified that before DiLauro arrived, he was sitting in a chair in the conference room with the lights out. (Hansberry Dep. 119.) Although Hansberry testified that the alarm would go off if someone opened the shelter door, he did not recall it going off when DiLauro entered. (Hansberry Dep. 121.) In an internal grievance form filed with Father Flanagan, Hansberry stated that he was in the conference room with the lights out, but he was not asleep.

After confronting Hansberry, DiLauro inspected the remainder of the shelter. On the third floor, he found YCW Robert Spenser, an African American, alert with his log accurately completed. On the fourth floor, YCW Dan Coaxum, an African American, was sitting in the dark watching a DVD player. Coaxum's log was not filled out.

DiLauro conferred with Program Operations Manager Lyn Corbett, an African American, who arrived at the shelter shortly thereafter, and they decided to send Hansberry home. Corbett states in his affidavit that later that morning, he, Marcus Corbett, and DiLauro reported the results of the inspections to Father Flanagan's management team in Nebraska, which included Director of Human Resources Randolph Scott, an African American, Jerry Staffeld, Diane Schmidt, and Corbett's supervisor Mr. Kiesling. (Corbett Aff. ¶ 14.) Corbett recommended that Hansberry be terminated

and that Coaxum be given a written warning. (Corbett Aff. ¶ 15.) DiLauro agreed with the recommendation. [4]

In the first of two reports to John Daniel, the then Associate Director who is also African American, on August 9, 2002, Mr. Staffeld, Mr. Kiesling, and Ms. Schmidt made certain disciplinary recommendations, including that plaintiff and other shift supervisors be discharged. (Lauri Aff. Ex. R at D00234.) A report dated August 16, 2002, addressed to Mr. Daniel summarizes the final employment actions taken. (Lauri Aff. Ex. U at D00238.) Mr. Scott, the Director of Human Resources for Defendant and an African American, reviewed and approved the discipline decisions, including the decision to terminate plaintiff and to give written or verbal feedback to three other African American shift supervisors. [5] (Scott Aff. ¶ 10.)

**\*3** On August 16, 2002, Corbett met with Hansberry and informed him that he was being terminated. During the course of his employment with Father Flanagan, Hansberry never complained that DiLauro was discriminating against him because of his race. In his internal grievance form, plaintiff did not allege that DiLauro or anyone else discriminated against him. (Lauri Aff. Ex. X at D0221.) Neither side presents evidence of who, if anyone, replaced Hansberry.

### DISCUSSION

#### *Jurisdiction*

The Court has jurisdiction over this action under 28 U.S.C. § 1331, which grants district courts jurisdiction over civil actions arising under federal law and principles of pendent jurisdiction.

#### *Summary Judgment Standard*

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110, 117 (2d Cir.2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita,* 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola,* 273 F.3d 494, 498 (2d Cir.2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000).

## Title VII

The burden-shifting test articulated by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the elements of plaintiff's prima facie case of discrimination under Title VII. [6] *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To meet his initial burden, Hansberry must provide evidence: (1) that he is a member of a protected class; (2) he applied and was qualified for the job from which he was terminated; (3) that the termination constituted an adverse employment action; and (4) circumstances surrounding the adverse employment action that raise an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802; *Brown v. Coach Stores, Inc.,* 163

F.3d 706, 709 (2d Cir.1998); *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985). Father Flanagan concedes that Hansberry has established the first three elements of his prima facie case.

**\*4** Once a plaintiff offers evidence establishing a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 767 (2d Cir.2003). The plaintiff must then offer evidence sufficient to support a finding that the defendant's true motivation was discriminatory. *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 221 (2d Cir.2004). The plaintiff must show that defendant's stated reason was merely a pretext for the discrimination. *Tex. Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnel Douglass,* 411 U.S. at 804; *Schnabel v. Abramson,* 232 F.3d 83, 88 (2d Cir.2000) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Plaintiff retains the ultimate burden of persuading the trier of fact that the defendant has intentionally discriminated against him. *Schnabel,* 232 F.3d at 88 n. 2. Despite the fact that intent is the issue in a Title VII claim, summary judgment is available to reject discrimination claims that do not present genuine issues of material fact. *See Chambers v. TRM Copy Cent. Corp.,* 43 F.3d 29, 40 (2d Cir.1994); *Ngwu v. Salvation Army,* 1999 WL 2873, at *3 (S.D.N.Y. Jan.4, 1999). The Court of Appeals has said that "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. This court has stated that: 'the salutary purposes of summary judgment ... apply no less to discrimination cases than to ... other areas of litigation." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) (quoting *Meiri,* 759 F.2d at 998).

## Circumstances Giving Rise to
## an Inference of Discrimination

The inference of discriminatory intent sufficient to establish a prima facie case can be drawn in several circumstances, including, but not limited to:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in

ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu–Brisson,* 239 F.3d at 468 (age discrimination case) (citing *Chambers,* 43 F.3d 29, 37–38 (noting circumstances creating inferences of discriminatory intent). [7]

Hansberry presents no evidence concerning the identity much less the race of any person hired to take his position. [8] The only evidence that Hansberry presents to raise an inference that his termination was the product of a discriminatory motive on the part of his employer are a series of disconnected comments allegedly made by DiLauro. [9]

Those comments consist of: (1) DiLauro is said to have stated that graffiti was criminal mischief and that those that engage in the practice should be prosecuted. (Hansberry Aff. ¶ 6.) (2) DiLauro allegedly asked shift supervisors at a staff meeting, "Do I have to slap one of you all to get things in order in this house?" (Hansberry Dep. 192–93.) (3) At another meeting, DiLauro allegedly stated that the meeting was "like a Puerto Rican battlefield." (Hansberry Dep. 186.) (4) DiLauro allegedly remarked about a young man to whom Hansberry was talking "let him go on to school" and that "what's going to happen he's going to get up here, do his time, go back to home, probably live in the projects or something like that, and he probably going to wind up back here again." (Hansberry Dep. 187–88.) Finally, (5) in his deposition, Hansberry describes a comment made by DiLauro on September 11, 2001, "that he shouldn't have let his 'brother with the rag on his head, fly the plane' ". (Hansberry Dep. 190.) In his affidavit, Hansberry describes the same incident and states that DiLauro said that "all dark skinned people" were responsible for the attack on the World Trade Center. [10]

**\*5** As a general rule, isolated and disconnected derogatory remarks by a decision maker are by themselves insufficient to raise an inference of discrimination. *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998); *Hayes v. Compass Group USA, Inc.,* 2004 WL 2471640, at \*7 (D.Conn. Oct.8, 2004). The remarks must either be accompanied by additional evidence of discrimination, or the plaintiff must demonstrate a nexus between the remarks and the adverse employment action that he suffered. *Schreiber v. Worldco, LLC,* 324

F.Supp.2d 512, 518 (S.D.N.Y.2004). In deciding whether this nexus is established, a court should consider whether the person who made the remarks had some connection to the employment decision, when the remarks were made in relation to the employment decision, and the context and content of the remarks. *Id.; see Turner v. N. Am. Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir.1992); *O'Connor v. Viacom, Inc.,* 543 Pa. 730, 673 A.2d 336, 1996 WL 104299, at \*5 (S.D.N.Y. April 23, 1996) (three isolated remarks by supervisor insufficient to establish pretext; stray remarks without a demonstrated nexus to the personnel actions complained of will not defeat employer's summary judgment motion), *aff'd,* 104 F.3d 356 (2d Cir.1996);.

As an initial matter, it is difficult to interpret DiLauro's comment that graffiti was a crime and should be prosecuted as evidence that DiLauro harbored a discriminatory animus toward African Americans. Defacing property with graffiti is in fact illegal. N.Y. PENAL LAW § 145.60 (criminalizing "making graffiti"). The City and State of New York have taken substantial steps to curb its production. *See* N.Y. CITY CODE § 10–117.1 (creating community-based anti-graffiti task forces); N.Y. CITY CODE § 10–117.2 (permitting police commissioners to offer rewards to persons providing tips that lead to the arrest of graffiti artists). Advocating the enforcement of such race-neutral laws does not betray an animus against African Americans, much less raise an inference that DiLauro's behavior towards Hansberry was racially motivated.

Nor can DiLauro's threat to slap shift supervisors be construed as evidence of racial animus however boorish and unprofessional the statement may have been;.

The "Puerto Rican battlefield" comment may illustrate a discriminatory animus towards Puerto Ricans but not towards African Americans. *See Richardson v. N.Y. State Dept. of Correctional Service,* 180 F.3d 426, 440 (2d Cir.1999) (noting in hostile work environment case brought by African American that from three comments by a co-worker, one about Native Americans, another about Blacks, and a third about Jews, only one involved plaintiff's protected racial category and the sum of the three failed to establish that she was discriminated against because of her race); *Krystek v. University of Southern Mississippi,* 164 F.3d 251 (5th Cir.1999)(for comments to provide sufficient evidence of discrimination, they must relate to the protected class of which plaintiff is a member).

**\*6** DiLauro's statements about the young man living in the projects and winding up at the shelter again does not mention race or suggest a causal connection or correlation between being African American and criminal activity. Such comments are too ambiguous to be probative. *See Wyvill v. United Co. Life Ins. Co.,* 212 F.3d 296, 304 (5ᵗʰ Cir.2000) (age-based comment to be probative of discriminatory intent, must be direct and unambiguous); *Fernandez v. Costa Bros. Masonry, Inc.,* 199 F.3d 572 (1ˢᵗ Cir.1999) (mixed motive analysis) (statements open to several interpretations are not direct evidence of racial discrimination).

Finally, DiLauro's alleged comments on September 11, 2001, even if intepreted to display a discriminatory animus towards African Americans, are both temporally remote from the adverse employment action (which took place almost a year later in August, 2002) and unrelated to the decision process.

Stray offensive remarks with a minimal nexus to the adverse employment action cannot raise an inference of discrimination, even when made by a decision maker. [11] *See, e.g., Danzer,* 151 F.3d at 56; *Soliman v. Deutsche Bank AG,* (S.D.N.Y. May 20, 2004) (comments to an Egyptian–American that he was a "sand nigger," that he was "like an Arab selling in a bazaar," and that "all blacks are good for is dancing" are insufficient to raise an inference of discrimination); *Ahmad v. Nassau Health Care Corp.,* 234 F.Supp.2d 185, 193 (E.D.N.Y.2002) (verbal comments are evidence of discrimination when they are related to race, proximate in time to the adverse decision, made by an individual with authority over the decision and related to the employment decision).

### *Defendant's Reason for Termination*

Even assuming that plaintiff established a prima facie case of race discrimination, defendant has articulated a legitimate, non-discriminatory reason for the termination and plaintiff has failed to show that this reason was pretextual. *See Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 302 (S.D.N.Y.2000) ("Any legitimate non-discriminatory reason will rebut the presumption triggered by the prima facie case. The defendant need not persuade the Court it was motivated by the proffered reasons.") Unsatisfactory job performance as indicated in defendant's policies and procedures includes sleeping on the job and is a stated ground for immediate termination. (Lauri Aff. Ex. J. at D00408.)

### *Hansberry's Evidence of Pretext*

Once defendant has articulated a non-discriminatory reason, plaintiff must show that the explanation offered by the defendant is false and that discrimination was the true reason for the employment decision. *Burdine,* 450 U.S. at 253; *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998) ( "[P]laintiff's very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough ..."); *Brennan v. Metro. Opera Ass'n.,* 192 F.3d 310, 317 (2d Cir.1999) (plaintiff's evidence must allow a fact-finder to reasonably conclude that employer's reason was pretextual and the real reason was discrimination); *Ahmad,* 234 F.Supp.2d at 196.

**\*7** Here plaintiff's showing that the defendant's reason for terminating him was false is exceedingly weak. In one of his several inconsistent accounts of his behavior, plaintiff concedes that on the night of the surprise inspection, he was sitting in the conference room, in the dark, covered by a blanket. [12] His explanation for this behavior is implausible. In his affidavit, Hansberry states that he entered the conference room, which was dark, and saw a person peering through the window from the outside. "[I]n an effort to dissuade the potential intruder from entering, I grabbed a blanket and covered myself. I then did not move until I heard the front door alarm go off." (Hansberr Aff. ¶ 9.)

DiLauro's explanation of his behavior that evening is both consistent and compelling. He reported his observations made from 3:50 a.m. to 5:00 a.m. on August 7, 2002, to Lyn Corbett the night of the inspection and wrote up his notes the next morning and then typed them. (Def.'s Rule 56.1 Stat. ¶ G.) The notes stated that "Shift Supervisor Wellington Hansberry was observed in the front conference room sitting slouched forward with a blanket on his head in the dark. He was still and did not move for over 2 minutes ... 4ᵗʰ Floor ... log not filled out since 11 p.m." (Lauri Aff. Ex. S at D00090–91.) Lyn Corbett recommended termination to the management team in Nebraska and the reason stated was "Program Director caught him sleeping in conference room with blanket over head." (Lauri Aff. Ex. R. at D00235.)

At the same time, plaintiff's evidence of discriminatory animus is weak in the extreme. As discussed above in reference to plaintiff's prima facie case, the disconnected and isolated remarks by DiLauro, and the absence of evidence that non-African American employees were treated differently, add little if anything to plaintiff's pretext argument. *Abdu–Brisson,* 239 F.3d at 468 ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"); *Schnabel,* 232 F.3d at 90–91 (court must examine "entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff' "); *Danzer,* 151 F.3d at 56 (remarks not stray when other indicia of discrimination are presented); *Ngwu,* 1999 WL 2873, at *5 (isolated discriminatory comments insufficient to defeat summary judgment); [13] *Burrell v. Bentsen,* 1993 WL 535076, at *8 (S.D.N.Y. Dec.21, 1993) (stray remarks in workplace, statements by decision makers, and statements by decision makers unrelated to decisional process do not satisfy plaintiff's burden of proving pretext). As noted above, the allegedly discriminatory remarks attributed to DiLauro were either not about African Americans, ambiguous, removed in time from the termination, or without a connection in subject matter to the employment decision.

 **\*8** In sum, I conclude that this record would not allow a rational fact finder to infer that Father Flanagan's decision to terminate Hansberry was motivated by a proscribed racial animus rather than by its stated reason that Hansberry was not fulfilling the duties of his position.

### State Law Claims

Because the same analysis applies to plaintiff's state discrimination claims as does to the Title VII claim, summary judgment is also granted for defendant on those claims.

In his remaining state claim, plaintiff asserts that he was discharged in violation of the policies and procedures in the employee handbook and that defendant had breached the contract of employment. (Compl.¶¶ 52–54.) However, plaintiff was an at-will employee of defendant as indicated in his employment application signed by plaintiff on January 12, 1998. *See* Ex. H at D00037. Further, plaintiff admits that he never entered into an employment contract with defendant or was told at any time that his employment would be for a specific period of time. (Hansberry Dep. 31–32, 35–36.)

In New York, employment for an indefinite term is "presumed to be a hiring at-will which may be freely terminated by either party at any time for any reason or even no reason." *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); *see also Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). New York courts decline to infer terms in at-will contracts. *Id.* Plaintiff admits that no employment agreement for a fixed duration existed between himself and Father Flanagan's. Accordingly, plaintiff's claim for breach of contract fails. Plaintiff does not identify the existence of any contract upon which any liability could be predicated.

In his opposition papers, plaintiff does not address the argument that plaintiff's breach of contract claim fails because there was no employment contract. Plaintiff only contends without making any legal argument that defendant failed to follow its policies that require that any termination occur only following review by the "Associate Executive Director and the Director of Human Resources, or their designees". (Lauri Aff. Ex. G at D00406.) Plaintiff alleges in his affidavit that John Daniels did not review the termination decision and did not designate anyone to do so in his place. (Hansberry Aff. ¶ G.) Plaintiff has no personal knowledge of this event and offers no evidence that the review did not take place. In fact, defendant's evidence suggests that John Daniels did review the personnel action recommendations summarized in a memo to John Daniels prior to the final actions taking place. *See* Scott Aff. ¶¶ 10–11, Lauri Aff. Exs. R and U.

To the extent plaintiff argues that Father Flanagan's employee handbook created a contract of employment that limited Father Flanagan's right to discharge plaintiff, this argument fails. An employee handbook that lists certain grounds for termination but does not expressly exclude others, does not limit the employer's right to terminate the employee. *See, e.g., Marvin v. Kent Nursing Home,* 153 A.D.2d 553, 544 N.Y.S.2d 210, 211–12 (N.Y.App.Div.1989).

### CONCLUSION

 **\*9** For the aforementioned reasons, defendant's motion for summary judgment is granted in its entirety.

The Clerk is directed to enter judgment dismissing the complaint and to furnish a filed copy of the within to all parties and to the magistrate.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3152393

Footnotes

1    *New York Executive Law § 296* provides:

It shall be an unlawful discriminatory practice

a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

2    *New York City Administrative Code § 8–107* provides:

It shall be an unlawful discriminatory practice

(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

3    Hansberry's response to Father Flanagan's Local Rule 56.1 statement of material facts consists largely of denials unsupported by citation to the record or denials made on "information and belief." Local Rule 56.1 requires the non-moving party to cite to admissible evidence to controvert the moving party's supported assertion of material fact. *Soriano ex rel. Garcia v. Bd. of Educ. of City of New York,* 2004 WL 2397610, at *2 n. 5 (E.D.N.Y. Oct.27, 2004). To the extent that the Court is able to ascertain the basis for the denial from the record, the Court will do so. Some of the unsupported denials are, however, inexplicable. For example, Hansberry denies, without citation to evidence, that Father Flanagan provides shelter to "at risk" youths, but then makes this factual assertion in his memo in opposition to summary judgment. *Compare* Plaintiff's Rule 56.1 Statement ¶ A1 *with* Plaintiff's Memo. 5.

4    Corbett Aff. ¶ 15. As of June 1, 2001, Father Flanagan's employee handbook stated that sleeping on the job was grounds for immediate termination. (Lauri Aff. Ex. J at D00407–08.) As a result of having two jobs, Hansberry slept on average about three to three-and-a-half hours a night. (Hansberry Dep. 238.) When prior to the surprise inspection, DiLauro questioned Hansberry about his ability to stay awake during the overnight shift, Hansberry assured him that he could do it. (DiLauro Dep. 61.)

5    Neither party states what disciplinary action was taken with respect to the fifth African American Shift Supervisor.

6    Liability for purposes of Title VII and New York State and City human rights laws is essentially identical. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *McCoy v. City of New York,* 131 F.Supp.2d 363, 375–76 (E.D.N.Y.2001). Consideration of claims brought under New York State and City Human Rights Laws parallels the *McDonnell Douglas* framework applied to Title VII claims. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Landwehr v. Grey Adver., Inc.,* 211 A.D.2d 583, 622 N.Y.S.2d 17 (N.Y.App.Div.1995). Accordingly, conclusions reached on the federal claims may resolve the corresponding state claims.

7    In *Abdu–Brisson,* the Court of Appeals reversed a district court's decision that an acquired airline's pilots failed to meet their initial burden of showing that acquiring airline Delta discriminated against them through its integration and benefits policies. The Court held that while stray remarks of a decision-maker, without more, cannot prove an employment discrimination claim when other indicia of discrimination were properly presented, the remarks were no longer stray and the jury could conclude that the remarks had a discriminatory significance. *Id.* at 468.

The Court of Appeals held that stray comments about the pilots' age when viewed against a background of other evidence showing Delta's interest in the age and projected retirement rates of the pilots would satisfy plaintiffs' initial burden which was de minimus. *Id.* at 467–68. The Court of Appeals held that given this evidence (stray comments plus other evidence) the inference of age discrimination was raised because Delta's actions may have been motivated by age-based animus. *Id.* at 468.

8    In his brief, Hansberry does not argue that any of the four elements of his prima facie case has been satisfied. Instead, he merely attempts to show that Father Flanagan's reason for terminating him was pretextual.

9    Hansberry also states in his affidavit that an African American former co-worker of his would testify about bad experiences with DiLauro and that DiLauro said that DiLauro was "uneasy and apprehensive" about being near the co-worker and commented on the co-worker's dress and carriage. (Hansberry Aff. ¶ 11.) Hansberry's testimony about what another employee has told him is hearsay and inadmissible. *See, e.g., Howley v. Town of Stratford,* 217 F.3d 141, 155 (2d Cir.2000) (in Title VII action, testimony by plaintiff that other firefighters told her of certain statements by her supervisor would be not admissible for fact that statements were made because not based on personal knowledge); *Taylor v. Potter,* 2004 WL 1811423, at *17 (S.D.N.Y. August 16, 2004). Plaintiff's lawyer informs the court that an affidavit from this witness could be provided *in camera* without disclosure of the identity to defendant because the witness fears reprisal from defendant. (Weinstein Affirmation ¶ 3.)

I decline to consider evidence submitted by one party *in camera* in ruling on a summary judgment motion. *See, e.g., Vining v. Runyon,* 99 F.3d 1056, 1057 (11th Cir.1996) (adversarial legal system does not generally sanction *ex parte* determinations on the merits of a civil case unless submissions involve compelling security concerns or the statute granting the cause of action provides for *in camera* resolution of the dispute). In *Vining,* plaintiff sought to compel the production of certain personnel files and defendant opposed the motion claiming the information was protected. The defendant moved for summary judgment, and the district court ordered production of the files for in camera consideration. The 11th Circuit reversed the lower court and held that an individual's right to due process includes a party's right to be aware and refute evidence against the merits of his case. *Id.* at 1057. Other circuit and lower courts have similarly concluded that *in camera* consideration of evidence is not appropriate in the absence of special circumstances not present here. See *Abourezk v. Reagan,* 785 F.2d 1043, 1060–61 (D.C.Cir.1986) (district court's reliance on *in camera ex parte* evidence submitted by government inappropriate in its granting of summary judgment for government; it is a firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions); *Kinoy v. Mitchell,* 67 F.R.D. 1, 15 (S.D.N.Y.1975) (*in camera* exhibits submitted by government in connection with government's motion for summary judgment in civil case may not be considered except to determine privilege, and are either privileged or they should be disclosed at least to the parties).

10   Hansberry Aff. ¶ 7. Comments (1) and (5) are to some extent corroborated by an affidavit of Adonis McDowell, an African American who worked with DiLauro and plaintiff.

11   Defendant assumes without explanation or citation to authority that DiLauro was not a decision maker. (Def.'s Mem. Supp. Summ. J. at 19, 24, 26.) Courts have generally considered immediate supervisors who make recommendations to other supervisors or management about work actions such as terminations to be decision makers. *See, e.g., Bickerstaff v. Vassar Coll.,* 196 F.3d 435 (2d Cir.1999) ("[T]he impermissible bias of a single individual at any stage of the [terminating] process may taint the ultimate employment decision in violation of Title VII ... This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [termination] process."); *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 397 (7th Cir.1997) (test is whether low-level supervisor influenced decision); *Penta v. Sears Roebuck, Co.,* 2003 WL 21143071, at *6 (E.D.N.Y.2003) (if plaintiff's direct supervisor's report of event leading to decision to terminate plaintiff was tainted by racial animus, finder of fact could conclude the entire decision making process was tainted); *Ngwu,* 1999 WL 2873, at *5 (while both [immediate supervisor] and [higher supervisor] had the power to terminate the Plaintiffs or to recommend termination). Assuming that DiLauro was a decision maker because he had input into the termination decision via his observations and report and recommendation into the employment action, the comments made by DiLauro and offered as evidence of impermissible racism by Hansberry are not at all related to the termination decision and still fall under the rubric of stray comments analysis. A stray remark can be either a remark made by a non-decision maker or a remark made by a decision maker unrelated to the decision process. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (mixed motive) (overruled in part by the 1991 Civil Rights Act) (O'Connor, J., concurring); *see also* discussion of stray remarks *infra.*

12   In his deposition, taken on May 18, 2004, Hansberry testified that he told DiLauro when questioned about what he was doing in the conference room, that he was on his "downtime." (Hansberry Dep. 127.) In his grievance form, Hansberry did not mention the intruder but instead described the events as him sitting in the conference room with the lights out and telling DiLauro upon meeting him in the hallway that he (Hansberry) was on his lunch break. (Lauri Aff. Ex. X at D00222.)

13   In *Ngwu,* the plaintiffs, who were Nigerian, worked the night shift at a group home. A fire occurred during their shift and their supervisor questioned plaintiffs when investigating the fire. According to the supervisor, plaintiffs admitted they were sleeping when the fire occurred. Plaintiffs later denied they were sleeping. The supervisor reported the incident to her supervisor and to other managers of the defendant, the Salvation Army. The supervisor recommended probation

or suspension but the higher supervisor directed termination based on the Salvation Army's written policy of immediate termination for an employee's sleeping while on duty. Plaintiffs later urged that their immediate supervisor had made discriminatory comments about Nigerians, including calling them "fucking Nigerians" on the morning after the fire. The court, noting that the supervisor had not recommended termination, found that her remarks did not support an inference of discrimination on the part of the Salvation Army. Although in this case, DiLauro recommended termination, some of the same logic relied on by the district court in *Ngwu* is persuasive—there is no evidence that any of DiLauro's stray remarks—influenced his decision to recommend termination and certainly no evidence that his stray remarks had any input on the other decisionmakers' rationale for terminating plaintiff. In fact, Scott, Daniels and Corbett, all involved in the decision to terminate plaintiff, are African Americans themselves. *See, e.g., Connell v. Consolidated Edison Co. of N.Y.,* 109 F.Supp.2d 202, 209 (S.D.N.Y.2000) (inference against discriminatory intent when decision makers in same protected class as plaintiff).

---

**End of Document**  <span style="float:right">© 2016 Thomson Reuters. No claim to original U.S. Government Works.</span>

1999 WL 138247
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Rashidi KHALFANI, Plaintiff,

v.

SECRETARY, DEPARTMENT OF
VETERANS AFFAIRS, Defendant.

No. 94–CV–5720 (JG).
|
March 10, 1999.

**Attorneys and Law Firms**

Rashidi Khalfani, Brunswick, GA, for Plaintiff Pro Se.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, By Sarah J. Lum, Assistant United States Attorney.

MEMORANDUM AND ORDER

GLEESON, District J.

**\*1** This dispute stems from the decision of the defendant Department of Veterans Affairs (the "VA") to terminate the employment of plaintiff *pro se* Rashidi Khalfani, whom the VA had employed as a social worker. Following his termination, Khalfani filed three separate judicial complaints. In his first complaint, Khalfani alleged that the VA had discriminated against him on the basis of his race or color, religion, sex, and handicapped status, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) ("Title VII"). Khalfani's second complaint again alleged that the VA, in violation of Title VII, discriminated against him on the basis of race or color, religion, sex, and handicapped status. In his third complaint, Khalfani asserted that VA officials released his medical records without his authorization; restricted his access to a VA facility; forged his name on Social Work Annual Reassessment forms; restricted his access to the VA Extended Care Center in St. Albans, New York; and wrote adverse "Reports of Contact" about him without his permission. Khalfani alleged that the foregoing constituted violations of both Title VII and, construing the third complaint liberally, 42 U.S.C. § 1983.

In two prior opinions, familiarity with which is assumed, I granted the VA's motions for summary judgment in part, thereby dismissing the first and second complaints, as well as the Title VII claim set forth in the third complaint. *See Khalfani v. Secretary, Dep't of Veterans Affairs,* 93–CV–5374 *et al.,* 1998 WL 817654 (E.D.N.Y. Mar. 2, 1998); *Khalfani v. Secretary, Dep't of Veterans Affairs,* 93–CV–5374 *et al.,* 1998 WL 765128 (E.D.N.Y. July 21, 1998).

In the second of those two opinions, I also construed Khalfani's § 1983 claim as a claim brought against the employees of a federal agency pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). The VA had argued that, even if so construed, the third complaint failed to state a claim because it did not allege that any federal officials intentionally or recklessly violated the plaintiff's constitutional rights. In rejecting this argument, I noted that citizens have a due process right to privacy which, under certain circumstances, can be violated when the government discloses medical information without authorization. *See, e.g., Roe v. Sherry,* 91 F.3d 1270, 1274 (9th Cir.1996). Accordingly, with respect to the third complaint, I denied the government's motion for summary judgment without prejudice to renewal if the VA chose to address the legal and factual merits of Khalfani's allegations. *Khalfani,* 1998 WL 765128, at *7.

The VA has renewed its motion and now seeks summary judgment on the *Bivens* claim in Khalfani's third complaint. For the reasons set forth below, the motion is granted.

DISCUSSION

A. *The Summary Judgment Standard*

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998).

**\*2** The initial burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. *Adams v. Department of Juvenile Justice,* 143 F.3d 61,

65 (2d Cir.1998). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on his pleadings "without offering 'any significant probative evidence tending to support the complaint.' " *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)).

B. *Bivens Actions*

In order to state a claim under *Bivens,* a plaintiff must allege facts showing that defendants acted under color of federal law to deprive the plaintiff of a constitutional right. *Bivens,* 403 U.S. at 397. Thus, the first step in any assessment of a claim under *Bivens* is whether the plaintiff has alleged the deprivation of a constitutional right at all. *See Stuto v. Fleishman,* 164 F.3d 820, 1999 WL 22659, at *4 (2d Cir. Jan. 21, 1999) (citing *County of Sacramento v. Lewis,* 118 S.Ct. 1708, 1714 n. 5 (1998)). Then, if a defendant asserts a qualified immunity defense, a court must assess "whether the right allegedly implicated was clearly established at the time of the events in question." *County of Sacramento,* 118 S.Ct. at 1714 n. 5. Under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

The Supreme Court has also identified two circumstances in which courts will not infer the existence of an action under *Bivens.* As the Supreme Court stated in *Carlson v. Green,* 446 U.S. 14 (1980),

> [A] [*Bivens* ] cause of action may be defeated ... in two situations. The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed equally as effective.

*Id.* at 18–19 (citations omitted) (quoting *Bivens,* 403 U.S. at 396). As the Supreme Court subsequently stated in *Schweiker v. Chilicky,* 487 U.S. 412 (1988),

> the concept of "special factors counselling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent.

**\*3** *Id.* at 423. In other words, courts will not create additional *Bivens* remedies "[w]hen the design of a government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration." *Id.*

Moreover, a *Bivens* action, like an action under § 1983, cannot be premised on the doctrine of *respondeat superior. See, e.g., Ellis v. Blum,* 643 F.2d 68, 85 (2d Cir.1981) ("[R]espondeat superior generally does not apply in § 1983 and consequently in *Bivens*-type actions"); *Shannon v. United States Parole Comm'n,* 97–CV–6420, 1998 WL 557584, at *2 (S.D.N.Y. Sept. 2, 1998) ("That the defendants may have had supervisory authority over those who violated the plaintiff's rights is not sufficient to make out a *Bivens* claim.") Instead, to be liable under *Bivens,* a defendant must either be personally involved in the violation of plaintiff's rights, must have created or acquiesced in a policy or practice of poor training or supervision, or must have otherwise acted recklessly in managing his or her subordinates. *See Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied sub nom. Barbera v. Schlessinger,* 489 U.S. 1065 (1989); *see also Cronn v. Buffington,* 150 F.3d 538, 544 (5th Cir.1998) (holding that supervisory officials may be liable under *Bivens* only if they were personally involved in the acts causing the deprivation of a person's constitutional rights, or if they "implement[ed] a policy so deficient that the policy itself acts as a deprivation of constitutional rights"); *Shannon,* 1998 WL 557584, at *2 ("To establish a *Bivens* claim, the plaintiff must allege that the individual defendants were personally involved in the violation of his constitutional rights.")

The VA asserts six arguments in support of its motion for summary judgment on Khalfani's *Bivens* claim: (1) that Khalfani's action should be dismissed as "frivolous" under the *in forma pauperis* statute, 28 U.S.C. § 1915(e); (2) that Khalfani failed to allege any personal involvement of the Secretary of the VA (the "Secretary") in the deprivation of Khalfani's constitutional rights; (3) that at the time of the events in question, it is "doubtful" that there was a clearly

established right to privacy in medical records; (4) that the Privacy Act, 5 U.S.C. § 552a, provides the exclusive remedy for Khalfani's grievance regarding the unauthorized release of his medical records; (5) that even if Khalfani's complaint is construed as setting forth a claim under the Privacy Act, that claim fails as a matter of law; and (6) that the restriction of Khalfani's access to the VA's Extended Care Center in St. Albans, New York, the forgery of his name, and the writing of adverse Reports of Contact without his permission did not deprive him of constitutional rights that were clearly established when the actions took place.

### C. *The In Forma Pauperis Statute*

**\*4** Under 28 U.S.C. § 1915(a), a court may authorize a litigant to commence a suit without the prepayment of fees, provided the litigant has submitted an affidavit stating his assets and his inability to pay such fees. The same statute also provides that a court shall dismiss an *in forma pauperis* action at any time if the court determines either that the allegation of poverty is untrue, or that the action is "frivolous or malicious," fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2). The VA argues that Khalfani's claims are without legal or factual merit, and thus should be dismissed as "frivolous." (Defendant Secretary's Memorandum of Law in Support of a Renewed Motion for Summary Judgment ("Def.Mem.") at 12–13.)

"The federal *in forma pauperis* statute ... is designed to provide indigent litigants meaningful access to the federal courts." *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). However, "[m]indful of the fact that litigants who can file lawsuits free of cost will not have the same incentive as paying litigants to avoid filing meritless suits," Congress authorized courts to dismiss a complaint *in forma pauperis* if the action is frivolous. *Id.* As the Supreme Court stated, "the statute accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Neitzke v. Williams,* 490 U.S. 319, 327 (1989).

A district court's determination regarding the frivolousness of a suit is a discretionary one. *Denton v. Hernandez,* 504 U.S. 25, 33 (1992). Moreover, "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible." *Id.* Here,

the allegations set forth in Khalfani's third judicial complaint are neither irrational nor incredible. The complaint and the documents attached thereto indicate that VA officials released his medical records without his authorization, restricted his access to a VA facility, and signed his name to VA forms without his authorization. Regardless of whether Khalfani's claims can survive the present motion, I do not find them frivolous, and decline to dismiss the complaint under the *in forma pauperis* statute.

### D. *The Lack of Personal Involvement of the Secretary*

The VA states in its brief that "there is no actual merit" to Khalfani's *Bivens* claim because Khalfani has not alleged that the Secretary, as the named defendant, was involved in the deprivation of Khalfani's constitutional rights. As discussed above, it is well-settled that "[t]o establish a *Bivens* claim, the plaintiff must allege that the individual defendants were personally involved in the violation of his constitutional rights." *Shannon,* 1998 WL 557584, at *2. The VA is also correct that Khalfani has not alleged that the Secretary had any involvement in the violations alleged.

**\*5** Nonetheless, I decline to dismiss the complaint for failing to state a claim against the Secretary. The pleadings of a *pro se* plaintiff such as Khalfani are to be read liberally and interpreted "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Because the attachments to Khalfani's complaint plainly indicate the identity of those VA officials who he believes deprived him of his constitutional rights, I construe his action as one against those officials rather than the Secretary. *See, e.g., O'Neal v. County of Nassau,* 992 F.Supp. 524, 531 (E.D.N.Y.1997) (holding that where the caption in a § 1983 case did not name individual defendants but the complaint "alleges their direct, personal involvement in the alleged violation of [plaintiff's] constitutional rights," plaintiff had sufficiently pled a cause of action against the individual defendants), *aff'd,* 133 F.3d 907 (2d Cir.1998); *Nationwide Mutual Ins. Co. v. Kaufman,* 896 F.Supp. 104, 109 (E.D.N.Y.1995) ( "[T]he caption itself ... is normally not determinative of the identity of the parties .... Where a party has actual notice of a suit and is correctly identified in the body of the complaint, courts have typically held that an error in the caption is a technical defect.") (citations omitted). Indeed, in its prior motion for summary judgment, the VA appeared to recognize that the Khalfani's § 1983 claim could be construed as a *Bivens* claim against individual VA employees. Although the VA now urges a considerably more

cramped reading of the complaint, that is not the reading I choose to adopt.

E. *The Merits of Khalfani's Bivens Claim*

1. *The Unauthorized Release of Medical Records*
Khalfani's allegation regarding the unauthorized release of his medical records appears to be based on a memorandum and accompanying report that Dr. Jonathan D. Owens, an orthopedist at the VA's Medical Center in Northport, New York, sent to the VA's Chief of Social Work Service in Brooklyn, New York. The memorandum, which is attached to Khalfani's complaint and is dated November 10, 1992, states that "written medical documentation for Khalfani, Kwesi" is enclosed. [1] Immediately following the memorandum is a single page report in which Dr. Owens described a "quadricep tendon avulsion" that Khalfani suffered in late July of 1992. Dr. Owens addressed Khalfani's range of motion and his course of treatment, and stated that Khalfani could begin to work provided that he not be required to walk one hundred feet or more for activities repeated several time during the day, not be required to stand for more than ten minutes when away from his desk, and be permitted to attend ongoing physical therapy.

a. *Qualified Immunity*
In his third complaint, Khalfani contends that by releasing his medical information without his permission or consent, the VA violated his right to privacy. (Compl.¶¶ 2, 5.) In its motion for summary judgment, the VA argues that, at the time the VA released Khalfani's medical records in 1992, it is "doubtful" whether "any constitutional right to privacy concerning the type of medical records at issue here was 'clearly established." ' (Def. Mem. at 6 n. 2.)

**\*6** Although the VA is less than forceful in pressing its argument, I find that as of 1992, the constitutional right to privacy with regard to medical records such as Khalfani's was far from "clearly established." In *Whalen v. Roe,* 429 U.S. 589 (1977), the Supreme Court upheld the New York State Controlled Substances Act on the ground that, while an individual may have a privacy interest with regard to the prescription medication he takes, that interest is outweighed by the legitimate public need to control the distribution of dangerous drugs. *Id.* at 598–99, 60304. Similarly, in *Strong v. Board of Education,* 902 F.2d 208 (2d Cir .), *cert. denied,* 498 U.S. 897 (1990), the Second Circuit found that an employer's insistence upon receiving an employee's medical

records before allowing her to return to work did not violate the employee's constitutional rights because "[l]egitimate requests for medical information by those responsible for the health of the community do not rise to an impermissible invasion of privacy." *Id.* at 212. Even in *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), in which the court of appeals held that individuals with the HIV virus "clearly possess a constitutional right to privacy regarding their condition," *id.* at 267, the court also stated that such a privacy right "is no more absolute than the right to control access to other types of personal information" and must be weighed against the city's interest in disseminating such information. *Id.* at 269.

As the foregoing cases show, "[t]he right to privacy in medical records or personal information is a conditional right that requires a determination of whether the state's interest in disclosing the records is sufficiently substantial to overcome the individual's interest in confidentiality." *Grosso v. Town of Clarkstown,* 94 Civ. 7722, 1998 WL 566814, at *10 (S.D.N.Y. Sept. 3, 1998). The records at issue in this case contained rather mundane information regarding Khalfani's tendon avulsion, his physical therapy and limitations on his ability to work—not the type of deeply personal information that was at issue in prior cases. I cannot say that the reasonable person would have known that disclosing Khalfani's medical records under the circumstances of this case would violate clearly established constitutional rights. Accordingly, defendants are entitled to qualified immunity with respect to this portion of Khalfani's *Bivens* claim.

b. *The Privacy Act*
Even if VA officials were not entitled to qualified immunity, the Privacy Act provides an alternative basis for dismissing this aspect of Khalfani's *Bivens* claim. The Privacy Act consists of "extensive provisions ... governing disclosure of confidential information and access to agency records." *Williams v. Department of Veteran Affairs,* 879 F.Supp. 578, 585 (E.D.Va.1995). Specifically, § 552a(b) forbids an agency from disclosing information in an individual's record except in specified situations, and § 552a(g) sets forth various remedies that an aggrieved plaintiff may have from an agency that violates the Privacy Act's provisions. *See* 5 U.S.C. § 552a(b); *id.* § 552a(g).

**\*7** "Congress did not explicitly declare the Privacy Act to be a substitute for an action directly under the Constitution." *Williams,* 879 F.Supp. at 585. Nonetheless, in cases involving *Bivens* claims for the allegedly wrongful disclosure of

government records, courts have viewed the Privacy Act's detailed provisions as a "special factor counselling hesitation in the absence of affirmative action by Congress," and have thus held that the Privacy Act bars claims under *Bivens.* *See, e.g., Williams,* 879 F.Supp. at 585 (claim against VA under *Bivens* for unauthorized release of veteran's medical records precluded by "comprehensive remedial structure of the Privacy Act"); *Mangino v. Department of Army,* No. Civ. A. 94–2067, 1994 WL 477260 (D.Kan. Aug. 24, 1994), at *9 ("[A]ny *Bivens* claims that plaintiff might have had with respect to the disclosures [of plaintiff's military and security records] are barred by the Privacy Act"); *Mittleman v. United States Treasury,* 773 F.Supp. 442, 454 (D.D.C.1991) (*Bivens* action for false statements in government report and disclosure of that report were precluded by the Privacy Act); *Patterson v. FBI,* 705 F.Supp. 1033, 1045 n. 16 (D.N.J.1989) (*Bivens* action for damages as a result of FBI's maintenance of records on plaintiff was "apt to be foreclosed" by the alternative, adequate remedy of the Privacy Act). [2] The same result applies here.

The VA next argues that, even if this Court construes Khalfani's complaint as invoking the Privacy Act, Khalfani has failed to state a claim upon which relief can be granted. (Def. Mem. at 8.) Specifically, the VA contends that the release of Khalfani's medical information was permissible under 5 U.S.C. § 552a(b)(1), which provides that an agency may disclose an individual's records "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." According to the VA, because Khalfani had suffered a knee injury on July 27, 1992 and sought to take a medical leave, "[t]he information released to Khalfani's supervisor was needed to verify Khalfani's claim of illness." (Def. Mem. at 9.)

Based on the record before me, there is no genuine issue of material fact that would preclude the dismissal of Khalfani's claim under the Privacy Act. Khalfani attached to his complaint a memorandum dated October 28, 1992 that he sent to Zelda Foster, the Chief of Social Work Services and apparently Khalfani's supervisor. In this memorandum, Khalfani stated that he had undergone knee surgery in August of 1992, was continuing to have problems with his knee, and would need to take a leave of absence so that he could remain off of his feet for approximately four weeks. Foster responded in a memorandum of that same day, requesting that Khalfani provide additional information regarding his medical condition so that the VA could document the medical

reasons underlying Khalfani's request for sick leave. Foster also requested in her memorandum that, when Khalfani met with his treating physician, Khalfani provide the physician with an attached directive entitled "standard of Medical Document." [3] Subsequently, on November 10, 1992, Dr. Owens sent a memorandum to the Chief, Social Work Service (Brooklyn)—an apparent reference to Foster—and included the report in which he discussed Khalfani's quadricep avulsion and the limitations on Khalfani's ability to work. Khalfani's complaint also includes a single page of a transcript from the deposition of Robert Siegfeld, the Assistant Chief of Social Work Service. In pertinent part, the deposition transcript reads as follows:

**\*8** Q: To get back to medical statements, did you obtain any on your own? Did you contact Northport?

A: No, I didn't.

Q: Did anybody contact Northport?

A: I believe the hospital director did to clarify a statement of what the nature of the disability is to warrant not reporting to work.

Q: The Director of the Brooklyn VA hospital, James Farsetta?

A: Yes, I believe so.

Q: His office?

A: I believe so.

Finally, in a memorandum dated November 30, 1992, Robert Siegfeld wrote to Khalfani to confirm that, in a prior discussion, Khalfani had been assigned to "light duty" as a result of his medically confirmed mobility restrictions. Based on these documents in the record, no reasonable jury could rule in Khalfani's favor on a claim under the Privacy Act. As described in a Joint House and Senate Report, a primary purpose of 5 U.S.C. § 552a(b) was to

> prevent the office gossip, interoffice and interbureau leaks of information about persons of interest in the agency or community, or such actions as the publicizing of information of a sensational or salacious nature or of that detrimental to character or reputation.

*Pippinger v. Rubin,* 129 F.3d 519, 529 (10th Cir.1997) (quoting S.Rep. No. 93–1183, H.R.Rep. No. 93–1416, at 51 (1974), reprinted in 1974 U.S.C.C.A.N. 6916, 6966.) No "leak of information" occurred here, nor was there an exchange of information that was "sensational or salacious" in nature or that would harm Khalfani's reputation. Instead, the evidence leads to only one conclusion: that Khalfani's medical records were transmitted within the VA so that Foster could perform her duties as Khalfani's supervisor. Specifically, the records were released for the purpose of documenting Khalfani's request for medical leave and determining the level of work that Khalfani could perform given the injury to his knee. Accordingly, the VA's motion for summary judgment is granted with respect to this aspect of Khalfani's claim.

### 2. *The Restriction of Access to a VA Facility*

On July 7, 1993, Zelda Foster issued Khalfani a written notice informing him that his performance level was unacceptable and that his discharge had been proposed. On July 28, 1993, Acting Chief of Social Work Service Harriet Sherman sent Khalfani a letter in which she informed him of certain restrictions on his ability to enter the VA Extended Care Center at St. Albans, where Khalfani had worked. Specifically, Sherman's letter read as follows:

> Please note that while you are being carried in a paid non-duty status until further notice, you are not to report to the Veterans Administration Extended Care Center facility for any purpose unless you report to Security Service, and are escorted by a police officer.

On August 25, 1993, Khalfani received another notice informing him that the VA had decided to terminate his employment as of September 18, 1993.

Although Khalfani does not set forth the theory underlying his claim, his third complaint appears to allege that Sherman violated his constitutional rights by "[a]ttempting to restrict plaintiffs [sic] entrance into a Department of Veterans Affairs facility without given [sic] proper reason." (Compl.¶ 4.) The VA argues that there is no legal authority to support a *Bivens* action based on Khalfani's factual allegations, let alone the violation of a "clearly established" constitutional right. (Def. Mem. at 10.) I agree. Because Khalfani was an employee at the VA Extended Care Center at St. Albans

rather than a patient, his only argument appears to be that he had a constitutional right of unrestricted access to his place of employment. This is an untenable claim. An employee, merely by his status as such, does not obtain an unrestricted right to enter the premises of his employer. Moreover, although Khalfani apparently believes otherwise, the fact that one served in the armed services does not give rise to a right to enter into a government building whenever and however one chooses. Accordingly, this aspect of Khalfani's *Bivens* claim is dismissed.

### 3. *The "Forgery" of Khalfani's Name*

**\*9** Also attached to Khalfani's complaint is a letter he wrote to Carol Bierut on April 29, 1993. In this letter, on which Khalfani wrote "SUBJECT: Forgery," Khalfani alleged that someone signed his name on four Social Work Annual Re–Assessment forms. [4] Bierut wrote back to Khalfani on May 5, 1993, informing him that his allegations of forgery should be addressed on a "Service level," and that Zelda Foster should be notified of his claim. The record also includes an undated, typewritten statement that appears to be signed by Robert Siegfeld. In this statement, Siegfeld refers to a meeting in which Khalfani raised the issue of the alleged forgery. In pertinent part, Siegfeld's statement reads as follows:

> You then brought up whether it was correct for someone to sign someone else's name on a form. I asked what was being referred to. You noted that someone, possibly myself, signed your name on annual assessment forms in the chart about one year ago. I acknowledged that I did so, and it occurred after I reviewed every form in the patient package on the ward since Q.A. [Quality Assurance] was reviewing all charts due. When I reviewed charts on your units I noted several without signatures; I knew you had written them, as I had gone over them with you and I knew your handwriting. I did sign them using your name to remain in compliance. Actually, I should have signed my name for you, printing your name. Clearly there was no malicious intent, though I should not have done it this way nor will it be done again. In fact it is required that you sign your documentation in the folder as it was not done in those instances.

In response to the present motion, Khalfani does not contest this version of events. Instead, Khalfani states only that "[f]alsification of government documents is a serious offense because it goes to an employee's reliability, veracity, trustworthiness, and ethical conduct." (Plaintiff Rashidi Khalfani's Response to Defendant Secretary's

Memorandum of Law in Support of a Renewed Motion for Summary Judgment, at 5.)

Notwithstanding the undisputed fact that Siegfeld, a VA official, signed Khalfani's name to a government form without authorization, this aspect of Khalfani's *Bivens* claim still fails. There is no indication that Siegfeld's "forgery" of Khalfani's name deprived Khalfani of any rights or privileges protected by the United States Constitution. The Social Work Annual Re-assessment forms were not part of any process by which Khalfani's property, liberty, or due process rights were at stake. Instead, the forms apparently were mere administrative reports that VA social workers used to keep track of a patient's status. Even if the unauthorized signatures undermined the "reliability, veracity, trustworthiness, and ethical conduct" of Siegfeld, that has no bearing on whether Khalfani's constitutional rights were violated. Given the lack of any indication that Khalfani was deprived of a constitutional right through Siegfeld's actions, this element of the *Bivens* claim is dismissed.

4. *The Reports of Contact*

**\*10** The record reveals that VA officials completed no less than thirteen Reports of Contact with regard to Khalfani between September 25, 1992 and June 4, 1993. Based on the exhibits Khalfani attached to his complaint, "Reports of Contact" appear to be internal forms that VA employees complete upon observing or being subjected to unprofessional conduct by other VA employees. These reports were written by Siegfeld and another social worker, Doris Quijano, and include allegations that Khalfani failed to comply with VA personnel policies, called his supervisor a "fucking racist bastard," went on grand jury duty without informing his co-workers, accused Siegfeld of harassing him, and otherwise acted in an "erratic, unpredicatable and unstable" manner. According to Khalfani, VA officials violated his rights when they completed such Reports of Contact without his permission, without his consent, and without first speaking to him. (Compl.¶ 3.)

Khalfani's claim regarding the Reports of Contact, like the other aspects of his *Bivens* claim, is meritless. The record is devoid of any indication that the adverse Reports of Contact were the result of discriminatory animus, were written in retaliation for protected speech, or were motivated by any other improper purpose. Indeed, Khalfani's entire argument appears to be premised on the notion that he has a constitutional right to participate in or consent to adverse evaluations of his job performance. No such right exists.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted. The Clerk of the Court is advised that this order closes the case.

So Ordered.

All Citations

Not Reported in F.Supp.2d, 1999 WL 138247

Footnotes

1     In a letter to Carol L. Bierut, the Privacy Act Officer at the Department of Veterans Affairs in Brooklyn, Khalfani stated that although he commonly refers to himself as Rashidi J. Khalfani, his legal name is Kwesi Rashidi J. Khalfani and he was known to the doctors at the Northport Medical Center by the name Kwesi Khalfani.

2     One court in this circuit has held that the Privacy Act does not preclude a *Bivens* action. *See Doe v. United States Civil Serv. Comm'n,* 483 F.Supp. 539, 564 (S.D.N.Y.1980). However, as the *Williams* court noted, some of the plaintiff's claims addressed in *Doe* related to events that occurred before the effective date of the Privacy Act, and the *Doe* court did not have the benefit of the Supreme Court's decisions in *Schweiker v. Chilicky,* 487 U.S. 412 (1988) and *Bush v. Lucas,* 462 U.S. 367 (1983), which directly addressed whether an elaborate statutory scheme constituted a "special factor" that might preclude a *Bivens* action. *Williams,* 879 F.Supp. at 587 n. 16.

3     The "standard of Medical Document" directive, which appears to be an exhibit to Khalfani's complaint, provides a treating physician with a general description of the type of medical information that the VA seeks "in connection with a medical determination related to employability."

4     The four Social Work Annual Re–Assessment forms to which Khalfani refers were attached to his letter to Bierut, and are included in his complaint. The forms apparently are used by social workers at the VA to comment upon the "Present Biopsychosocial Situation" and "Social Work Treatment Plan" of a given patient.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Morehouse v. York, N.D.N.Y., January 7, 2016

2015 WL 4394604
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edgardo L. LOPEZ, Plaintiff,

v.

N. WHITMORE, et. al., Defendants.

No. 9:13–CV–952 (BKS/ATB).
|
Signed July 16, 2015.

**Attorneys and Law Firms**

Edgardo L. Lopez, Last Known Address, Syracuse, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Christopher W. Hall, Assistant Attorney General, The Capitol, Albany, NY, for Defendants.

**ORDER**

Hon. BRENDA K. SANNES, District Judge.

**\*1** Plaintiff Edgardo L. Lopez, a former New York State inmate, commenced this civil rights action under 42 U.S.C. § 1983 raising federal and state claims against New York State Department of Correction officials arising out of plaintiff's confinement at Marcy Correctional Facility. Dkt. Nos. 1, 32. On October 9, 2014, defendants filed a motion for summary judgment which was referred to United States Magistrate Judge Andrew T. Baxter. Dkt. Nos. 69, 83. On May 20, 2015, Judge Baxter issued a Report–Recommendation, recommending that defendants' motion for summary judgment be granted, and that plaintiff's First Amendment and Eighth Amendment claims be dismissed without prejudice to refiling and that plaintiff's due process and state law claims be dismissed with prejudice. Dkt. No. 83, p. 24. Judge Baxter advised the parties that:

> Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Sec. of Health & Human Servs., 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

Dkt. No. 83, p. 24. A copy of the Report–Recommendation was mailed to Lopez's last known address via certified mail. Dkt. No. 83. Lopez's copy of the Report–Recommendation was returned to the Court marked "Return to sender, unable to forward." Dkt. No. 85.

On June 8, 2015, Lopez filed a notice of change of address and a request for an extension of time to respond to the Report–Recommendation. Dkt. Nos. 86–87. Lopez noted that he received the Report–Recommendation that day at the public counter in the courthouse. Dkt. No. 87. The Court granted Lopez's request for an extension of time and, in a text order dated June 8, 2015, extended the due date for filing objections to June 22, 2015. The text order was mailed to Lopez's last known address. Lopez's copy of the text order was returned to the Court marked "Return to sender, not deliverable as addressed, unable to forward." Dkt. No. 89.

In a Decision and Order on June 29, 2015, the Court reminded Lopez of his obligation to notify the Court of any change in address, *see* Local Rule 10.1(c)(2), and provided Lopez an additional fourteen days to file his current address and any objections to the Report and Recommendation. Dkt. No. 90, pp. 2–4. The Court advised Lopez that if he failed to comply with the Decision and Order, the Court would "consider the Report and Recommendation as unopposed and review for clear error only." Dkt. No. 90, p. 4. The Decision and Order was served on Lopez via certified mail at his last known address. Dkt. No. 90. On July 8, 2015, the Court received an executed return receipt of delivery. Dkt. 91. Lopez has not, to date, filed any objections to the Report–Recommendation.

**\*2** Accordingly, as no objections to the Report–Recommendation have been filed and the time for filing objections has expired, the Court reviews the Report–Recommendation for clear error. See *Glaspie v. N.Y.C. Dep't of Corr.,* No. 10 CV 00188(GBD)(JCF), 2010 WL 4967844, at \*1, 2010 U.S. Dist. LEXIS 131629, at \*2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that when no objections to report

and recommendation are made, "the Court may adopt [it] if there is 'no clear error on the face of the record.' ") (quoting *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005)). Having reviewed the Report and Recommendation in its entirety and having found no clear error, it is hereby:

**ORDERED** that the Report–Recommendation (Dkt. No. 83) is **ADOPTED in its entirety** for the reasons stated therein; and it is further

**ORDERED** that the defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED;** and it is further

**ORDERED** that plaintiff's due process and state law claims are **DISMISSED with prejudice;** and it is further

**ORDERED** that plaintiff's remaining claims under 42 U.S.C. § 1983 relating to assault and retaliation are **DISMISSED without prejudice to refiling;** and it is further

**ORDERED** that the Clerk of the Court shall close this case; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order as well as the Report–Recommendation (Dkt. No. 83) upon all parties in accordance with the local rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c) by the Honorable Brenda K. Sannes, United States District Judge.

In this civil rights action, plaintiff claims that in May 2013, several correctional officers assaulted him during his confinement at the Marcy Correctional Facility ("Marcy") in retaliation for filing a grievance, and then issued several false disciplinary charges against plaintiff to cover up their actions. (Amended Compl ., Dkt. No. 32, ¶¶ 26–55). Plaintiff amended his complaint in November 2013 to further allege that the disciplinary hearing related to these charges violated his due process rights. (*Id.* ¶¶ 60–74). Plaintiff also raises several state

law tort claims in connection with the alleged assault. (*Id.* ¶ 77, 80, 82).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt. No. 69). Plaintiff has opposed the motion. (Dkt. No. 73) [1]. Defendants did not submit a reply.

For the reasons set forth below, this court recommends that defendants' summary judgment motion be granted. Plaintiff's claims should be dismissed because no rational fact finder could conclude that he exhausted his administrative remedies as to the assault and retaliation claims as required before filing an action under 42 U.S.C. § 1983, or that plaintiff failed to receive all the process he was due during his disciplinary hearing. Plaintiff's state law claims, raised pursuant to the court's supplemental jurisdiction, should also be dismissed.

## *DISCUSSION*

### I. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine

issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin,* 467 F.3d at 272.

To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint must not be conclusory or overly general. *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 10 (N.D.N .Y. Apr. 24, 2006). Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n. 11 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Exhaustion of Administrative Remedies

**\*4** Plaintiff has alleged that he was the victim of two separate assaults by Marcy Correctional Officers on the morning of May 7, 2013. (Amended. Compl., Dkt No. 32, ¶¶ 31–38, 43). Plaintiff further alleges that the assaults were in retaliation for a prior grievance which he had submitted against one or more of the defendants, and that the defendants then issued him disciplinary tickets for failing to obey orders and possessing a weapon in order to cover up their actions [2] . (*Id.* ¶ 55). Based on the record discussed below, the court concludes that no reasonable fact finder could conclude that the plaintiff had completed the administrative grievance process for these claims prior to commencing this federal proceeding. Accordingly, this court recommends that plaintiff's First Amendment retaliation claims and Eighth Amendment cruel and unusual punishment claims be dismissed for failure to exhaust administrative remedies.

### A. Legal Standards

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the relevant facility. *Id.* § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/ her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

**\*5** At the same time that the Second Circuit decided *Giano*, it also decided four related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[3] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some discussion.[4] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g., Messa v. Goord*, 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York*, 311 F. App'x 397, 399 (2d Cir.2009).

**B. Application**

Plaintiff filed a grievance on June 17, 2013, after being transferred to Downstate Correctional Facility ("Downstate"), alleging that on May 7, 2013, certain Marcy Correctional Officers verbally and physically abused him following a pat-down frisk while plaintiff was en route from the Marcy housing unit to the facility's infirmary. (Def. Statement of Material Facts, Dkt No. 69–1, ¶ 4; Pl's Resp. to Def. Statement of Material Facts, Dkt. No. 73, 4). This grievance was acknowledged and forwarded for investigation by IGRC on June 19, 2013. (Dkt. No. 73–2, Pl's Ex. 3(B).) On September 17, 2013, the Downstate Superintendent denied plaintiff's grievance. (Hall Aff, Dkt No. 69–3, Ex. 3; Dkt No. 73–2, Pl's Ex. 3(C).) On September 23, 2013, Plaintiff appealed this determination to the Central Office Review Committee. *Id.* On June 11, 2014, CORC issued its decision denying the grievance, the final step in the administrative process. (Dkt. No. 73–2, Pl's Ex. 3(D).)

While the administrative grievance process was ongoing, Plaintiff commenced this litigation on August 12, 2013, alleging essentially the same facts as his grievance. (Dkt. No. 1, Compl.). Plaintiff later submitted an Amended Complaint dated November 3, 2013 which restated the assault and retaliation claims and added a due process claim arising out of the related disciplinary hearing. (Dkt. No. 32, Amended Compl.)

In their motion for summary judgment, defendants argue that plaintiff failed to exhaust his administrative remedies relating to his assault and retaliation claims prior to commencing this federal litigation[5]. Plaintiff argues that his administrative remedies were exhausted upon filing his grievance on June 17, 2013, and that "[i]t is common knowledge that one not need to wait on the CORC decision in order to file a civil action against New York State Department of Corrections and Community Supervision (N.Y.SDOCCS) employees for committing such brutally physical body harm upon plaintiff." (Pl's Mem. of Law, Dkt. No. 73–1, at 7). Plaintiff also asserts that his administrative grievance was not resolved within a reasonable time, as it took three months to receive the Downstate Superintendent's determination, and another ten months before the CORC determination was issued. (*Id.* at 8).

**\*6** "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. Plaintiff did not complete the state administrative grievance process for the assault and retaliation claims before commencing this litigation, and therefore failed to exhaust his administrative remedies in accordance with the PLRA. The only excuse offered by plaintiff, that the administrative grievance process took an unreasonably long time, is unavailing. (Pl's Mem. of Law, Dkt. No. 73–1, at 8). If the superintendent failed to timely respond to plaintiff's grievance, Plaintiff needed to appeal that failure to the CORC before commencing this litigation. "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar.11, 2003) (Sharpe, M.J.).[6]

In applying the Second Circuit's three-party inquiry, plaintiff has offered no evidence to suggest that the grievance process was unavailable to him, that the defendants are estopped from asserting the defense of failure to exhaust, or that there are any other special circumstances under *Hemphill* and its progeny that would excuse plaintiff's failure to exhaust his administrative remedies.

In support of defendants' motion, Jeffrey Hale, the DOCCS Assistant Director of the Inmate Grievance Program ("IGP")

and the custodian of records for CORC, which maintains files of grievance appeals by inmates, submitted a declaration based upon his review of those records. (Dkt. No. 69–2). Ass't Dir. Hale certified that CORC records contained five separate grievances filed by plaintiff for the period between September 2012 and May 2014. (Hale Decl., Dkt. No. 69–2, ¶¶ 6–7, 10, and Ex. B.).

During his August 26, 2014 deposition, plaintiff acknowledged that he was familiar with the DOCCS grievance process and understood that CORC is the final administrative step for deciding an inmate grievance. (Hall Aff, Dkt No. 69–3, Ex. 1 at 18). While plaintiff asserts that he was discouraged from reporting the alleged assaults immediately afterwards by threats from one or more of the defendants, plaintiff not only filed a detailed administrative grievance, but also raised the assault and retaliation allegations during his disciplinary hearing. *See, e.g., Black v. Fischer,* No. 12 Civ. 2341, 2013 WL 1314940, at *8–9 (S.D.N.Y. Mar. 28, 2013)* (the plaintiff's claim that he was deterred from pursuing grievances by threats from a defendant was overcome by the fact that plaintiff filed other grievances and complaints during the relevant time period).

It is true that under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding. *Giano,* 380 F.3d at 678–79; *Johnson,* 380 F.3d at 697. However, such exhaustion is essentially limited to instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing, and (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim. *Murray,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *3 (collecting cases). Here, where plaintiff filed a grievance eleven days after the hearing, there is no indication that he reasonably believed that the disciplinary hearing was his only available remedy. In addition, the disciplinary hearing officer, defendant Cavaleri, informed plaintiff that his testimony regarding the assault was "not credible," and plaintiff declined to call any witnesses or question any witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4). No rational fact-finder could conclude that plaintiff had articulated or pursued his claim in a manner that afforded prison officials an opportunity to investigate his claim.

**\*7** During the pendency of this litigation, plaintiff received a decision by the CORC, dated June 11, 2014, upholding

the Superintendent's denial of the grievance. (Dkt. No. 73–2, Pl's Ex. 3(C)). While it is true that this decision means that plaintiff has now exhausted his administrative remedies, the Second Circuit has held that a plaintiff must exhaust his remedies *before* filing his federal action, and that the court must dismiss plaintiff's complaint notwithstanding his subsequent exhaustion. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001).

Because plaintiff failed to exhaust his administrative remedies by failing to wait for the CORC's decision, this court is constrained to recommend dismissing this complaint without prejudice. Plaintiff may immediately re-file his action on the First and Eighth Amendment claims because he has now exhausted his remedies. As in *Neal,* plaintiff may find that requiring him to initiate a new law suit is "judicially inefficient." *Id.,* 267 F.3d at 123. However, the Second Circuit specifically rejected such an argument, finding that "if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Id.*

## II. Due Process–Disciplinary Hearing

### A. Plaintiffs Request for Voluntary Dismissal

Plaintiff amended his complaint in November 2013 to add a due process cause of action alleging deficiencies in the disciplinary hearing arising out of the incidents at Marcy. (Dkt. No. 32). The Amended Complaint was filed after plaintiff's administrative appeal was denied, and therefore plaintiff has exhausted his administrative remedies as to the due process issue. *See Chavis v. Goord,* No. 9:00–CV–1418 (LEK/DEP), 2007 WL 2903950 (N.D.N.Y.2007) (citing *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). Defendants seek summary judgment on the merits of this claim, arguing that plaintiff was afforded all process that was due.

In response, plaintiff has requested that the court dismiss his due process claim, in order to focus on the alleged assault. However, since plaintiff's request for dismissal comes after the defendants have answered (Dkt. No. 37) and moved for summary judgment (Dkt. No. 69), and the parties have not stipulated to dismissal, plaintiff has no right to a voluntary dismissal. Fed.R.Civ.P. 41(a)(1). Instead, dismissal lies in the discretion of the court. *See* Fed.R.Civ.P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the

plaintiff's request only by court order, on terms that the court considers proper."); *see also Lebewohl v. Heart Attack Grill LLC,* 890 F.Supp.2d 278, 304 (S.D.N.Y.2012) ("A trial court has great discretion in considering whether to grant a motion for voluntary dismissal under the rule.").

The circumstances of this case weigh heavily in favor of denying plaintiff's motion for voluntary dismissal and deciding defendants' motion for summary judgment on the due process claim. These claims have been pending since 2013, and the parties have engaged in discovery, including the deposition of plaintiff. (Hall Aff., Dkt. No. 69–3, Ex. 1). Defendants filed a summary judgment motion, fully supported by numerous affidavits and exhibits, to dismiss plaintiff's claims with prejudice, in October 2014. (Dkt. No. 69). Plaintiff, who requested permission in November 2013 specifically to add the due process claims, provides no justification for withdrawing these claims, other than stating that his "complaint is not about the Tier Hearing nor Due Process regarding the tier hearing, but the factual facts that the defendants physically assaulted plaintiff...." (Pl.'s Mem. of Law, Dkt. 73–1, at 3).

**\*8** At this stage of the proceedings, it would be unfair and unduly prejudicial to the defendants to allow plaintiff to withdraw his due process claim, particularly given the potential that plaintiff may re-file this litigation in order to raise the now administratively exhausted assault claims. *See, e.g., Murray v. Fischer,* No. 9:11–CV–225 (GLS/ATB), 2015 WL 457693, at \*2–3) (denying prisoner's motion to dismiss certain claims without prejudice and granting defendants' motion for summary judgment instead); *Emory v. New York,* No. 11–CV–1774, 2013 WL 1881009, at \*3 (E.D.N.Y. May 6, 2013) (denying plaintiffs' motion to dismiss action without prejudice where plaintiffs failed to proffer reasons why their "voluntary" dismissal came so late in the litigation, and only after the defendants marshaled strong arguments in favor of dismissal in substantive motions, both because it reflects plaintiffs' lack of diligence and because it may subject defendants to the burden of relitigating these same claims); *Krivchenko v. Clintondale Aviation, Inc.,* No. 1:13–CV–820 (TJM), 2014 WL 4684808, at \*4 (N.D.N.Y. Sept.18, 2014) (denying voluntary motion to dismiss action, filed without adequate explanation after defendant filed a motion for summary judgment motion, because it indicates an "an undue vexatiousness" and could potentially subject the defendants to the burden of unnecessary relitigation). The court will now address the merits of plaintiff's due process claims.

## B. Legal Standards

In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ...., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

**\*9** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

In certain cases, an inmate has a limited right to assistance with his disciplinary hearing. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

## C. Application

Since the disciplinary hearing resulted in a one year sentence to the special housing unit ("SHU"), plaintiff is considered to have a liberty interest subject to due process protection. Plaintiff alleges that defendants issued him fabricated disciplinary tickets to cover up the alleged retaliatory assault, leading to procedural due process and privacy violations. It is well established that fabricated or false disciplinary charges do not violate an inmate's due process rights, so long as an inmate received a proper disciplinary hearing, with a determination based upon "some evidence." *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Therefore, the analysis focuses on the disciplinary hearing itself, and this court recommends that defendants' motion for summary judgment be granted.

### 1. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). Plaintiff alleges that he requested assistance, but that the employee assistant, who is not named as a defendant, refused to help plaintiff locate relevant documents and threatened physical violence. (Amended Compl., Dkt. No. 32, ¶ 68).

At the beginning of the disciplinary hearing, defendant Cavaleri inquired about the pre-hearing assistance, and asked whether plaintiff wanted to identify any witnesses or make any other requests before the hearing commenced. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 4). At the close of the hearing, plaintiff was also given an opportunity to raise any issues on the record. (*Id.* at 36). Plaintiff declined to raise any issues before or after the hearing about the quality or conduct of his pre-hearing assistant. Plaintiff's bare allegations in the Amended Complaint, which do not identify the offending

officer, are not sufficient to overcome defendants' motion for summary judgment. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Moreover, even assuming for purposes of this motion that plaintiff's allegations are accurate, plaintiff waived any objection to inadequate assistance when he failed to raise the issue during the disciplinary hearing. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (plaintiff waived right to object to allegedly inadequate assistance when he did not raise the issue when questioned by hearing officer); *Hailey v. Provost,* No. 94–CV–1616 (RSP/DS), 1997 WF 627547 at *2 & n. 3 (N.D.N.Y., Oct. 9, 1997) (inmate waived right to effective employee assistance by specifically answering "no sir" after hearing officer asked if he needed any additional assistance).

### 2. Use of OMH Information

 **\*10** Plaintiff alleges that defendant Cavaleri's consideration of testimony from State Office of Mental Health ("OMH") staff regarding plaintiff's psychiatric and medical history violated his due process right to privacy. (Amended Compl., Dkt. No. 32, 71). Defendant Cavaleri advised plaintiff during the hearing that such testimony was admitted and would be considered, but did not disclose the contents of that evidence. Following policy, the OMH testimony was heard without the plaintiff present. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 36).

In the United States Constitution, there exists a right to privacy, protecting an individual's interest in avoiding the disclosure of personal matters. *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) (citing *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). This right is protected by the Due Process Clause. *O'Connor v. Pierson,* 426 F.3d 187, 201 (2d Cir.2005) (citing *Whalen,* 429 U.S. at 598–600). The right to privacy has also been "characterized as a right to 'confidentiality,' which 'includes the right to protection regarding information about the state of one's health.' " *Matson v. Bd. of Ed. of City School Dist. of New York,* 631 F.3d 57, 64 (2d Cir.2011) (quoting inter alia *Doe,* 15 F.3d at 267).

With respect to the "disclosure" of medical information, an inmate's privacy right varies with the inmate's condition, with a greater interest in preventing the disclosure of highly sensitive conditions. *Id.* (citations omitted). Prison officials may impinge upon the inmate's privacy right only to the extent that their actions are "reasonably related to legitimate

penological interests." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999).

The Second Circuit has concluded that the OMH policy of offering such testimony outside the patient's presence during a prison disciplinary proceeding is constitutionally valid and does not violate any due process right. *See Powell v. Coughlin,* 953 F.2d 744, 749 (2d Cir.1991). As the disclosure of unfavorable mental health evaluations in an inmate's presence will likely impair the inmate-clinician relationship, and the disclosure of favorable evaluations may encourage inmates to "act out" in order to obtain such findings, the policy of hearing mental health testimony outside the inmate's presence, followed in this case, is reasonably related to legitimate penological interests and is an appropriate measure. *Id.*

### 3. "Some" Evidence Standard

Plaintiff alleges that defendant Cavaleri was biased, that plaintiff's guilt was not based upon reliable evidence, and that Cavaleri failed to consider plaintiff's testimony, particularly about injuries following the alleged assault. (Amended Compl., Dkt. No. 32, 74). Defendants argue that the disciplinary hearing transcript shows that defendant Cavaleri explained plaintiff his rights, read him the charges and took his not guilty plea. (Def. Mem. of Law at 10–12). Plaintiff was allowed to offer testimony, and given the opportunity to call and question witnesses. (Hall Aff., Dkt. No. 69–3, Ex. 4 at 8–22). Plaintiff declined to propose questions for any witness. (*Id.*). When the witness testimony was concluded, plaintiff was given an opportunity to rebut their statements. (*Id.* at 26–30). After plaintiff raised the issue of injuries suffered in the alleged assault, defendant Cavaleri reviewed plaintiff's medical records with the assistance of a physician's assistant. (*Id.* at 35). When issuing his disposition, defendant Cavaleri noted the consistent testimony of seven witnesses, and the lack of any evidence that would support plaintiff's testimony (*Id.* at 39).

**\*11** As the hearing officer, Defendant Cavaleri was authorized to make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at *11 n. 25 (N.D.N.Y. Aug.5, 2010) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep't. Rec. adopted,* 2010 WL 3762016, at *1 (N.D.N.Y. Sept.20, 2010). It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other

contexts." *Alien v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was sufficient evidence supporting the hearing officer's determination. Defendant Cavaleri specifically noted the consistent testimony of seven witnesses, and the lack of evidence to support plaintiff's testimony, which was deemed not credible.

The record evidence supports the conclusion that plaintiff's due process rights were satisfied in his disciplinary hearing. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Cavaleri be granted. Because his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that this court has found comported with due process, summary judgment should also be granted with respect to defendant Prack [7] .

### III. State Law Claims

Plaintiff asserts a number of tort claims including assault and battery, invasion of privacy, sexual harassment, infliction of mental, emotional and physical distress and negligence in connection with the incidents at Marcy, all arising out of New York State statutory and common law. (Am. Compl., Dkt No. 32, 77, 79, 80, 82). Defendants have moved for summary judgment dismissing these claims, arguing that pursuit of such tort claims in this action is statutorily precluded pursuant to New York Corrections Law § 24. (Def. Mem. of Law, Dkt. No. 69–4, at 12–13). Plaintiff counters that the United States Supreme Court ruled Corrections Law § 24 unconstitutional, and that, in any case, state law immunity does not extend to excessive force claims, which fall outside the ordinary scope of a correctional officer's employment duties. (Pl.'s Mem. of Law, Dkt. No. 73–1, at 9–12).

**\*12** New York Corrections Law § 24 precludes "the assertion of claims against corrections officers in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out of the acts committed by corrections officers within the scope of their employment." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996).

In *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), cited by plaintiff in his response (Pl's Mem. of Law, Dkt. No. 73–1, at 11), the Supreme Court held that New York Corrections Law § 24 was unconstitutional to the extent that it precludes inmates from pursuing § 1983 actions in state or federal court. However, plaintiff overstates the scope of *Haywood* as it pertains to this litigation.

Although the *Haywood* decision found New York Corrections Law § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under federal law, such as § 1983. In applying supplemental jurisdiction, federal courts are bound to apply state substantive law to claims brought pursuant to state statute or common law. *Baker,* 77 F.3d at 15. The courts of this district have unanimously held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS officials. *See, e.g., Rucano v. Koenigsmann,* No. 9:12–CV–35 (MAD/RFT), 2014 WL 1292281, \*16 (N.D.N.Y., Mar.31, 2014); *Rounds v. Thompson,* No. 9:12–CV–953, 2013 WL 3187074 at \*4 (N.D.N.Y.2013) (collecting cases). If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court must not allow that claim to be appended to a federal law claim in federal court. *Baker,* 77 F.3d at 15.

Plaintiff alleges that he was assaulted during a pat-down by correctional officers as he traversed a prison walkway, and then again while being transported and questioned about the incident. (Amended Compl. Dkt No. 32, ¶ 24–43). Transporting an inmate and subduing that individual, should a disciplinary issue arise, is 'common conduct by a DOCCS officer or sergeant.' " *Crosby v. Russell,* No. 9:10–CV–595, 2014 WL 3809129, \*5 (N.D.N.Y.2014) (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision,* No. 11–CV–0079, 2013 WL 5347468, at \*3 (W.D.N.Y. Sept. 23, 2013)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, 'no matter how irregularly, or with what disregard of instructions.' " *Id.,* 2014 WL 3809129, \*6 (quoting *Cepeda v. Coughlin,* 128 A.D.2d 995, 996, 513 N.Y.S.2d 528 (3d Dep't 1987)). Therefore, based upon the allegations in the amended complaint, this court recommends that defendants' motion for summary judgment as to plaintiff's state law claims be granted, without leave to amend.

Even if New York Corrections Law § 24 did not apply, this court would still recommend dismissal of plaintiff's state law claims in light of the recommendations of dismissal of all federal causes of action in plaintiff's amended complaint. *See* 28 U.S.C. § 1367(c)(3) (the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994).

**\*13** **WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 69) be **GRANTED,** and that plaintiff's First Amendment and Eighth Amendment Claims be **DISMISSED WITHOUT PREJUDICE TO REFILING,** and that plaintiff's due process and state law claims be **DISMISSED WITH PREJUDICE.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed May 20, 2015

**All Citations**

Slip Copy, 2015 WL 4394604

Footnotes

1    Plaintiff requested oral argument on defendant's motion. That request is denied, and this court will make its report and recommendation based upon the parties' papers and the record.

2    Defendants assert that plaintiff has failed to state a claim in connection with the misbehavior reports, since plaintiff's allegations of retaliation are conclusory and defendant was found guilty based upon the evidence at his disciplinary hearing. (Def. Mem. of Law, Dkt. No. 69–4, at 8–10). In his response, plaintiff has requested that the court dismiss the claim for retaliatory misbehavior reports in order to focus on the assault claim. (Pl.'s Mem of Law, Dkt. No. 73–1, at 9). Because I am recommending that defendants be granted summary judgment on the retaliation claim due to plaintiff's failure to exhaust administrative remedies, I do not need to address whether summary judgment should be granted on the merits on this claim.

3    *See* *Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

4    See, e.g., *Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

5    Defendants had previously raised the failure to exhaust administrative remedies as an affirmative defense in their answer to the Amended Complaint. (Dkt. No. 37, Def.Answer, 12).

6    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. 7 N.Y.C.R.R. § 701.6(g)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level, including the CORC, in order to properly complete the grievance process. *Accord, Murray v. Palmer,* 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. March 31, 2010).

7    The court notes that if plaintiff had stated a valid due process claim, the fact that defendant Prack affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero,* No. 09–CV–5209, at *11–18 (S .D.N.Y. Mar. 17, 2011) (Rep't.-Rec.) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky,* No. 9:07–CV–432, 2011 WL 1086001, at *4–7 (N.D.N.Y. Jan.25, 2011) (Rep't–Rec.), *adopted,* 2011 WL 830639 (N.D.N.Y., Mar.3, 2011).

2008 WL 4241746
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shawn MARTINEZ, Plaintiff,
v.
R.J. MINOGUE, Captain; and Donald Selsky,
Director, Special Housing Unit, Defendants.

No. 9:06-CV-546.
|
Sept. 11, 2008.

**Attorneys and Law Firms**

Shawn Martinez, Orlando, FL, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David Fruchter, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Shawn Martinez, brought this civil rights action
pursuant to 42 U.S.C. § 1983. By Report-Recommendation
dated July 31, 2008, the Honorable David E. Peebles, United
States Magistrate Judge, recommended that defendants'
motion for summary judgment (Docket No. 31) be granted,
and the plaintiff's complaint be dismissed in all respects.
The plaintiff has not filed any objections to the Report-
Recommendation.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Treece, the Report-
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants; motion for summary judgment is
   GRANTED;

2. The plaintiff's complaint is DISMISSED in all respects.

3. The Clerk is directed to enter judgment accordingly and
   close the file.

IT IS SO ORDERED.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Shawn Martinez, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983,
complaining of constitutional violations alleged to have
occurred during the time of his confinement. In his complaint
the plaintiff, who following a due process hearing was found
guilty of assaulting a fellow inmate and was sentenced, *inter
alia,* to three years of disciplinary confinement in a prison
special housing unit ("SHU"), alleges deprivation of his right
to procedural due process stemming from the refusal of the
presiding hearing officer to call two witnesses requested by
Martinez, but who had informed plaintiff's legal assistant of
their refusal to testify at the hearing. As relief plaintiff seeks
compensatory damages computed based upon the amount of
time served in SHU confinement up until the reversal of the
hearing officer's determination, following his initiation of a
state court proceeding challenging the ruling.

Currently pending before the court is a motion by the
two named defendants for summary judgment dismissing
plaintiff's complaint in its entirety. In their motion, defendants
assert that while plaintiff's rights under state law or regulation
may have been violated, as indeed was the finding of the
state court which overturned the hearing determination, no
constitutional deprivation occurred when the hearing officer,
reasonably believing that the two witnesses at issue had
refused to testify on the plaintiff's behalf, failed to require
their appearance for that purpose.

There being no dispute that the evidence adduced during
the hearing was adequate to support the finding of plaintiff's
guilt, and discerning no constitutional violation based upon
the hearing officer's decision not to call the two recalcitrant
witnesses, I recommend that defendants' motion be granted.

### I. *BACKGROUND* [1]
Plaintiff is a prison inmate entrusted to the custody of
the New York State Department of Correctional Services

("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to the claim in this action, Martinez was designated to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.*

**\*2** On March 4, 2003, while at Clinton, plaintiff was issued a misbehavior report authored by Corrections Sergeant A.J. Trombley, charging him with various infractions arising out of an alleged attack on a fellow inmate, including assault (Disciplinary Rule 100.10), fighting (Disciplinary Rule 100.13), violent conduct (Disciplinary Rule 104.11) and weapons possession (Disciplinary Rule 113.10). Fruchter Decl. (Dkt. No. 31-3) Exh. A. In preparation for a disciplinary hearing to address the charges lodged in the misbehavior report, a corrections counselor was assigned to assist Martinez in preparing a defense to the accusations. *Id.* Exh. B.

A Tier III disciplinary hearing was held, beginning on March 10, 2003, to address the allegations set forth in the misbehavior report; presiding at that hearing was defendant R.J. Minogue, a Corrections Captain at the facility. [2] Fruchter Decl. (Dkt. No. 31-3) Exhs. B-F. During the course of that proceeding testimony was elicited from the plaintiff as well as several other witnesses, including various inmates at Clinton; certain of the witnesses were examined outside of plaintiff's presence, given their status as confidential informants, and plaintiff was provided with a form reflecting that fact and advising him of the hearing officer's decision to accept their testimony *ex parte* "to preserve [the witnesses'] safety as well as the institutional safety and correctional goals." *Id.* Exhs. D, pp. 23-24 and Exh. F. Two witnesses, including the victim and another inmate, whose appearance at the hearing was requested by the plaintiff did not testify, based upon their refusal to do so requested by the plaintiff. *Id.* Exh. D at p. 2.

At the conclusion of the hearing plaintiff was convicted on all four counts. Fruchter Decl. (Dkt. No. 31-3) Exh. C. As a result of that finding defendant Minogue imposed a penalty which included thirty-six months of disciplinary confinement in the facility's SHU, with a corresponding loss of package, commissary, and telephone privileges, and a further recommendation that plaintiff lose thirty-six months of good time credits. *Id.,* Exh. D at 25-26. The hearing officer's finding of guilt and the penalties imposed were upheld on administrative appeal to defendant Donald Selsky, who at that time served as the DOCS Director of Special Housing/Inmate Disciplinary Program, in a determination issued on May 5, 2003. Fruchter Decl. (Dkt. No. 31-3) Exh. H.

Following his unsuccessful administrative challenge, plaintiff commenced a proceeding in New York State Supreme Court, pursuant to Article 78 of the New York Civil Practice Law and Rules, challenging the disciplinary determination. Complaint (Dkt. No. 1) ¶ 4. While Martinez's Article 78 petition was initially dismissed by the trial court on February 5, 2004, that determination was reversed on appeal to the New York State Supreme Court Appellate Division, Third Department, by memorandum-decision and order issued on February 10, 2005. *Id.* ¶¶ 3-4, Exh. A. In its decision reversing the lower court's holding and vacating the disciplinary determination, the Third Department concluded that the hearing officer had failed to comply with governing state regulations regarding the refusal of witnesses to testify at such hearings, based upon his failure to inquire as to the basis for the refusal of the two witnesses to testify and to then provide the plaintiff with an adequate explanation regarding that failure. *Id.* The hearing determination was therefore reversed, and the matter was remanded to the DOCS for a new hearing at which defendants were directed to provide plaintiff with the reason for the refusal of the two witnesses to testify. *Id.* Of note, in its decision the Third Department observed that "petitioner does not dispute that the evidence in the record was sufficient to sustain the [hearing officer's] determination[.] ...." *Id.*

**\*3** Plaintiff was subsequently released from SHU confinement on March 3, 2005. Complaint (Dkt. No. 1) at 7. No new disciplinary hearing was conducted regarding the March 4, 2003 assault. Fruchter Decl. (Dkt. No. 31-3) ¶ 13.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 3, 2006. Dkt. No. 1. In his complaint Martinez names Captain Minogue, the hearing officer, and Donald Selsky, who denied his internal administrative appeal, as defendants and asserts a single claim of procedural due process deprivation based upon the hearing officer's failure to call the two requested witnesses or to provide him with an adequate explanation regarding their refusal to testify.

On January 31, 2008 defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 31. In their motion defendants assert that at best, plaintiff's claim implicates a violation of state regulation which does not rise to a level of constitutional significance, particularly in view of the Third Department's finding of the existence of sufficient evidence to support the hearing officer's substantive determination. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 33, which is now ripe for

determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See also FED. R. CIV. P. 72(b). [3]

### III. DISCUSSION

#### A. Summary Judgment Standard

Defendants' motion is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Although pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

**\*4** When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. Anderson, 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; Security Ins., 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553; Wright v. Coughlin, 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. Procedural Due Process

Plaintiff's complaint alleges that during the course of the disciplinary proceedings against him he was denied procedural due process, in violation of rights secured under the Fourteenth Amendment. Defendants assert that plaintiff's claim, while potentially implicating a violation of state regulation, as the Third Department found, does not similarly support the finding of a procedural due process deprivation.

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the protections guaranteed under the Fourteenth Amendment were the focus of the Supreme Court's decision in Wolff v. McDonnell, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). In its decision in that case the Court held that once its protections are triggered in connection with an inmate disciplinary proceeding, the Fourteenth Amendment affords certain minimal safeguards, requiring 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. Wolff, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; see also Eng v. Coughlin, 858 F.2d 889, 897-98 (2d Cir.1988). In addition to these procedural safeguards, the Fourteenth Amendment also requires that a hearing officer's disciplinary determination must garner the support of at least "some evidence". Superintendent v. Hill, 472 U.S. 445, 454, 105 S.Ct. 2768, 2773 (1985).

**\*5** As defendants tacitly acknowledge in their moving papers, the plaintiff's disciplinary confinement for nearly two years in a prison SHU represents a liberty interest deprivation sufficient to invoke the procedural requirements of the Fourteenth Amendment. In this instance, however, plaintiff

has been denied none of the rights guaranteed under *Wolff.* As the Third Department noted, and plaintiff apparently conceded during the course of his Article 78 proceeding, the evidence adduced during the disciplinary hearing was adequate to support the hearing officer's determination of Martinez's guilt. Complaint (Dkt. No. 1) Exh. A, *slip op.* at 2. Having conducted an independent review of the hearing transcript, I similarly conclude that the hearing officer's determination is supported by the requisite modicum of evidence necessary to satisfy the Fourteenth Amendment. *Hill,* 472 U.S. at 454, 105 S.Ct. at 2773. Plaintiff does not deny having received adequate notice of the charges against him, nor does he challenge the sufficiency of the hearing officer's determination or the adequacy of the assistance provided to him in preparation for the hearing.

Plaintiff's quarrel in this case is with the hearing officer's failure to call two witnesses whose presence he requested, including the victim of the assault and another inmate at the prison. While the Fourteenth Amendment guarantees an inmate's rights to call witnesses and present evidence in his or her defense before being deprived of a cognizable liberty interest, that right is not without bounds; the law requires only that an inmate be permitted to present witness testimony only where "permitting him [or her] to do so will not be unduly hazardous to institutional safety or correctional goals." *Hill v. Selsky,* 487 F.Supp.2d 340, 342 (W.D.N.Y.2007) (citing *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979). In this instance defendant Minogue, in his capacity as a hearing officer, was informed by plaintiff's legal assistant that two requested witnesses, including M. Mitchell and D. Padgett, had refused to testify at plaintiff's hearing. Fruchter Decl. (Dkt. No. 31-3) Exh. B. During the hearing, Minogue advised the plaintiff of his decision not to call those two individuals as witnesses, in light of their refusals to testify for the plaintiff. *Id.* Exh. D at 2, 5. Where a hearing officer reasonably believes that a witness identified and requested by an accused inmate has refused to testify as requested by an accused inmate, he or she may permissibly opt not to call that witness, concluding that to do so is unnecessary in light of that refusal. *Hill,* 487 F.Supp.2d at 342-43; *see also Sweet v. Wende Corr. Facility,* 514 F.Supp.2d 411, 414 (W.D.N.Y.2007); *Shell v. Brezniak,* 365 F.Supp.2d 362, 377 (W.D.N.Y.2005).

In bringing this action and resisting defendants' motion for summary judgment, plaintiff appears to take solace in the Third Department's decision reversing the adverse disciplinary determination against him. That court's decision, however, was predicated entirely upon the hearing officer's failure to comply with a regulation which provides, in pertinent part, that an

> **\*6** ... inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. *If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety ...*

7 N.Y.C.R.R. § 254.5(a) (emphasis supplied). It is well-established, however, that a violation of state law or regulation in and of itself will not establish a constitutional violation or support a civil rights claim under 42 U.S.C. § 1983. *See Johnson v. Columbia Univ.,* No. 99 Civ. 3415, 2003 WL 22743675, at \*14 (S.D.N.Y. Nov. 19, 2003) (citing *Paul v. Davis,* 424 U.S. 693, 700, 96 S.Ct. 1155, 1160 (1976)); *see also Hill,* 487 F.Supp.2d at 343 (state court decision concluding that the hearing officer violated state regulation by not providing the accused inmate with a signed witness refusal form did not establish a constitutional deprivation).

Because plaintiff's complaint alleges only a violation of state regulation related to the hearing officer's failure to conduct a proper inquiry into the refusal of two witnesses requested by the plaintiff and to provide both an adequate reason and a signed witness refusal form to the plaintiff, and those violations do not rise to a level of constitutional significance, I recommend that defendants' motion be granted and plaintiff's complaint in this action dismissed. *Hill,* 487 F.Supp.2d at 343 ("Having been told that the inmates were refusing to testify, [the hearing officer] could reasonably have concluded that it would have been futile to call them, and his failure to do so or to go to their cells and interview them themself did not give rise to a constitutional violation, regardless of whether [the hearing officer and plaintiff inmate] had been given signed refusal forms from those inmates.") (citation omitted).

## IV. *SUMMARY AND RECOMMENDATION*
Plaintiff's disciplinary conviction, following a hearing, of multiple rule violations based upon his participation in an assault by several inmates upon a fellow prisoner is adequately supported by some evidence, including the testimony received during the hearing. While that adverse determination was ultimately vacated based upon a state

court finding that the hearing officer had refused to satisfy the requirements of a state regulation regarding refusals of witnesses to testify during such proceedings, the record reflects that upon being informed of their refusal to testify the hearing officer reasonably concluded that it was unnecessary to call the two witnesses requested by the plaintiff. Under these circumstances, no reasonable factfinder could conclude that a constitutional deprivation occurred, and defendants are therefore entitled to judgment as a matter of law dismissing plaintiff's complaint.

Accordingly, it is hereby

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 31) be GRANTED, and plaintiff's complaint in this action DISMISSED in all respects.

**\*7** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4241746

Footnotes

1    In light of the procedural posture of the case the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

2    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3    In his opposition to defendant's motion Martinez also makes assertions which potentially implicate other constitutional claims, including deliberate medical indifference. *See* Plaintiff's Opposition (Dkt. No. 33) at pp. 12, 21 (discussing plaintiff's alleged psychological injuries due to his SHU confinement). Because these issues are not raised in plaintiff's complaint, which only claims a violation of his due process rights, I have not addressed these potential additional claims in this report and recommendation. *See, e.g., Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J) (refusing to hear a claim raised for the first time in a summary judgment motion).

**End of Document**                                                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3171783
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Bryan L. RUPLE, Plaintiff,

v.

Lynne BAUSCH, County Nurse at Otsego County Jail; Richard Devlin, Jr., Sherriff of Otsego County; and Laura Child, Information Officer for Otsego County Jail, Defendants.

No. 09–CV–1108 (NAM/DRH).
|
July 21, 2010.

**Attorneys and Law Firms**

Bryan L. Ruple, Attica, NY, pro se.

Bailey, Kelleher & Johnson, P.C., Nannette R. Kelleher, Esq., of Counsel, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Bryan Ruple ("Ruple"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that while he was incarcerated at the Otsego County Jail, three County employees, violated his constitutional rights under the Fourteenth Amendment, the Health Insurance Portability and Accountability Act, 29 U.S.C. § 1182 ("HIPAA"), Section 18 of the New York State Public Health Law, and the New York State Freedom of Information Law. Compl. (Dkt. No. 1). Presently pending is defendants' motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 17. Ruple opposes the motion. Dkt. No. 19. For the following reasons, it is recommended that defendant's motion be granted and the complaint be dismissed with prejudice.

**I. Background**

The facts are related herein in the light most favorable to Ruple as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999). All events appear to have occurred during 2007 and 2008 when Ruple was incarcerated at Otsego County Jail, prior to his transfer to DOCS custody. Compl. ¶¶ 1–4, 6.

On December 15, 2008, defendant Bausch, a nurse, disclosed medical records to defendant Sheriff Devlin, who in turn submitted those records to the County Attorney James Konstanty, without first obtaining Ruple's permission. Compl. ¶ 6; *see also* Dkt. No. 1–1 at 2. The surrender of such records coincides with Ruple's filing of a previous lawsuit in the Northern District of New York. [2] Compl. ¶ 5. Ruple contends that the disclosures made by Bausch "did not pertain to ... [the] pending case." *Id.* ¶ 6; *see also* Dkt. No. 1–1 at 3–4. During 2007 and 2008, Bausch allegedly provided unnamed correctional staff with information regarding the medications prescribed for Ruple. Compl. ¶ 6. Additionally, defendant Child released medical information from Ruple's medical file, to Ruple, which he had requested. *Id.* ¶ 6; *see also* Dkt. No. 1–1 at 5–8. This action followed.

**II. Discussion**

**A. Legal Standard**

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*2** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950–51.

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

**B. HIPAA**

HIPAA creates a monetary remedy for the wrongful disclosure of medical information. 42 U.S.C. § 1320d–6. "However, HIPAA does not confer a private cause of action to any particular class of individuals or either explicitly or implicitly, confer to private individuals a right of enforcement." *Hamilton v. Smith,* No. 06–CV–805 (GTS/DRH), 2009 WL 3199531, at \*20 (N.D.N.Y. Jan. 13, 2009) *modified* 2009 WL 3199520 (N.D.N.Y. Sept. 30, 2009) (internal quotation marks and citations omitted). "Furthermore, HIPAA provides for no federal cause of action; instead, HIPAA provides for an enforcement mechanism for the Secretary of Health and Human Services [HHS]." *Id.* (citations omitted). Therefore, Ruple cannot sustain his HIPAA claim since there is no private cause of action granted by the statute. Ruple's only recourse through this statute is to request the State of New York or the Secretary of HHS to bring the action on his behalf.

Accordingly, defendants' motion to dismiss on this ground should be granted.

**C. Privacy in Medical Records**

Claims surrounding disclosure of confidential medical information have been analyzed under both the Eighth and Fourteenth Amendments. *See generally Rodriguez v. Ames,* 287 F.Supp.2d 213, 218–221 (S.D.N.Y.2003). Liberally construing the complaint, Ruple has also alleged an Eighth Amendment violation pertaining to the disclosure of his medical records.

**1. Eighth Amendment**

The Eighth Amendment provision against cruel and unusual punishment includes the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must demonstrate deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*3** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The

severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Ruple has failed to allege what, if any, serious medical need he suffered from so that the disclosure of his medical records could be considered deliberately indifferent to his serious medical needs. Without such an allegation, Ruple has failed to proffer facts upon which relief could be granted. Accordingly, he has failed to establish the first prong of the Eighth Amendment analysis.

However, even if the unknown conditions reflected in Ruple's records did constitute serious medical needs, the disclosure of that information to staff and ultimately the county attorney did not constitute malicious interference or deliberate indifference. The disclosures were necessary (1) to investigate the pending litigation and determine its validity, (2) to provide Ruple with the appropriate medication to ensure his health and safety and (3) comply with a facility request to provide Ruple with his own health information which he had properly requested. The disclosures were limited in scope and purpose and, at most, could be categorized as negligent if others viewed them. As previously discussed, negligent behavior is not actionable under § 1983. *Hathaway,* 99 F.3d at 553.

Accordingly, to the extent that Ruple alleges an Eighth Amendment violation, such allegation is without merit and defendants' motion to dismiss the claim should be granted.

## 2. Fourteenth Amendment

**\*4** As of 1994, the Second Circuit recognized a prisoner's privacy interest in confidentiality of medical and health-related information. *Doe v. City of N.Y.,* 15 F.3d 264, 267 (2d Cir.1994). The Second Circuit further held that prisoners retained a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information contained within the medical records was not the type of sensitive medical information contemplated by the courts for constitutional protection. *See Powell v. Schriver,* 175 F.3d 107, 111–13 (2d Cir.1999); *see also Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y.2003) (upholding Fourteenth Amendment protection in cases where the prisoner "has an unusual medical problem which, if disclosed unnecessarily to other inmates, would likely expose plaintiff to discrimination, intolerance, or potential violence," or where the information "spread through 'humor or gossip.' ") (quotations omitted); *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000) (dismissing a Fourteenth Amendment claim because the prisoner "has not alleged that his prison records contained the sort of sensitive medical information at issue in ... *Powell."* ). The Second Circuit has extended Due Process protection to medical information surrounding the conditions of transsexualism and a positive HIV status. [3] *Watson v. Wright,* No. 08–CV–62 (NAM/GJD), 2010 WL 55932, at *1 (N.D.N.Y. Jan. 5, 2010). The "person's interest in the privacy of medical information will vary with the medical condition." *Id.* Therefore, where a prisoner holds a right to privacy in his medical condition, "prison officials may impinge on it only to the extent that their actions are reasonably related to legitimate penological interests." *Id.*

Here, Ruple fails to allege from what, if any, severe health condition he suffers. As the only two noted conditions worthy of protection are transsexualism and HIV, and there is no plausible indication in the record that Ruple was suffering from either condition, he has failed to plausibly establish a Fourteenth Amendment claim. In fact, the medical information attached to the complaint shows numerous liver enzyme tests and a conclusion that Ruple's elevated enzyme levels "were due to fatty infiltrations and med[ication]s." Dkt No. 1–1 at 8. Such notations do not indicate an active HIV infection but instead a quest to seek out potential liver damage and its cause. The only other ailment which was noted in the attached medical records was depression, for which Ruple was not receiving active treatment and was not indicated to be of a severe or emergent nature. Dkt. No. 1–1 at 8. Accordingly, this medical information is not the kind expected to invoke discrimination, intolerance, or violence. Additionally, these disclosures were made to (1) marshal evidence for a defense in litigation which Ruple

commenced, (2) inform staff of medication for which Ruple required disbursement to maintain his health and safety, and (3) comply with a facility request initiated by Ruple requesting his own medical records, all of which represent legitimate penological interests.

**\*5** Accordingly, Ruple's Fourteenth Amendment claim is without merit and defendants' motion to dismiss should be granted as to this claim.

### D. State Law

Ruple contends that defendants have also violate Section 18 of the New York State Public Health Law and the New York State Freedom of Information Law. First, "[a] violation of state law neither gives [Ruple] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Doe v. Conn. Dep't of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) (internal quotation marks and citations omitted); see *also Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not itself violate the Constitution and is not alone actionable under § 1983 ...."); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since federal constitutional standards rather than state law define the requirements of procedural due process.") (internal quotation marks and citations omitted). Accordingly, for this reason, the defendants' motion to dismiss should be granted as to Ruple's state law claims.

Second, even if the substance of the laws were to be considered, Ruple has failed to allege any statutory violations. Protection of patient information from disclosure to any other person is ensured by Section 18 of the Public Health Law. However, providing medical information to "an attorney consulted by," a health care provider does not constitute a disclosure of patient information to an unconsented to third party. N.Y. Pub. Health Law § 18(1)(e). Therefore, Bausch's disclosure of Ruple's medical records to defendant Devlin for ultimate dispersal to the county attorney did not constitute a violation of the law because the records were being delivered to an attorney for litigation purposes. [4]

Furthermore, Bausch's alleged disclosure of a list of medications for prescribed to Ruple was also not in contravention of state law. First, there are no facts alleged

to identify when and to whom the list of medications was divulged. Even if such events did occur, however, they were still lawful because New York State rules and regulations require that, if medications are warranted, inmates shall be provided such medications by staff as prescribed by the facility physician. N.Y. Comp.Codes R. & Regs. tit. 9, § 7010.2(e), (j). Therefore, to the extent that any medication lists were disclosed to staff, such disclosures are authorized so that medication may be properly provided.

Additionally, Ruple's contentions fail to support his allegations against Child. The Public Health Law provides that "upon the written request of any subject, a health care provider shall provide an opportunity ... for such subject to inspect any patient information concerning or relating to the examination or treatment of such subject ....," including a copy of such records. N.Y. Pub. Health Law § 18(2)(a), (g). Therefore, Child was obligated to provide Ruple with his medical information, unless "review of the information c[ould] reasonably be expected to cause substantial and identifiable harm to the subject ...." *Id.* § 18(3)(a). Such cause for concern has not been advanced and therefore, there is nothing in the record to rebut Child's duty to provide Ruple with such documents. This statutory interpretation, along with a similar conclusion when applying the New York Freedom of Information Law ("FOIL"), has also been utilized by the state court in holding that patients have a right to initiate inquiry into, and discovery of, their own medical records and that limitations on the dissemination of such information occur only when there is a showing of "substantial and identifiable harm to the subject or others which would outweigh the qualified person's right of access." *Mantica v. New York State Dep't of Health,* 248 A.D.2d 30, 31–33 (3d Dep't 1998) (citing N.Y. Pub. Health Law § 18(2), (6); N.Y. Pub. Off. Law § 87).

**\*6** Accordingly, defendants' motion to dismiss should be granted as to this claim.

### E. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10,

2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights ... immunity might still be available as a bar to ... suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

In this case, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Ruple's allegations as true, he has not alleged that defendants violated his constitutional rights. Accordingly, in the alternative, defendants' motion to dismiss should be granted on this ground.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 17) be **GRANTED** and that the complaint be **DISMISSED WITH PREJUDICE** as to all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3171783

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The previous lawsuit was cited in Ruple's complaint and alleged an Eighth Amendment violation that he was subjected to excessive force. *See* Compl. ¶ 5; *see also Ruple v. Reckeweg,* No. 08–CV–1307 (FJS/RFT)); Defs. Mem. of Law (Dkt. No. 17–2) at 1–2. The case was settled. Compl. ¶ 5.

3    This and other districts in the circuit have contemplated numerous illnesses which have not been deemed worthy of Fourteenth Amendment protection with regard to medical confidentiality, including Hepatitis A and C, high blood pressure, high cholesterol, wrist injuries, stomach problems, and proctitis. *Watson v. Wright,* No. 08–CV–62 (NAM/GJD), 2010 WL 55932, at *1 (N.D.N.Y. Jan. 5, 2010) (citations omitted)

4    Moreover, to the extent Ruple contends that the records pre-dated the excessive force incident at issue in his prior action, such contentions are legitimately explained by the attorney wishing to see what, if any, preexisting conditions and treatment Ruple was undergoing in the weeks prior to the alleged incident. Compl. ¶ 6; Dkt. No. 1–1 at 4.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.          5

2009 WL 790973
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony SHULER, Plaintiff,
v.
BROWN, et al., Defendant.

No. 07–CV–0937.
|
March 23, 2009.

West KeySummary

**1**    **Civil Rights**

👉    **Prisons and Jails;  Probation and Parole**

An inmate failed to state a § 1983 claim for a
violation of his right to privacy. The inmate did
not allege precisely what medical information
he believed that his counselor had revealed to
a corrections officer. Thus, the court could not
determine from the face of the complaint whether
the inmate suffered from an "unusual" condition
that would be protected by his right to privacy.
Moreover, the inmate did not allege that his
condition, whatever it might be, was revealed to
other inmates. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Anthony Shuler, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Charles J. Quackenbush, Esq., of Counsel, New
York, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1**  This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. George H. Lowe, United States

Magistrate Judge, for a Report–Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections
to the February 2, 2009 Report–Recommendation have been
raised. After examining the record, this Court has determined
that the Report–Recommendation is not subject to attack
for plain error or manifest injustice. Accordingly, this Court
adopts the Report–Recommendation for the reasons stated
therein. Defendant's motion for judgment on the pleadings is
GRANTED and Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to
42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Local Rules of Practice
for this Court. Plaintiff Anthony Shuler alleges that two
employees of the New York State Department of Correctional
Services ("DOCS") [1] violated his constitutional rights when
one revealed statements he made during a counseling session
and the other, based on that revelation, issued a misbehavior
report that resulted in a 60–day disciplinary sentence. (Dkt.
No. 1.)

Currently pending is Defendants' motion for judgment on the
pleadings pursuant to Federal Rule of Civil Procedure 12(c) [2].
(Dkt. No. 16.) After Defendants filed the pending motion,
Plaintiff requested a voluntary dismissal without prejudice.
(Dkt. No. 19.) The Court denied that request. (Dkt. No. 21.)
Plaintiff has not opposed the pending motion despite having
been granted an extension of time to do so and being advised
of the consequences of failing to do so. (Dkt. No. 21.) Because
I find that Plaintiff's complaint fails to state a cause of action,
I recommend that Defendants' motion for judgment on the
pleadings be granted.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**
Liberally construed, the complaint alleges as follows:

On August 25, 2006, Plaintiff went to see his Mental Health
Unit counselor, Defendant V. Brown. (Dkt. No. 1 at ¶ II(D).)

Thereafter, Defendant Brown informed Defendant Sergeant R.J. Ballard that Plaintiff had behaved inappropriately toward her. (Dkt. No. 1 at 16.) On September 25, 2006, Defendant Ballard issued a misbehavior report. The report stated that when Defendant Ballard interviewed Plaintiff about Defendant Brown's allegations, Plaintiff "began yelling 'I'll do or say what I want to these females. I'm 41 years old and I'll do what I want.' " (Dkt. No. 1 at 10.) After a Tier III hearing on the misbehavior report, Plaintiff was sentenced to 60 days of keeplock along with loss of commissary, package and phone privileges. (Dkt. No. 1 at 17.)

On October 19, 2006, Plaintiff filed an inmate grievance. (Dkt. No. 1 at 8.) He complained that Defendant Brown had revealed the contents of their September 25, 2006, counseling session to Defendant Ballard. *Id.* He requested that Defendant Brown "take or retake a course in patient confidentiality." *Id.* He also asked "to have no future female as my counselor, since it makes me feel very uncomfortable to deal with the other sex on that level." *Id.* The grievance was denied. (Dkt. No. 1 at 16.)

**\*2** Plaintiff appealed his disciplinary sentence. (Dkt. No. 1 at 11–13.) On November 27, 2006, after Plaintiff had completed his keeplock sentence, DOCS reversed the disciplinary sentence. (Dkt. No. 1 at 15.)

In his complaint, Plaintiff alleges that Defendants violated his civil rights by violating his right to privacy and unlawfully detaining him in keeplock. (Dkt. No. 1 at ¶ II(D).) Liberally construed, Plaintiff's complaint raises a right-to-privacy claim against Defendant Brown and procedural and substantive due process claims against Defendant Ballard. Plaintiff requests $1 million in damages. (Dkt. No. 1 at ¶ V.)

## B. Summary of Grounds in Support of Defendants' Motion For Judgment on The Pleadings

Defendants argue that (1) Plaintiff has not stated a right-to-privacy claim because he has not alleged that he suffers from a medical condition "unusual" enough to warrant privacy protection; (2) even if Plaintiff had alleged a cognizable privacy interest, the face of the complaint reveals that Defendant Brown's disclosure was reasonably related to legitimate penological interests; (3) the complaint fails to state a due process claim because the face of the complaint reveals that Plaintiff was granted a hearing and given the opportunity to rebut the charges against him [3]; and (4) they are entitled to qualified immunity. (Dkt. No. 16–2.) Because I

find that the complaint fails to state a cause of action, I will not address Defendants' argument regarding qualified immunity.

## II. ANALYSIS

### A. First Basis for Dismissal: Facial Merit of Defendants' Unopposed Motion

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion for judgment on the pleadings was properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(c). [4]

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] is a more limited endeavor than a review of a contested motion for judgment on the pleadings. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [5] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [6]

Here, I find that Defendants have met their lightened burden on their unopposed motion given Defendants' cogent, and legally supported, legal arguments set forth in their memorandum of law. (Dkt. No. 16.) I note that this Court has, on numerous occasions, granted motions to dismiss based on a similar facial analysis of a defendant's legal arguments (and a plaintiff's claims). [7]

**\*3** For these reasons, I recommend that the Court grant Defendants' motion for judgment on the pleadings.

### B. Alternative Basis for Dismissal: Substantive Merit of Defendants' Motion

In the alternative, I recommend dismissal based on the sort of detailed scrutiny of Defendants' legal arguments that would be appropriate on a *conteste* d motion for judgment on the pleadings.

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter. ., 448 F.3d 518, 521 (2d Cir.2006).* Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of pleading" under Federal Rule of Civil Procedure 8(a)(2);[8] or (2) a challenge to the legal cognizability of the claim.[9]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."[10] The main purpose of this rule is to "facilitate a proper decision on the merits."[11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[12]

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[13] However, it is well established that even this liberal notice pleading standard "has its limits."[14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[15]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 (2007).[16] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74.

**\*4** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[17] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[18]

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*—that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley*

*v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [19] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [20] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* [21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

 **\*5** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [26]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [27] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [28] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules

8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [29] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [30]

### 1. *Privacy*

#### a. *Cognizable privacy interest*

Plaintiff alleges that Defendants violated his right to privacy. (Dkt. No. 1 at ¶ II(D).) Defendants argue that Plaintiff has not stated a cause of action. (Dkt. No. 16–2 at 5–7.) Defendants are correct.

There is a constitutional right of privacy [31] that protects the individual interest against disclosure of personal matters such as one's medical condition. *Whalen v. Roe,* 429 U.S. 589, 598–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), the Second Circuit applied *Whalen* to hold that individuals who are HIV positive "clearly possess a constitutional right to privacy regarding their condition." The Second Circuit has extended this protection to prisoners. *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). These decisions do not create an absolute right of privacy regarding a prisoner's medical condition. Rather, the prisoner's privacy interest will vary with the prisoner's medical condition. *Id.* at 111; *Doe v. City of New York,* 15 F.3d at 267. This privacy interest is at its zenith when the prisoner suffers from an "unusual" condition, such as HIV or transsexualism, that is "likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell,* 175 F.3d at 111. Courts have refused to recognize a protected privacy interest where a prisoner's medical condition is not "unusual." *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (W.D.N.Y.2003). Courts have also refused to recognize a protected privacy interest where there is no evidence that a prisoner's condition was revealed to other inmates. *Leon v. Johnson,* 96 F.Supp.2d 244, 252 (W.D.N.Y.2000) [32] .

 **\*6** Here, Plaintiff has not alleged precisely what medical information he believes Defendant Brown revealed. He states that "the contents" of his August 25, 2006, session with Brown were disclosed and that "the information released was not a threat to the facility, staff or the inmate population." (Dkt. No. 1 at 8.) Thus, this Court cannot determine from the face of the complaint whether Plaintiff suffers from an "unusual" condition that would be protected by his right to privacy. Moreover, Plaintiff does not allege

that his condition, whatever it may be, was revealed to other inmates. Therefore, Plaintiff has not alleged a cognizable privacy interest.

### b. *Legitimate penological interest*

Even if Plaintiff had alleged a cognizable privacy interest, his right to privacy claim would be subject to dismissal for failure to state a claim because the face of the complaint reveals that Defendant Brown had a legitimate penological interest in revealing information from her counseling session with Plaintiff.

Prison officials may reveal a prisoner's medical condition, even an "unusual" medical condition that is protected by the zenith of the prisoner's right to privacy, if the disclosure is "reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112. A court can determine whether a prison official's actions were "reasonably related to legitimate penological interests" on a motion to dismiss. See e.g. *Webb v. Goldstein,* 117 F.Supp.2d 289 (E.D.N.Y.2000).

Here, the face of the complaint reveals that Defendant Brown had legitimate penological reasons for revealing information from her session with Plaintiff. During the session with Defendant Brown, Plaintiff allegedly engaged in "inappropriate sexual behavior/conduct." (Dkt. No. 1 at 10.) Reporting this incident to a correctional officer was reasonably related to the legitimate penological interest of protecting prison personnel from potential threats. See e.g. *Choice v. Coughlin,* No. 94 Civ. 8307, 1996 WL 325627 (S.D.N.Y. June 11, 1996) (prisoner's letter regarding his romantic feelings for a civilian medical employee at prison was "fundamentally inconsistent with the legitimate penological interests of the facility" because it presented "a potential threat to the safety and security of [employee] and other prison staff.").

Therefore, it is recommended that Plaintiff's cause of action for invasion of his right to privacy be dismissed.

### 2. *Due Process*

Plaintiff does not explicitly allege that Defendants violated his due process rights. However, the complaint states that Defendant Ballard "wrote up a fabricated misbehavior report that led to me being sentenced to 60 days of keeplock." (Dkt. No. 1 at ¶ II(D).) Liberally construing the complaint, I have deemed this to be a claim that Defendants violated Plaintiff's procedural and substantive due process rights.

### a. *Procedural due process*

In order to state a claim for violation of his procedural due process rights, Plaintiff must allege facts plausibly suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

**\*7** As Defendants note, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *accord, Pittman v. Forte,* 01–CV–0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03–CV–1263, 2007 WL 965345, at \*8 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted]. Here, Plaintiff does not claim that the misbehavior report was issued in retaliation for Plaintiff's exercise of a constitutional right. Accordingly, the complaint does not state a claim for a procedural due process violation based on the filing of an allegedly false misbehavior report.

The complaint could also be construed as stating a procedural due process claim based on the length of Plaintiff's keeplock detention. Although Defendants did not address this claim, I will do so *sua sponte* under 28 U.S.C. § 1915(e)(2). An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU [33] ." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

In the Second Circuit, determining whether a disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [34] ." *Palmer,* 364 F.3d at 65. For confinements of an "intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64–65. Disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life." *Palmer,* 364 F.3d at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)).

**\*8** Here, Plaintiff alleges that he served 60 days in keeplock. Accordingly, a protected liberty interest is implicated only if Plaintiff was confined under conditions "more severe" than "normal" SHU conditions. Plaintiff has alleged no such conditions. Compare *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (plaintiff alleged that while in the SHU he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes); *Palmer,* 364 F.3d at 66 (plaintiff alleged that he suffered unusual SHU conditions such as being deprived of his property, being mechanically restrained whenever he was escorted from his cell, and being out of communication with his family); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (plaintiff alleged that he was confined to his cell for 24 hours a day, not permitted to shower for weeks at a time, denied hygiene products, and denied utensils); *Wheeler v. Butler,* 209 F.App'x 14 (2d Cir.2006) (plaintiff alleged that he was denied the use of his hearing aids during his SHU confinement). Therefore, Plaintiff has not sufficiently alleged that his confinement in keeplock deprived him of a protected liberty interest.

District courts in the Second Circuit are split on whether a prisoner can state a procedural due process cause of action when he alleges that he served less than 101 days in the SHU but does not allege conditions more severe than normal SHU conditions. Compare *Gonzalez–Cifuentes v. Torres,* No. 9:04–cv–1470 GLS/DRH, 2007 WL 499620, at \* 3

(N.D.N.Y. Feb.13, 2007) ("The Second Circuit has held that at least where the period of confinement exceeded thirty days, refined fact-finding is required to resolve defendants' claims under *Sandin.* No such fact-finding can occur ... on a motion to dismiss") and *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ("Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions ... However, such detailed factual allegations are not necessary to withstand a motion to dismiss ... Since Smart has alleged that she was confined for seventy days, she has met her burden in alleging the deprivation of a protected liberty interest") with *Alvarado v. Kerrigan,* 152 F.Supp.2d 350 (S.D.N.Y.2001) (granting motion for judgment on the pleadings where prisoner's allegations about the conditions of his 93–day SHU confinement failed to "elevate his confinement to the level of deprivation required under *Sandin* ); *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at \*7 (S.D.N.Y. Dec.2, 2004) (granting motion to dismiss with leave to amend because plaintiff's "due process claim arising out of two months' confinement in the SHU ... cannot survive the *Sandin* test absent further allegations") *Tookes v. Artuz,* No. 00 Civ. 4969 RCC HBP, 2002 WL 1484391, at \* 3 (S.D.N.Y. July 11, 2002) ("No such additional egregious circumstances are pled here. Indeed, the complaint is devoid of any allegations regarding the circumstances of plaintiff's confinement. Nor has [plaintiff] responded to the defendants' motion in order to provide further detail. Therefore, dismissal of plaintiff's due process claims is appropriate"); and *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382, at \*5 (S.D.N.Y. May 17, 2000) (dismissing case with prejudice where the complaint contained "no allegations whatever regarding the conditions of [prisoner's 66–day] confinement."). The Second Circuit has never addressed this issue directly [35] .

**\*9** The undersigned agrees with the *Alvarado, Sales, Tookes,* and *Prince* courts that a motion to dismiss can be granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU conditions. The undersigned adopts this view for two reasons. First, as discussed at length above, Rule 8 requires that a complaint include factual allegations that raise a right to relief above the speculative level to the plausible level. Where a prisoner contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory

is purely speculative. Second, the Second Circuit's manner of reviewing motions to dismiss in SHU confinement cases suggests that dismissal is the better course. In its cases, the Second Circuit has focused on the *content* of the prisoner's allegations regarding SHU conditions rather than establishing a bright-line rule that a determination of whether conditions were "atypical and significant" cannot be resolved on a Rule 12(b)(6) motion. For example, in *Ortiz,* the district court granted the defendants' motion to dismiss a case in which a prisoner complained of a 90–day SHU confinement. The Second Circuit reversed, not because the *Sandin* issue can never be decided at the motion to dismiss stage, but because *the prisoner had alleged the existence of "conditions in SHU far inferior to those prevailing in the prison in general." Ortiz,* 380 F.3d at 655 (emphasis added). Plaintiff's bare allegation that his procedural due process rights were violated by his 60–day keeplock confinement is insufficient to state a claim. Therefore, I recommend that Plaintiff's procedural due process claim be dismiss with leave to amend.

b. *Substantive due process*

Given the special solicitude due to *pro se* civil rights plaintiffs, I have deemed the complaint to include a substantive due process claim and will address it *sua sponte* under 28 U.S.C. § 1915(e)(2). Defendants have not addressed any possible substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process. In *Sandin,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs. *Sandin,* 515 U .S. at 479 n. 4, 484. Courts have also noted that a prison official's refusal to obey a state court order to release a prisoner from disciplinary confinement may violate the prisoner's right to substantive due process. *Johnson v. Coughlin,* No. 90 Civ. 1731, 1997 WL 431065, at *6 (S.D.N.Y. July 30, 1997); *Arce v. Miles,* No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991).

**\*10** Plaintiff's complaint does not allege facts plausibly suggesting that Defendants' actions were arbitrary, conscience-shocking or oppressive in the constitutional sense. As discussed above, the complaint does not indicate that Plaintiff was held in unusual keeplock conditions. Moreover, Plaintiff does not allege that Defendants refused to obey a state court order to release him from disciplinary confinement. Therefore, the complaint fails to state a claim for violation of Plaintiff's right to substantive due process and I recommend that the claim be dismissed with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 16) be ***GRANTED*** with leave to amend.

**ANY OBJECTIONS to this Report–Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report–Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a) (2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [36]

**BE ALSO ADVISED that the failure to file timely objections to this Report–Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 790973

Footnotes

1    Plaintiff's complaint also named DOCS as a defendant. (Dkt. No. 1 at ¶ I(B).) The Court dismissed DOCS as a defendant upon initial review of the complaint. (Dkt. No. 6.)

2    Defendants' memorandum of law suggests that the Court find the complaint "wholly insubstantial and frivolous" and dismiss it for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). (Dkt. No. 16–2 at 4–5.) That suggestion did not appear in the notice of motion, the title page of the memorandum of law, or the introduction to the memorandum of law. Accordingly, I decline Defendants' suggestion and will address Plaintiff's complaint solely under Federal Rule of Civil Procedure 12(c).

3    Defendants devoted only a four-sentence footnote to their argument regarding Plaintiff's due process claims.

4    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

5    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

6    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7–8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious* " ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M .J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, 2007 WL 894375, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28–29 & n. 40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336, 2007 WL 189021 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

7    *See, e.g., Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Local Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 96–CV–1269, 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D .Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.); *Munoz v. Coombe,* 95–CV–1191, 1996 U.S. Dist. LEXIS 15107, at *3 (N.D.N.Y. Aug. 21, 1996) (Hurd, M.J.), *adopted by* 95–CV–1191, 1996 U.S. Dist. LEXIS 15108, 1996 WL 589369, at *2 (N.D.N.Y. Oct. 11, 1996) (Pooler, J.) (rejecting plaintiff's objections, explaining that "Local Rule 7.1(b) permits the court to grant an unopposed motion"); *Owens v. Long,* 95–CV–0604, 1996 U.S. Dist. LEXIS 6520, at *2 (N.D.N.Y. March 11, 1996) (Hurd, M.J.), *adopted by* 95–CV–0604, 1996 U.S. Dist. LEXIS 4807 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.).

8    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

9    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ...

fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, 2004 WL 2613993, at *4–5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, 2002 WL 313156, at *6–7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion—one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

10    *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

11    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

12    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98–CV–0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

13    *See, e.g., Swierkiewicz,* 534 U.S. at 513–514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

14    2 *Moore's Federal Practice* § 12.34[1][b] at 12–65 (3d ed.2003).

15    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634–1635, *Christopher v. Harbury,* 536 U.S. 403, 416–422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234–235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208–209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01–7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

16    The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

17    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07–CV–2537, 2008 U.S.App. LEXIS 2241, 2008 WL 269100, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust

cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

18    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ) ; *Boykin v. KeyCorp.,* 521 F.3d 202, 215–16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

19    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199–2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

20    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

21    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

22    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96–CV–7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading—which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

23    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

24    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

25   *Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

26   *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05–CV–0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint—the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process—was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07–CV–0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint—lack of subject-matter jurisdiction and lack of standing —were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint—which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00–CV–1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint—the fact that the defendants were protected from liability by Eleventh Amendment immunity—was substantive and not formal in nature, rendering repleading futile).

27   *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

28   *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ) ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

29   *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

30   *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

31   The Supreme Court has ruled that "a right to privacy ... [is] derived from the Fourteenth Amendment or the 'penumbra' of other constitutional rights." *Webb v. Goldstein,* 117 F.Supp.2d 289, 296 (E.D.N.Y.2000) (citing *Whalen v. Roe,* 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)).

32   Defendants have not cited, and the Court has not found, authority specifically addressing the standard to be applied where a prison mental health official allegedly reveals statements made by a prisoner during a counseling session. However, the logic underlying the disclosure-of-medical-condition cases—that prisoners have a reduced right to privacy that arises only in unusual situations, such as those that implicate a prisoner's safety—is applicable here.

33   Although keeplock confinement and SHU confinement are not identical detention statuses, the Second Circuit has applied the same procedural due process analytical framework to both. See e.g. *Palmer v. Richards,* 364 F.3d 60, 66–67 (2d Cir.2004).

**34** "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

**35** While the Second Circuit has stated that "development of a detailed record will assist appellate review" of SHU cases and that "development of a detailed record of the conditions of the confinement relative to ordinary conditions is required," it has done so only in cases involving "intermediate" SHU confinements of 101 to 305 days. *Colon,* 215 F.3d at 232; *Palmer,* 364 F.3d at 64–65. Even in this "intermediate" context, where a detailed record is "required," the Second Circuit has not remanded a case for further development of the record absent an allegation of severe SHU conditions. For example, in *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007), the plaintiff was confined to a super-restrictive housing unit for six months. He sued, arguing in part that his procedural due process rights were violated. The defendants moved to dismiss. The district court denied the motion, finding that the plaintiff had alleged the deprivation of a liberty interest. The defendants brought an interlocutory appeal. The Second Circuit affirmed, finding that "the Plaintiff's confinement of more than six months fell in the intermediate range, thereby requiring inquiry into the conditions of his confinement, which he *sufficiently alleges* to have been severe." *Iqbal,* 490 F.3d at 163 (emphasis added).

**36** *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88–CV–5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; se*e also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson–Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990–91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1652193
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Timothy WILLIAMS, Plaintiff,

v.

Kenneth PERLMAN, et al., Defendants.

Civil Action No. 9:06–CV–00936 (GLS/DEP).
|
Feb. 5, 2009.

West KeySummary

**1** **Federal Civil Procedure**

 👉 Civil Rights Cases in General

Genuine issues of material fact existed as to whether a prison nurse retaliated against an inmate by filing allegedly false disciplinary reports against the inmate. Thus, summary judgment was precluded in an inmate's § 1983 action that alleged retaliation by the prison nurse for the inmate's attempts to seek medical attention for his ankle and foot condition. The inmate alleged that after he filed a grievance for not receiving the correct size shoes, the nurse authored a misbehavior report charging the inmate with prison rule violations. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Timothy Williams, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Senta B. Siuda, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Timothy Williams, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against various defendants alleging that while incarcerated he was subjected to constitutional deprivations as well as violations of federal law. In his complaint the plaintiff, who suffers from both physical and mental impairments, asserts an array of claims related to defendants' treatment of him, including their failure to provide him with proper footwear and orthopedic inserts and forcing him to perform manual labor despite his ankle and foot condition; the issuance of a misbehavior report, allegedly in retaliation for exercising his constitutional right to file grievances; and treatment received generally at the facility, including in the mental health unit. In his complaint, *inter alia,* plaintiff seeks recovery of compensatory damages in the amount of $765,000.

Following the close of discovery, defendants have moved seeking the entry of judgment on the pleadings dismissing plaintiff's complaint in its entirety. Defendants' motion is predicated upon several grounds, including their alleged entitlement to qualified immunity from suit. Having carefully considered plaintiff's allegations in the light of arguments raised in defendants' motion, which plaintiff has not opposed, I find that with one exception, he has failed to set forth a cognizable civil rights claim, and therefore recommend that defendants' motion for judgment on the pleadings be granted and all of plaintiff's claims except his retaliation cause of action against defendant Brodt be dismissed.

I. *BACKGROUND* [1]

Plaintiff, a veteran of the United States Military Service, suffers from a foot, ankle and arch condition of an undisclosed nature; degenerative disc disease; and manic depression, or bipolar disorder. Complaint (Dkt. No. 1) ¶¶ 14, 16–17, 28, 39. At the times relevant to his claims in this action, Williams was a prison inmate entrusted to the custody of the New York Department of Correctional Services ("DOCS"), and was designated to the Mid–State Correctional Facility ("Mid–State"), located in Marcy, New York. *Id.* ¶¶ 2–3, 25.

Among the claims asserted by the plaintiff are those related to the alleged failure of prison officials to provide him with proper footwear with orthopedic inserts while at Mid–State. Complaint (Dkt. No. 1) ¶¶ 28–38. Plaintiff also maintains that he was forced by prison officials, including defendant Zagby, a corrections officer, to perform manual labor despite

experiencing pain caused by his foot and ankle condition. *Id.* ¶¶ 36, 43.

Plaintiff's efforts at Mid–State to secure proper footwear commenced shortly after his transfer in December of 2005 into the facility from the Oneida Correctional Facility. *See* Complaint (Dkt. No. 1) ¶ 25. Following that transfer, in response to his complaints that he had not been provided footwear, plaintiff was told by prison officials to have his feet measured by the state shop. *Id* ¶ 26. On December 30, 2005 plaintiff met with Ms. Renninger, the state shop supervisor, who measured plaintiff's feet and recorded his left foot as size 13.5 AA and his right foot as size 13 AA. *Id.* ¶ 26 and Exh. 9. Since footwear in those sizes was not readily available, plaintiff was temporarily provided with size 14EE boots which, not surprisingly, did not fit quite properly. *Id.* ¶¶ 26–27 and Exh. 10. As a result, plaintiff was required to choose between walking in slightly oversized boots or barefoot, and was unable to participate in certain prison programs and activities, including sports and recreation. *Id.* ¶¶ 27–30.

 **\*2** In addition to receiving boots that did not fit, plaintiff additionally requested but was denied new orthopedic inserts for his shoes. Complaint (Dkt. No. 1) ¶ 29 and Exh. 10. Plaintiff's need for orthopedic inserts was the result of his having undergone left lateral ankle stabilization surgery in January of 1996, requiring such devices to alleviate his foot, ankle and arch pain. *Id.* Exh. 12. While plaintiff apparently was fitted with orthopedic inserts, they were ineffective when used in conjunction with his size 14EE boots. *Id.* Exh. 10.

Plaintiff alleges that both defendant Kenneth Perlman, as the superintendent at Mid–State, and defendant Brodt, a nurse at the facility, were aware of his foot, ankle and arch conditions and the failure of prison officials to provide him with proper footwear. *See, e.g.* Complaint (Dkt. No. 1) ¶ 35. Plaintiff wrote to Superintendent Perlman concerning the issue on January 5, 2006; in response, defendant Perlman wrote to the plaintiff advising that he would look into the matter. *Id.* ¶ 33 and Exhs. 10, 11. A memorandum was issued on January 10, 2006 from Rosemary Reed, the Head Account Clerk at Mid–State, advising plaintiff that in response to his letter to the superintendent an investigation had been conducted, and a decision was made to issue him a pair of special order boots, and the order for those boots was then being processed. *Id.* Exh. 11.

On May 18, 2006, not having received either the special order boots or having been fitted for boots and sneakers with custom orthopedics for his feet, plaintiff again wrote to Superintendent Perlman complaining of the matter. Complaint (Dkt. No. 1) Exh. 10. That letter was augmented by correspondence dated March 23, 2006, from one of plaintiff's treating physicians, Dr. Frank Caruso, to Deputy DOCS Commissioner Dr. Lester N. Wright, describing the surgery performed on plaintiff's ankle in January, 1996 and emphasizing the necessity for custom orthopedic devices in order to avoid aggravation of plaintiff's ankle and foot condition. [2] *Id.* Exh. 12.

Nurse Brodt encountered the plaintiff on April 13, 2006, when he reported to sick call complaining of left ankle pain caused by a fall the previous day. Complaint (Dkt. No. 1) ¶ 41 and Exh. 13. Plaintiff described the incident as having occurred while he was leaving the second floor of his housing unit, at which time while descending the stairs his ankle "gave way and his arches stretched, straining his lower back." *Id.* ¶ 40. According to plaintiff, defendant Brodt responded by warning Williams that if he "[kept] on coming to sick call about the same foot problems, [she] would write [him] up for 'misuse of the sick call process.' " *Id* . ¶ 35.

Plaintiff was in fact subsequently issued an inmate misbehavior report, dated April 13, 2006, prepared by Nurse Brodt and accusing him of failing to report an injury promptly (Disciplinary Rule 118.23), creating a disturbance with loud talking in the hallway (Disciplinary Rule 104.13), making threats (Disciplinary Rule 102.10), and providing misleading information (Disciplinary Rule 107 .20). Complaint (Dkt. No. 1) ¶ 45 and Exh. 13. In the misbehavior report, defendant Brodt noted that while plaintiff reported to sick call on the morning of April 13, 2006, complaining of ankle pain, Williams failed to report the injury to appropriate corrections officials. *Id.*

 **\*3** A disciplinary hearing was subsequently held on April 16, 2006 to address the misbehavior report. Complaint (Dkt. No. 1) ¶ 46 and Exh. 14. At the hearing, plaintiff was found guilty of creating a disturbance, but exonerated on the remaining three charges set forth in the misbehavior report. *Id.* Though somewhat difficult to discern from the complaint and exhibits, it appears that a penalty consisting principally of thirty days of keeplock confinement in the facility's special housing unit ("SHU") was imposed, although deferred for a period of ninety days, as a result of the hearing officer's finding of guilt. [3] *Id.*

Another aspect of plaintiff's complaint concerns actions of defendant Tina Procopio, a counselor assigned to assist inmates including those who like the plaintiff had been designated to a therapeutic residential program for veterans. *See* Complaint (Dkt. No. 1) ¶¶ 11, 47–51. Plaintiff alleges that defendant Procopio, who also oversees use of video conferencing facilities at Mid–State, overheard and later disclosed confidential information exchanged between the plaintiff and his attorney, and that she, acting in concert with other employees and inmates, has engaged in a campaign to force the plaintiff out of the unit. *Id.* ¶¶ 47–62. Plaintiff's complaints regarding Procopio were the subject of both a grievance filed on April 11, 2006, and pursued to completion through the available, internal DOCS grievance process, and a letter sent on April 17, 2006 by the plaintiff to then-DOCS Commissioner Glenn Goord. Complaint (Dkt. No. 1) ¶¶ 59–61 and Exh. 19.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 2, 2006. Dkt. No. 1. As defendants, plaintiff's complaint named Mid–State Superintendent Perlman; Mid–State Assistant Deputy Superintendent McDaniels; Senior Corrections Counselor Joslyn; Corrections Officer Zagby; J. Morgan, described as the unit chief of the Mid–State mental health unit ("MHU"); Nurse Practitioner Sergio; Social Worker Johnson; Registered Nurse Brodt; and Corrections Counselor Procopio. [4] In his complaint plaintiff asserts a variety of claims, including under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as claiming that he was subjected to deliberate indifference and cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution, and unlawful retaliation, in contravention of the First Amendment. Typical of plaintiff's claims against the various individuals are assertions of "failure to train", "conspiracy", "breach of fiduciary duty", "negligent supervision", "negligent hiring" and "respondeat superior". *See generally* Complaint (Dkt. No. 1) ¶¶ 85–95. The defendants remaining in the case have filed answers to plaintiff's complaint generally denying its material allegations and interposing various defenses. Dkt. Nos. 36, 45.

**\*4** On March 14, 2008 defendants moved seeking the entry of judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, urging dismissal of plaintiff's complaint on a variety of bases, contending that 1) plaintiff's negligence claims are not cognizable under section 1983; 2) plaintiff's allegations, even if proven, are insufficient to sustain a claim of deliberate indifference toward plaintiff's serious medical needs; 3) plaintiff's allegations regarding conspiracy are unduly vague and fail to support a cognizable claim; 4) plaintiff's privacy claims do not arise to a level of constitutional significance; 5) plaintiff's claims under the ADA and Rehabilitation Act are legally insufficient, since no individual liability lies under those sections; 6) plaintiff's false misbehavior reports do not support a constitutional claim; 7) plaintiff's retaliation claims have been insufficiently pleaded; 8) plaintiff's cruel and unusual punishment and unconstitutional customs and policies claims are facially lacking in merit; and 9) in any event defendants are entitled to qualified immunity from suit. Defendants' motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Legal Significance of Plaintiff's Failure to Respond*

While defendants have sought dismissal of plaintiff's complaint on a variety of grounds, plaintiff has not provided the court with the benefit of any argument as to why that motion should not be granted. As a threshold matter I first address the significance of this shortcoming, and specifically whether it automatically entitles the defendants to the dismissal which they now seek.

At the outset, it should be noted that the fact that plaintiff has failed to oppose defendants' motion for judgment on the pleadings does not preclude the court from deciding the motion without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99–CV–8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan.18, 2001). Like motions to dismiss, a motion for judgment on the pleadings tests only the legal sufficiency of the plaintiff's complaint; accordingly, a party faced with such a motion should be given reasonable opportunity to respond to such a motion, the court is fully capable of determining the issue of legal sufficiency of the plaintiff's claims as a matter of law based on its own reading of the complaint and knowledge of the relevant case law. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000).

Under this court's local rules, a party's failure to respond to a properly filed motion is regarded as the functional equivalent of consent to the granting of the motion; before such an unopposed motion may be granted, however, the court must first make a threshold finding that the moving party has met its burden of facially demonstrating entitlement to the relief requested. N.D.N.Y .L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322–23 (holding that plaintiff's failure to respond to a motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n .2 (citing *McCall* ).

B. *Standard of Review*

**\*5** Defendants' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings.[5] When analyzing a Rule 12(c) motion, a court must apply the same standard as that applicable to a motion under Rule 12(b)(6). *See, e.g., Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion "is not whether [the] plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly,* 127 S.Ct. at 1974). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from

conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (internal quotations omitted); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave [to amend] when justice so requires.").

C. *Deliberate Indifference to Serious Medical Need*

**\*6** Plaintiff's complaint centers principally upon the failure of prison officials at Mid–State to provide him with adequate footwear to meet his medical condition. In their motion, defendants challenge plaintiff's ability to demonstrate that his foot and ankle condition constitutes a serious need sufficient to invoke Eighth Amendment protection.

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must satisfy the lynchpin requirement of alleging a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional,

depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136–37 (2d Cir.2000) (quoting, *inter alia, Chance* ).

To prove the existence of such a serious medical need a plaintiff need not establish that he is facing imminent death, but must establish more than a "condition[ ] which many people suffer from and function despite on a daily basis." *Davidson v. Scully,* 914 F.Supp. 1011, 1015 (S.D.N.Y.1996). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2–*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.).

Plaintiff's deliberate indifference claims in this action surround the alleged exacerbation of a pre-existing foot, ankle and arch condition, which required surgery in January of 1996. Following the surgery, plaintiff was issued custom-made orthopedic devices, designed to alleviate his pain when walking. *See* Complaint (Dkt. No. 1) Exh. 12. Plaintiff contends that the effectiveness of his orthopedic devices was seriously undermined, following his transfer into Mid–State, since he was issued excessively large footwear. *Id.* Exh. 10. According to Williams, wearing the wrong sized shoes created "intense pain on [his] toes and arches", and caused him to develop painful callouses which needed to be "lanced from [his] feet." *Id.*

**\*7** Despite these allegations, there is nothing in plaintiff's complaint to suggest that his foot, ankle and arch condition presented a question of urgency resulting in degeneration or extreme pain. Accordingly, based upon a survey of plaintiff's complaint and the attached materials, I conclude that plaintiff has not alleged the existence of a constitutionally cognizable serious medical need. *See Veloz v. New York,* 35 F.Supp.2d 305, 309, 312 (S.D.N.Y.1999) (prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996) (prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious); *see also Gill v. Frawley,* No. 9:02–CV–1380 (TJM/GHL), 2006 WL 1742738, at *7 n. 32 (N.D.N.Y. June 22, 2006 (collecting cases).

Because plaintiff's complaint fails to disclose a plausible basis to find the existence of a serious medical condition for Eighth Amendment purposes, I recommend that plaintiff's medical indifference claim be dismissed, though with leave to replead in light of his *pro se* status. *See Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

### D. Cruel and Unusual Punishment

In broad and general terms, plaintiff alleges that the conduct of defendants Perlman, Morgan, Johnson and Zagby constituted cruel and unusual punishment. *See generally* Complaint (Dkt. No. 1) ¶¶ 85, 89, 92–93. In their motion for judgment on the pleadings, those defendants also challenge the legal sufficiency of plaintiff's claims of cruel and unusual punishment against them, asserting that plaintiff's non-specific statements are insufficient to state a claim under section 1983.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*8** As the Second Circuit has noted, "to state a civil rights claim under § 1983, a complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). In this instance, aside from the conclusory allegations of cruel and unusual punishment, plaintiff's complaint is devoid of any specifics or factual recitations describing conditions which could support a plausible claim of cruel and unusual punishment. The only reference in plaintiff's complaint to a specific condition which, he contends, was tantamount to cruel and unusual punishment, concerns defendant Zagby's directive that he perform three hours of work requiring him to remain on his feet despite the pain which he was experiencing in his ankles and feet. *See* Complaint (Dkt. No. 1) ¶ 36. Such a modest allegation is insufficient to support a claim of cruel and unusual punishment. *Compare Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) (finding that prisoner's allegations that he had been exposed to freezing and sub-zero temperatures in his cellblock during the winter months, and was exposed to unsanitary conditions including mice, human feces, urine, and sewage water, were sufficient to support his claim of cruel and unusual punishment).

Given plaintiff's failure to allege facts to support a plausible claim of cruel and unusual punishment, I recommend dismissal of this cause of action as well, again with leave to replead.

### E. *Conspiracy*

In his complaint, plaintiff includes bald allegations of "conspiracy" against defendants McDaniels, Joslyn, Morgan, Procopio, Johnson and Zagby. Complaint (Dkt. No. 1) ¶¶ 87–89, 91–93. Aside from identifying the participants in the conspiracy, however, plaintiff makes no further assertions in support of the claim, and specifically fails to allege any facts which would reflect a meeting of the minds, or details regarding its objective.

To sustain a conspiracy claim under § 42 U.S.C.1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983).

When measured against this standard, it is readily apparent that plaintiff's conspiracy claims are sufficiently lacking in detail as to warrant dismissal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999). Accordingly, I also recommend that the portion of defendants' motion addressing plaintiff's conspiracy claims be granted, with leave to replead. [6]

### F. *Retaliation*

**\*9** Embedded within plaintiff's complaint is a cause of action against defendant McDaniels for retaliation. Complaint (Dkt. No. 1) ¶ 87. The complaint also intimates that plaintiff claims to have experienced retaliation on the part of defendant Brodt, based upon her issuance of the April 13, 2006 misbehavior report, although the summary portion of his complaint outlining the causes of action plaintiff, while referring to that defendant's "falsifying disciplinary records", does not specifically reference the term retaliation. *See* Complaint (Dkt. No. 1) ¶¶ 45, 90. In their motion defendants maintain that such a retaliation claim, which is particularly prone to abuse by prison inmates, does not lie against defendant McDaniels, given the allegations set forth in plaintiff's complaint, but do not address the potential retaliation cause of action stated against defendant Brodt.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1

(2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** A careful review of plaintiff's complaint fails to review any specifics regarding the retaliation claim, which is set forth in wholly conclusory fashion against defendant McDaniels. While there are several references in plaintiff's complaint to the filing of grievances, Williams does not identify which among them, if any, represent the protected activity that purportedly triggered retaliatory measures taken against him. Similarly, plaintiff's complaint does not disclose what adverse action was taken which, he maintains, is attributable to his protected activity, nor does he provide any specifics regarding the nexus between the two. Under the circumstances, plaintiff's claim of retaliation against defendant McDaniels is impermissibly vague and does not disclose the existence of a plausible cause of action for retaliation. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). I therefore recommend dismissal of this claim as well, again with leave to replead. *See Flaherty,* 713 F.2d at 13.

The same cannot be said with respect to plaintiff's potential retaliation claim against defendant Brodt. In his complaint, plaintiff alleges that in response to the filing of a grievance, defendant Brodt authored a misbehavior report charging Williams with four prison rule violations. Complaint (Dkt. No. 1) ¶¶ 44–46. While the factual reiterations in plaintiff's

complaint do not pointedly assert that the misbehavior report was false, his contention to that effect can reasonably be inferred from his statement in the claims portion of the complaint accusing Nurse Brodt of "falsifying disciplinary reports." *Id.* ¶ 90. Since the filing of a false misbehavior report in retaliation for engaging in protected activity could represent unlawful retaliation in violation of the First Amendment, plaintiff's complaint states a plausible cause of action for retaliation as against defendant Brodt. *Franco,* 854 F.2d at 589. I therefore recommend against dismissal of that claim.

G. *Plaintiff's Privacy Claim*
In a similarly summary fashion, plaintiff alleges that defendants McDaniels and Procopio abridged his right to privacy, including under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Pub.L. 104–191, 110 Stat.1936. Complaint (Dkt. No. 1) ¶¶ 87, 91. Though this is far from clear, it appears that at least with regard to defendant Procopio, the claim relates to her having informed other corrections workers and inmates of plaintiff's psychiatric condition and treatment.[7] *Id.* ¶ 49.

1. *Right of Privacy Generally*
In *Doe v. City of New York,* the Second Circuit recognized a right of privacy enshrouding information to the effect that a person has been infected with the human immunodeficiency virus ("HIV"). 15 F.3d 264, 267 (2d Cir.1994). In recognition of the inherently private nature of certain conditions, including HIV positive status, and the attendant risk of embarrassment and ridicule for a person whose intimately private condition becomes known, the court in *Doe* "constitutionalized" a right of privacy with respect to such information under the umbrella of the due process clause of the Fourteenth Amendment. *Id.; see Powell v. Shriver,* 175 F.3d 107, 112 (2d Cir.1999).

**\*11** While prison inmates are divested of many significant constitutional rights as a result of their status, the limited right of privacy recognized in *Doe* has been extended to cover medical information regarding prison inmates, and in particular that which discloses certain types of medical conditions. *See Powell,* 175 F.3d at 112–13 (citing *Doe* ). Under the protections afforded by this limited right, "a prisoner's interest in keeping a medical condition private varies with the condition." *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (W.D.N.Y.2003) (citing *Powell,* 175 F.3d at 111). This narrow constitutional right applies in the case of an

unusual medical condition which, if disclosed unnecessarily, would likely expose an inmate to ridicule, discrimination, or even potentially violence, particularly when the word of the condition is likely to spread through "humor or gossip[.]" *Powell,* 175 F.3d at 112; *Rodriguez,* 287 F.Supp.2d at 220; *see also Leon v. Johnson,* 96 F.Supp.2d 244, 252 (W.D.N.Y.2000). Conditions found sufficient to have triggered this qualified right of privacy include HIV positive status, as well as transexualism. *Powell,* 175 F.3d at 112–13 (transexualism); *Doe,* 15 F.3d at 266–67 (HIV positive).

*Powell* and the relative few cases in this circuit which have addressed the issue of disclosure of a prison inmate's medical information disclose the relatively narrow confines of the cause of action of which plaintiff now seeks to avail himself. The cases in which the unauthorized disclosure of prison medical information has been found to give rise to liability involve inmates with unknown conditions which, if publicized, would subject the inmate to harassment, shame or ridicule. *Powell,* 175 F.3d at 112–13; *contrast Rodriguez,* 287 F.Supp.2d at 220–21; *Leon,* 96 F.Supp.2d at 252. Those cases also reveal that the liability inquiry is informed by whether legitimate penological interests are at stake when the disclosure is made. *See Powell,* 175 F.3d at 112–13; *Rodriguez,* 287 F.Supp.2d at 220–21; *Leon,* 96 F.Supp.2d at 252. Thus, for example, the disclosure by prison officials of an inmate's medical information to law enforcement for purposes of an ongoing investigation does not give rise to liability. *Webb v. Goldstein,* 117 F.Supp.2d 289, 298–99 (E.D.N.Y.2000); *contrast Powell,* 175 F.3d at 112 ("[G]ratuitous disclosure of an inmate's confidential medical information as humor or gossip ... is *not* reasonably related to a legitimate penological interest, and it therefore violates the inmates constitutional right to privacy.") (emphasis in original; footnote omitted).

In this instance plaintiff's complaint, even under the most generous construction, fails to allege the existence of any condition of such a magnitude or nature as to place it on par with HIV positive status or transexualism which was disclosed indiscriminately to non-medical personnel. Under the circumstances, plaintiff's right to privacy claims under the due process clause of the Fourteenth Amendment are subject to dismissal.

**2. HIPAA**

**\*12** The HIPAA was enacted by Congress in order to protect against unwarranted disclosure of health records and information, authorizing the Secretary of Health and Human Services "to make final regulations concerning the privacy of individually identifiable health information." *Barnes v. Glennon,* No. 05–CV–0153, 2006 WL 2811821, at \*5 (Sept. 28, 2006) (citing and quoting *Nat'l Abortion Fed'n v. Ashcroft,* No. 03 Civ. 8695, 2004 WL 555701, at \*2 (S.D.N.Y. Mar. 19, 2004) and 42 U.S.C. §§ 1320d through 1320d–8). Courts which have addressed claims similar to those now raised have determined that in light of the availability of monetary and criminal penalties to be assessed by the Secretary of Health and Human Services or the State, *see* 42 U.S.C. § 1320d–6(b), the statute does not confer an independent private right of action. *See Barnes,* 2006 WL 2811821, at \*5– 6; *Cassidy v. Nicolo,* No. 03–CV–6603, 2005 WL 3334523, at \*5–6 (W.D.N.Y. Dec.7, 2005); *see also Pecou v. Forensic Committee Personnel,* No. 06–CV–3714, 2007 WL 1490450, at \*2 (E.D.N.Y. Jan. 5, 2007).

Under the circumstances presented, plaintiff has failed to demonstrate the existence of a private right of action under HIPAA. Similarly, plaintiff does not allege the disclosure of such inherently private and potentially embarrassing information as was involved in *Doe* and its progeny sufficient to invoke substantive due process protections. I therefore recommend dismissal of plaintiff's right to privacy and HIPAA claims.

**H.** *Plaintiff's ADA and Rehabilitation Act Claims*

In their motion, defendants also seek dismissal of plaintiff's claims under the ADA and section 504 of the Rehabilitation Act. In support of this portion of their motion, defendants assert that no claim for liability against an individual defendant lies under either provision.

In 1990 Congress enacted the ADA pursuant to the Commerce Clause of the United States Constitution, as well as under section five of the Fourteenth Amendment. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 108 (2d Cir.2001); *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1006 (8th Cir.1999) (en banc) (citing 42 U.S.C. § 12101(b) (4)); *see also Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998). Title II of the Act prohibits exclusion of a qualified individual with a disability "from participation in or [denial of the] benefits of the services, programs, or activities of a public entity, of from discrimination by any such entity", and extends its coverage to prisons operated by the states. *Yeskey,* 524 U.S. at 209–210, 118 S.Ct. at 1955 (citing 42 U.S.C. § 12132). The rights afforded to disabled individuals under Title II of the Act apply to some degree, and subject to legitimate countervailing

penological concerns, to prison inmates. *Yeskey,* 524 U.S. at 210, 118 S.Ct. at 1955.

In this instance plaintiff has asserted damage claims against the various defendants, including those named in his ADA and Rehabilitation Act claims, apparently in their capacities as individuals. Neither the ADA nor section 504 of the Rehabilitation Act, however, provides for individual capacity suits against state officials. *Garcia,* 280 F.3d at 107; *Alsbrook,* 184 F.3d at 1005 n. 8; *Shariff v. Coombe,* No. 96 Civ. 3001, 2002 WL 1392164, at *2 (S.D.N.Y. June 26, 2002). I therefore recommend that plaintiff's ADA and Rehabilitation Act claims be dismissed.

### I. *Negligence*

**\*13** The remainder of plaintiff's claims in this action are couched in such terms as negligence in hiring and supervision, breach of fiduciary duty, and *respondeat superior.* It is well-established, however, that such claims are not cognizable under section 1983. *Champion v. Artuz,* 76 F.3d 483, 487 (2d Cir.1996) (noting that *respondeat superior* claim is not cognizable under section 1983); *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ( "Proof of mere negligence will not give rise to a constitutional violation."); *Edmond v. Babcock,* No. 91–3091–S, 1991 WL 49671, at *1 (D.Kan. Mar.28, 1991) (indicating that plaintiff's claims for breach of contract and fiduciary duties were not cognizable under section 1983). Accordingly, defendants are entitled to judgment on the pleadings dismissing those claims as well.

### J. *Qualified Immunity*

In their motion, defendants advance qualified immunity as an alternative basis for dismissal of plaintiff's claims. Because I have recommended that one of plaintiff's claims survives the pending motion on the merits, I will address this additional argument.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999)

(citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id .; Gilles v. Repicky,* 511 F.3d 239, 243–44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

**\*14** The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be

regarded as compulsory. *Pearson v. Callahan,* 555 U.S. ––––, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, at *9 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at *10. The inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by *Saucier* may serve to defeat this goal by requiring the parties "to endure additional burdens of suit—such as the cost of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted).

As a result of its reflection on the matter, the *Pearson* Court concluded that because the judges of the district courts and courts of appeals "are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at *9.

Since I have already concluded that plaintiff's complaint does not state plausible constitutional claims, with the exception of a retaliation cause of action alleged against defendant Brodt, it is unnecessary to continue further with the qualified immunity analysis with regard to those claims. Turning to the retaliation cause of action I note, having already found that a plausible constitutional violation has been alleged, that the First Amendment right in issue to be free from retaliation, in return for having engaged in protected activity, was clearly established at the time of the alleged violation in April of 2006. *Rivera v. Senkowski,* 62 F.3d 80, 85 (2d Cir.1995) (citing *Franco,* 854 F.2d at 589–90). From the limited record now before the court, I discern no basis to conclude that defendant Brodt would have been reasonable in her belief that the issuance of an allegedly false misbehavior report, in retaliation for Williams having engaged in protected activity in the form of filing grievances, did not violate plaintiff's First Amendment rights. Accordingly, I recommend a finding that

defendant Brodt is not entitled to qualified immunity from suit. *See id.* at 85–86.

## IV. *SUMMARY AND RECOMMENDATION*

**\*15** Plaintiff's complaint, the substance of which defendants now challenge as failing to set forth a plausible constitutional or federal statutory claim, recites various offending conduct in largely conclusory fashion, and asserts a broad array of claims against the several defendants named. Plaintiff's primary claim, which relates to the alleged failure of the defendants to accommodate his medical needs, is legally deficient in that he has failed to allege the plausible existence of a sufficiently serious medical condition of constitutional proportions. With the exception of a retaliation cause of action against defendant Brodt, which I find has been sufficiently alleged, the balance of plaintiff's claims are deficient on a variety of grounds, including the fact that there is no private right of action under the ADA, section 504 of the Rehabilitation Act, and the HIPAA, several of the provisions cited by the plaintiff as forming a basis for his claims, and further in light of the fact that no claims lie under section 1983 for negligence, breach of fiduciary duty, or under a *respondeat superior* theory. Based upon these deficiencies, I recommend that all of plaintiff's claims with the exception of his retaliation claim against defendant Brodt be dismissed, though with leave to replead in deference to his *pro se* status. Based upon the foregoing it is hereby respectfully

RECOMMENDED, that defendants' motion for judgment on the pleadings (Dkt. No. 63) be GRANTED, in part, and that all of the claims set forth in plaintiff's complaint (Dkt. No. 1), with the exception of plaintiff's retaliation cause of action against defendant Brodt, be DISMISSED, with leave to replead,

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1652193

Footnotes

1    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. *544,* 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Portions of the background description which follow have been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

2    There is no indication from the record now before the court as to whether, and if so when, plaintiff received either his specially ordered boots or custom orthotics fitted to his size 14EE boots.

3    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N .D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams and counseling, and can have cell study, books and periodicals, *Id.* The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.*

4    Also originally named as defendants in plaintiff's complaint were the Mid–State Correctional Facility and the Central New York Psychiatric Center. Dkt. No. 1 ¶¶ 3–4. Those entities, however, were dismissed from the case by order issued by the court, *sua sponte,* on August 5, 2006. Dkt. No. 8.

5    Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rule 12(d) further mandates that:

   [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

   Fed.R.Civ.P. 12(d).

6    Even had the plaintiff properly alleged a plausible claim of conspiracy, under the circumstances now presented it would In all likelihood be precluded by the intra-agency conspiracy doctrine. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y.2002); *Griffin–Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10–11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.); *see also Little v. City of New York,* 487 F.Supp.2d 426, 441–442 (S.D.N.Y.2007).

7    Plaintiff's privacy claim against defendant McDaniels appears to be derivative of his claim against defendant Procopio, and based upon the contention that by virtue of his position as Assistant Deputy Superintendent for the programs, defendant McDaniels "had constructive knowledge" regarding defendant Procopio's behavior. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 53.

End of Document                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.